UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | Case No: 21-CR-161 RBW |
| : | |
| DUSTIN THOMPSON, : | |
| : | |
| Defendant. : | |

**UNITED STATES' RESPONSE TO DEFENDANT DUSTIN THOMPSON'S BRIEF IN SUPPORT OF TESTIMONY OF DONALD J. TRUMP, ET AL.**

Defendant Dustin Thompson contends that he can call several witnesses, including the former President, to support two affirmative defenses or to cast doubt on the government's proof of his intent. But Thompson cannot avail himself of the entrapment-by-estoppel or public-authority defenses he invokes. And to the extent the witnesses' statements on January 6, 2021, are marginally relevant to proof of his intent, Rule 403 of the Federal Rules of Evidence precludes Thompson from attempting to elicit those statements through live testimony—which is subject to the vagaries of the witnesses' memories—because video that perfectly captures the statements (and their tone, delivery, and context) is publicly available.

This is not the first time courts in this district have heard the defense that high-ranking government officials authorized criminal misconduct. Thirty years ago, the D.C. Circuit considered an asserted defense not unlike that made by Thompson. In the wake of the Iran-Contra scandal, Oliver North faced criminal prosecution for conduct that North said he had been directed to engage in by the National Security Advisor to President Reagan, allegedly with the President's acquiescence or approval. North was a high-ranking government official indisputably working on behalf of the Administration; his superior, the National Security Advisor, had not only condoned but engaged in similar misconduct; and his superior reported

directly to the President. North subpoenaed the then-former President to be a witness at his trial. North also requested that the trial court use this jury instruction at his trial: "If you find that . . . North acted in good faith on a superior's apparent authorization of his action, and that his reliance was reasonable based on the facts as he perceived them, that is a complete defense . . . ." *United States v. North*, 910 F.2d 843, 879 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990).

The D.C. Circuit flatly rejected North's claim that he could raise a good-faith defense based on the apparent or implied authorization by his superiors in the Executive Branch:

> North's suggested instruction, quoted above, goes so far as to conjure up the notion of a "Nuremberg" defense, a notion from which our criminal justice system, one based on individual accountability and responsibility, has historically recoiled. In the absence of clear and comprehensible Circuit authority that we must do so, we refuse to hold that following orders, without more, can transform an illegal act into a legal one.

*Id.* at 881. The Court similarly concluded that whether North "was following President Reagan's orders" was "immaterial" to whether North intended to "corruptly" obstruct Congress under 18 U.S.C. § 1505. *Id.* at 884. In so doing, the Court rejected North's "stunning" idea that he could "escape the criminal consequences of his otherwise unlawful acts merely by asserting that his reason for committing the acts was that he was 'following orders.'" *Id.* at 883-84.

Thompson's claim of public authorization is weaker than North's unsuccessful claim in virtually every respect. He has no personal connection to any of the witnesses he seeks to subpoena. He is not—nor ever has been—a government official, let alone a government official engaged in high-level national security work. Instead, he is a member of the public who claims that he went to a rally and heard (1) former President Trump say in a speech that "we're going to walk down—and I'll be there with you," and "if you don't fight like hell, you're not going to have a country anymore," and (2) heard Rudolph Giuliani, a private citizen, "encourage them to

engage in 'trial by combat.'" Dkt. 53 at 3. Based on that, Thompson contends that he is entitled to testimony from former President Trump, Mr. Giuliani, and other witnesses so that he can argue that his ensuing criminal conduct, including entering restricted Capitol grounds, stealing from and ransacking the Senate Parliamentarian's office, and obstructing Congress's certification of the Electoral College vote, was authorized and immune from prosecution.

This Court should reject Thompson's attempt to deflect responsibility. The two narrow affirmative defenses Thompson invokes—entrapment by estoppel and public authority—have no application here, and he should be precluded from raising them at trial. With respect to entrapment by estoppel, Thompson cannot show that former President Trump or Mr. Giuliani advised him that the criminal statutes he is alleged to have violated did not apply to his conduct. As to public authority, Thompson cannot show that former President Trump or Mr. Giuliani had the authority to empower Thompson to engage in criminal conduct on January 6, 2021. And with respect to neither defense can Thompson show that it was objectively reasonable for him to rely on the statements of former President Trump or Mr. Giuliani as invitations to commit consequence-free criminal acts.

Thompson also claims that these witnesses' testimony would undermine the government's proof as to his intent. But most of what Thompson appears to want to elicit through these witnesses would have no bearing at all on his state of mind. He apparently seeks testimony from these witnesses about what he alleges was a behind-the-scenes, "concerted effort to deceive the public." Dkt. 53 at 3. The issues Thompson raises are, while weighty, ultimately irrelevant at his criminal trial. All that matters in this trial is *Thompson*'s intent. And all that could possibly bear on Thompson's intent would be statements that Thompson heard or actions that Thompson knew of—with foundation having been laid that he heard or knew of them. Given that, Thompson's request to have former President Trump and others testify makes little sense.

3

Based on what he has thus far alleged, these witnesses' testimony would be limited to reciting (or attempting to recall) statements from January 6 that were public and recorded on video. Because there is video evidence of any relevant statements, Federal Rule of Evidence 403 precludes Thompson from calling witnesses to testify about those statements. The video evidence stands by itself: the witnesses are very unlikely to recall their January 6 statements with the accuracy of the video evidence, or to recreate the demeanor, tone, and gestures they used while delivering those statements, and it is unnecessary for them to try. Thus, this Court should preclude Thompson from calling these witnesses to testify with respect to his intent, unless Thompson identifies a way in which their testimony, as opposed to their prior statements, would be relevant and admissible under Rule 403.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

On January 4, 2021, Thompson texted his co-defendant Robert Lyon: "Leaving for dc in the morning this is your notice soldier." The next day, the pair drove from Ohio to the Washington, D.C. suburbs. On the morning of January 6, 2021, they traveled to the U.S. Capitol Building in the early afternoon and entered the Capitol grounds. Thompson was wearing a bulletproof vest.

After crowds breached the law enforcement lines that day, Thompson entered the Capitol building and walked into the Senate Parliamentarian's office. While he was inside, other rioters were looting it. Thompson took a celebratory video and left with two stolen bottles of liquor. Thompson re-entered the office, this time with his co-defendant Robert Lyon, five minutes later. This time, Thompson stole a coat rack.

Lyon went to the Lower West Terrace of the Capitol building, but Thompson made his way to the North Doors. He texted Lyon that he was "[g]oing inside." When Lyon responded that a "girl died already," presumably referring to Ashli Babbitt, Thompson replied: "Was it

Pelosi." Later that afternoon, he texted Lyon that he was "taking our country back."

At approximately 6 p.m. on January 6, 2021, two U.S. Capitol Police Special Agents approached Thompson and Lyon while the two of them were sitting on the sidewalk at the northwest corner of South Capitol Street and C Street, SW. Thompson still had the stolen coat rack. The Special Agents told them to leave. Thompson picked up the coat rack to go, at which point the Special Agents instructed Thompson to drop the coat rack. Thompson did so, but then ran away on foot. The Special Agents were unable to locate Thompson that day, but later identified him.

Based on this conduct, Thompson and Lyon are charged with Obstruction of an Official Proceeding under 18 U.S.C. § 1512(c)(2) and (2) (Count One); Theft of Government Property under 18 U.S.C. § 641 (Count Two); Entering and Remaining in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(1) (Count Three); Disorderly and Disruptive Conduct in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(2) (Count Four); Disorderly Conduct in a Capitol Building under 40 U.S.C. § 5104(e)(2)(D) (Count Five); and Parading, Demonstrating, or Picketing in a Capitol Building under 40 U.S.C. § 5104(e)(2)(G) (Count Six).

In early January 2022, Thompson filed a motion seeking to have the U.S. Marshals Service serve subpoenas on former President Trump and others in the former President's "inner circle," including Mr. Giuliani, Stephen Bannon, John Eastman, Stephen Miller, L. Lin Wood, and Sidney Powell. *See* Dkt. 44 at 2. This Court denied that motion on January 27, 2022, given that Thompson can instead pay to have witnesses served. Dkt. 51. It also directed Thompson to explain why these witnesses' testimony would be relevant, such that subpoenas for their testimony should issue. *Id.*

**II.     ARGUMENT**

Thompson's filing invokes three ways in which he asserts these witnesses' testimony would be relevant. The first two rely on affirmative defenses, public authority or entrapment by estoppel. Dkt. 53 at 3. Thompson's reliance on these two affirmative defenses is misplaced. As a matter of law, neither defense could apply on these facts, and so he can raise neither at trial. The entrapment-by-estoppel defense applies only if the defendant was "actively misled . . . about the state of the law defining the offense," and relied on that misleading advice. *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018). No such advice was given to Thompson on or before January 6. The public-authority defense, meanwhile, applies only to a "defendant who knows the conduct he has been authorized to commit is illegal," but believes he is acting as an agent of a government official who possessed actual authority to order his conduct. *United States v. Alvarado*, 808 F.3d 474, 485 (11th Cir. 2015). Here, no executive official had actual authority to ask Thompson to trash or steal from the Senate Parliamentarian's office or obstruct Congress. Both defenses also require that the defendant's reliance or belief be *reasonable*. Even if Thompson believed that former President Trump authorized him to engage in illegal conduct, or that the statutes he is now charged with had been interpreted to permit his conduct, neither belief would be reasonable.

The Court should therefore preclude the defenses in advance of trial. "In a variety of procedural contexts, the vast majority of cases have held, as a matter of law, that the defense was unavailable on the facts of the case." *United States v. Conley*, 859 F. Supp. 909, 926 (W.D. Pa. 1994). Accordingly, courts have routinely rejected either jury instructions or requests to put on evidence by defendants whose proffered evidence fails, as a matter of law, to meet the defenses' requirements. *E.g.*, *United States v. Nichols*, 21 F.3d 1016, 1018 (10th Cir. 1994)

(affirming denial of motion to appoint psychological expert to testify in support of entrapment-by-estoppel defense); *United States v. Weitzenhoff*, 35 F.3d 1275, 1290 (9th Cir. 1993) (upholding refusal to instruct jury on entrapment-by-estoppel defense); *United States v. Brebner*, 951 F.2d 1017, 1024-27 (9th Cir. 1991) (affirming exclusion of evidence purporting to raise the defense as immaterial as a matter of law); *United States v. Etheridge*, 932 F.2d 318, 320-21 (4th Cir. 1991) (order granting motion in limine precluding evidence upheld).

Thompson also contends the witnesses' testimony would be relevant to his "honest[] belie[f]" that he was "performing the otherwise criminal acts in cooperation with the government," which could "undermine the government's burden of proof relative to criminal intent." Dkt. 53 at 3. But most of what Thompson seeks to introduce—conversations or conduct to which Thompson was not privy—could not possibly have influenced his intent. Only those remarks from these witnesses that Thompson heard on or before January 6, 2021 would be relevant to Thompson's intent that day. Video footage of those remarks exists and fully captures the tone, gestures, and statements made by the witnesses that day. The witnesses' live testimony reciting the same could not add anything of relevance and is likely to be inaccurate and to confuse the issues.

**A.    No Executive official could empower Thompson, explicitly or implicitly, to commit the criminal conduct he engaged in on January 6.**

As an initial matter, former President Trump did not have the authority to permit or authorize the criminal conduct engaged in by Thompson—theft of government property, unlawful entry and disorderly conduct, and obstruction of Congress—on January 6. As Chief Judge Howell wrote last year in rejecting the idea of an entrapment-by-estoppel defense for January 6 defendants:

> [A President] cannot, in keeping with his constitutional function and his responsibilities under Article II, lawfully permit actions that directly undermine

7

> the Constitution. Thus, a President cannot, within the confines of his constitutional authority, prevent the constitutionally mandated certification of the results of a Presidential Election or encourage others to do so on his behalf, nor can he direct an assault on the coequal Legislative branch of government. Were a President to attempt to condone such conduct, he would act *ultra vires* and thus without the force of his constitutional authority. . . . Put simply, even if former President Trump in fact [explicitly directed the rioters' actions,] his statements would not immunize defendants charged with offenses arising from the January 6 assault on the Capitol from criminal liability.

*United States v. Chrestman*, 525 F. Supp. 3d 14, 32-33 (D.D.C. 2021).

The D.C. Circuit came to the same conclusion in *North*, when addressing Oliver North's contention that President Reagan authorized his obstruction of Congress in that case. The court made clear that "'[n]either the President nor any of [North's] superiors had the legal authority to order anyone to violate the law,' particularly if such 'orders,' explicit or implicit, represented nothing more than [the President's] desires." *North*, 910 F.2d at 891 n.24. Fifteen years earlier, the D.C. Circuit did not even entertain the idea that the President can lawfully authorize an individual to obstruct justice or Congress when it would have most obviously applied. Three former high-ranking officials in the Nixon Administration were convicted of obstruction of justice, conspiracy, and perjury in connection with the Watergate scandal. *See United States v. Haldeman*, 559 F.2d 31, 51 (D.C. Cir. 1976). President Nixon had spoken directly and privately with several of the defendants and directed or at least acquiesced in much of their illegal conduct. *See id.* at 57-59. Yet neither the district court nor the D.C. Circuit apparently contemplated that Nixon's involvement in the Watergate cover-up could somehow immunize the participants from later prosecution. *Id.* at 84-88; *United States v. Mitchell*, 385 F. Supp. 1190 (D.D.C. 1974) (district court opinion). Indeed, the district court (later affirmed on appeal) thought so little of Nixon's importance to his subordinates' trial that it denied a continuance that would have allowed Nixon to testify, on the ground that his testimony was largely immaterial

or cumulative to the defendants' case. *Mitchell*, 385 F. Supp. at 1192-93.

Thus, even if former President Trump explicitly called for Thompson to engage in the charged criminal conduct, that could not underlie an entrapment-by-estoppel or public-authority defense.

> **B.    There is no available entrapment-by-estoppel defense, because Thompson cannot point to an interpretation of the statutes he is charged with violating on which he reasonably relied.**

Courts have narrowly confined the entrapment-by-estoppel defense. The Supreme Court first adopted a due process defense to entrapment by public officials in *Raley v. Ohio*, 360 U.S. 423 (1959). In *Raley*, the Supreme Court set aside the convictions of three individuals who refused to answer the questions of the Ohio Un-American Activities Commission, in reliance on inaccurate representations by the Commission "that they had a right to rely on the privilege against self-incrimination" under the Ohio Constitution. 360 U.S. at 425. The Court held that the convictions violated the Fourteenth Amendment's Due Process Clause because they involved "the most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him." *Id.* at 438. The Court emphasized that the Commission's advice constituted "active misleading" as to the contours of that "vague and undefined" area of law. *Id.*

A few years later, the Court revisited the subject in *Cox v. Louisiana*, 379 U.S. 559 (1965). *Cox* reversed the conviction of a protester who had led a group of 2,000 in a civil rights march across the street from a courthouse and was later prosecuted for violating an anti-picketing statute prohibiting demonstrations "near" a courthouse. 379 U.S. at 560, 564-65. The statute did not define that term. *Id.* at 560. The protesters had been "affirmatively told" by "the highest police officials of the city, in the presence of the Sheriff and Mayor," that protesting across the street from the courthouse was lawful under that statute. *Id.* at 571. The Court

9

determined that the statute's ambiguous term "near" necessarily "foresees a degree of on-the-spot administrative interpretation by officials charged with responsibility for administering and enforcing it," and thus found that the demonstrators "would justifiably tend to rely on [the police's] administrative interpretation of how 'near' the courthouse a particular demonstration might take place." *Id.* at 568-69. The Court concluded that the local officials' interpretation of "near" was a "limited administrative regulation of traffic" that the protesters reasonably relied on. *Id.* at 569. But it also made clear that a defendant cannot reasonably rely on a law enforcement official's attempt to provide "a waiver of law," which the Court described as "beyond the power of the police." *Id.*

Distilling these cases, recent case law has limited the entrapment-by-estoppel defense to the narrow circumstances in which a defendant reasonably relies on an interpretation of a statute that, if accurate, would render the defendant's conduct non-criminal. "To win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation." *Cox*, 906 F.3d at 1191; *United States v. Burrows*, 36 F.3d 875, 882 (9th Cir. 1994) ("This defense applies when [1] a government official [2] tells a defendant that certain conduct is legal and the defendant commits what would otherwise be a crime [3] in reasonable reliance on the official's representation." (quoting *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994)); *United States v. Neville*, 82 F.3d 750, 761 (7th Cir. 1996)

("[W]e have required that [1] the government official "actively mislead the defendant; and that the defendant's reliance be [2] actual and [3] reasonable in light of the identity of the agent, the point of law represented, and the substance of the misrepresentation."). Last year, Chief Judge Howell adopted the Tenth Circuit's four-part test in preliminarily rejecting a Capitol riot defendant's claim to a defense similar to Thompson's. *See Chrestman*, 525 F. Supp. 3d at 33 (adopting *Cox*'s four-part test for entrapment-by-estoppel defense).

Thompson cannot make out an entrapment-by-estoppel defense. No official provided an interpretation of the law covering Thompson's alleged criminal conduct, thereby assuring Thompson that his conduct was legal. Moreover, assuming Thompson relied on former President Trump's or Mr. Giuliani's words to commit theft and obstruction of Congress, that reliance was objectively unreasonable.

> **1.    Thompson identifies no witness who "actively misled" him by interpreting a law in a manner indicating that his criminal conduct was non-criminal.**

In his speech on January 6, 2021, former President Trump did not purport to interpret the scope of the statutes Thompson is charged with violating. Said another way, former President Trump did not "affirmatively assure[] the defendant that certain conduct [was] legal." *United States v. Howell*, 37 F.3d 1197, 1204 (7th Cir. 1994); *United States v. Troncoso*, 23 F.3d 612, 615 (1st Cir. 1994) (defense fails absent advice from official that conduct "was actually legal").

Former president Trump did not state that the U.S. Capitol grounds were no longer "restricted" under 18 U.S.C. § 1752(a); nor that it would not constitute obstruction to enter the Capitol building under 18 U.S.C. § 1512; nor that property inside the Capitol building was not government property, and so could be stolen notwithstanding 18 U.S.C. § 641. Former President Trump did not purport to reinterpret a specific criminal statute to render Mr. Thompson's

11

conduct non-criminal. He therefore did not "actively mis[lead]" Thompson "about the state of the law defining the offense." *Cox*, 906 F.3d at 1191. Thompson has not identified anyone else who might have authority to do so who did so either. While Thompson refers to a comment made by Mr. Giuliani—seeking "trial by combat"—that comment did not purport to reinterpret any law, and was made by a private lawyer, not a government official empowered to reinterpret the law. As Chief Judge Howell observed last year, an entrapment-by-estoppel defense by a January 6 rioter:

> would not be premised, as it was in *Raley* [and] *Cox*, . . . on a defendant's confusion about the state of the law and a government official's clarifying, if inaccurate, representations. It would instead rely on the premise that a defendant, though aware that his intended conduct was illegal, acted under the belief President Trump had waived the entire corpus of criminal law as it applied to the mob.

*Chrestman*, 525 F. Supp. 3d at 32; *see also North*, 910 F.2d 843 (noting that "North does not even claim that he relied on *any* 'conclusion or statement of *law*'"); *United States v. Smith*, 940 F.2d 710, 715 (1st Cir. 1991) (rejecting entrapment-by-estoppel defense because federal agent allegedly encouraged defendant to keep firearms to assist with undercover operation, but never was alleged "to have represented that keeping the guns was, in fact, *legal*").

### 2. Any reliance would not be objectively reasonable.

In any event, even if former President Trump's or Mr. Giuliani's statements could be construed as an unexpressed interpretation of the criminal laws applicable to Thompson's conduct, and even if he relied on that interpretation, Thompson cannot show that his reliance was reasonable. "[R]easonable reliance occurs" only "if 'a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.'" *United States v. Lynch*, 903 F.3d 1061, 1077 (9th Cir. 2018) (internal quotation marks omitted); *United States v. Corso*, 20 F.3d 521, 528 (2d Cir. 1994) (adopting

"sincerely desirous" standard).

After former President Trump's and Mr. Giuliani's remarks, Thompson entered the Senate Parliamentarian's office while it was being actively looted and stole a coat rack and two bottles of liquor. He later returned, joined a crowd that police officers attempted to disperse with pepper spray, and stood feet from the doors of the Capitol watching other rioters ram a bike rack into those doors.

Thompson could not have reasonably relied on statements by former President Trump and Mr. Giuliani—or, indeed, anyone—to conclude that that conduct was lawful. Thus, regardless of former President Trump's or Mr. Giuliani's intent or the foreseeability of Thompson's and other rioters' reactions to their statements, when Thompson stole a coat rack, walked around a looted office, and joined a group ramming bike racks into the doors of the Capitol, any reasonable person in his shoes would "[know] he was breaking the law." *Corso*, 20 F.3d at 529. Certainly, one "sincerely desirous of obeying the law" could not have accepted at face value any purported assurance that such conduct was lawful. *Lynch*, 903 F.3d at 1077-78. Thompson therefore cannot rely on the defense of entrapment by estoppel. That would be true even if former President Trump or Mr. Giuliani explicitly called for violence and mayhem: it is unreasonable, as a matter of law, for anyone to believe that a call for violence rendered their ensuing misconduct lawful.

### C. There is no available public-authority defense because former President Trump lacked actual authority to order Thompson's criminal conduct, and any reliance was unreasonable.

"The public authority defense allows 'the defendant [to] seek[ ] exoneration based on the fact that he reasonably relied" on the "actual authority of a government official to engage him in a covert activity.'" *United States v. Fulcher*, 250 F.3d 244, 253-54 (4th Cir. 2001); *see*

Fed. R. Crim. P. 12.3(a)(1).[1] "The difference between the entrapment by estoppel defense and the public authority defense is not great." *Burrows*, 36 F.3d at 882; *United States v. Baker*, 438 F.3d 749, 753 (7th Cir. 2006) ("The elements that comprise the two defenses are quite similar."). And here, Thompson's "public-authority" defense fails for two reasons already discussed above.

      First, "[t]he validity of" the public-authority "defense depends upon whether the government agent in fact had authority to empower the defendant to perform the acts in question. If the agent had no such power, then the defendant may not rest on the 'public authority' [defense]." *Burrows*, 36 F.3d at 881-82 (quoting *Baptista-Rodriguez*, 17 F.3d at 1368 n.18). The circuits that have considered the issue are unanimous on that point. *See, e.g.*, *United States v. Holmquist*, 36 F.3d 154, 161 nn. 6-7 (1st Cir. 1994) (characterizing as "nonexistent" and "not a defense at all" the "'defense' of apparent public authority" based "on a mistaken but good-faith belief that one's conduct is authorized by the government"); *United States v. Duggan*, 743 F.2d 59, 84 (2d Cir. 1984) (declining to adopt view that "a defendant may be exonerated on the basis of his reliance on an authority that is only apparent and not real"); *United States v. Pitt*, 193 F.3d 751, 758 (3d Cir. 1999), *abrogated on other grounds by Honeycutt v. United States*, 137 S. Ct. 1626 (2017); *Fulcher*, 250 F.3d at 254 ("we adopt the unanimous view of our sister circuits that the defense of public authority requires reasonable reliance upon the actual authority of a government official"); *United States v. Sariles*, 645 F.3d 315, 318-19 (5th Cir. 2011) ("the public authority defense requires the defendant reasonably to rely on . . . actual, not apparent, authority"); *cf. United States v. Sampol*, 636 F.2d 621 (D.C. Cir. 1980) (noting in dicta that defendants' claim that CIA officer had conspired with them to murder an ambassador "would

---

[1] "Rule 12.3 sets forth a notice requirement but does not limit or expand the public authority defense," which was defined by federal common law prior to that Rule's adoption. *See, e.g.*, *Burrows*, 36 F.3d at 881.

14

not have created a defense if appellants' participation in the crimes had been established," and therefore describing evidence of the officer's employment with the CIA as likely "immaterial").[2] As discussed above, the President lacks the authority to empower citizens to enter restricted Capitol grounds, to steal from congressional offices, or to obstruct congressional proceedings. *E.g.*, *North*, 910 F.2d at 891 n.24. The same goes for a President's personal attorney, or the other private citizens that Thompson seeks to subpoena.

Second, "a defendant makes out a defense of public authority only when he has shown that his reliance on governmental authority was reasonable as well as sincere." *Burrows*, 36 F.3d at 882; *Fulcher*, 250 F.3d at 254; *Sariles*, 645 F.3d at 318-19. This reasonableness requirement is necessary to ensure the "uniform enforcement of law"; otherwise, anyone could interpret a public official's actions or statements as authorizing them to engage in criminal conduct. *Id.* (quoting *United States v. Lansing*, 424 F.2d 225 (9th Cir. 1970)). Thompson's claim here appears to be that, because former President Trump made statements like "We fight like hell" and "if you don't fight like hell, you're not going to have a country anymore," Thompson believed he had been authorized as an agent of the Executive Branch to steal and loot from the

---

[2] In *United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976) (per curiam), the court reversed the convictions of two defendants who participated in the burglary of Daniel Ellsberg's psychiatrist's office. The defendants claimed they did so at the behest of E. Howard Hunt, a long-time CIA agent who worked under the supervision of John Ehrlichman in the White House. *North*, 910 F.2d at 879. The case featured fractured separate opinions from the three-judge panel. Judge Wilkey, half of the two-judge majority, wrote that a defendant's reasonable reliance on the "apparent authority" of a government official (there, Hunt) to authorize his conduct could make out a defense. *Id.* (quoting *Barker*, 546 F.2d at 949 (opinion of Wilkey, J.). But that portion of *Barker* was not the controlling rationale, and the panel majority in *North* subsequently rejected North's request for an instruction invoking his superiors' "apparent authorization of his action." *Id.* at 881. In any event, Judge Wilkey's application of reasonable reliance in *Barker*—where the defendants, each of whom had worked with the CIA, claimed that a government official (and previous CIA supervisor) authorized what they allegedly were told was a counter-espionage operation—has no analogue here.

15

Senate Parliamentarian's office and forcibly stop the congressional certification of the vote by breaking into the U.S. Capitol. If that was Thompson's belief, it was, as a matter of law, objectively unreasonable.

> **D.    This Court should preclude these witnesses from testifying as to Thompson's intent.**

Finally, Thompson is wrong that these witnesses' testimony is admissible because his "honest[] belie[f]" that he was "performing the otherwise criminal acts in cooperation with the government" could bear on his intent to commit the charged offenses. Dkt. 53 at 3. Although former President Trump's or Mr. Giuliani's January 6 statements could be relevant to intent for some of Thompson's pending charges, it does not follow that eliciting their *testimony* to establish those statements would be appropriate under Federal Rule of Evidence 403.

Even if Thompson's belief that his conduct was authorized might bear tangentially on his intent, only evidence relevant to that belief would be admissible. Obviously, only those statements or conduct of these witnesses of which Thompson was aware on January 6, 2021 could bear on his intent. *See, e.g.*, *United States v. George*, 786 F. Supp. 56, 64 (D.D.C. 1992) (agreeing that when "the defendant had not been able to establish (nor had even proffered) that the defendant *knew* what information others had," discovery into that information "was not material to the defense because it revealed nothing about the defendant's state of mind"). But Thompson does not allege that he knows these witnesses, or that he heard their statements or witnessed their conduct in a non-public setting. The only specific statements Thompson invokes are those made by former President Trump and Mr. Giuliani during speeches on January 6, 2021.[3] Thus, any potential testimony regarding an asserted behind-the-scenes, "concerted effort

---

[3] The government assumes, because there is no allegation to the contrary, that the remaining witnesses on Thompson's subpoena list would be called to testify regarding non-public statements and actions of which Thompson had no awareness. Those witnesses' testimony

16

to deceive the public," Dkt. 53 at 3, would be only an irrelevant sideshow in Thompson's trial.[4] Because his proposed behind-the-scenes evidence is inadmissible at his trial, Thompson would be limited to eliciting from these witnesses the public statements they made on January 6 that Thompson had established he had heard.

But that limited testimony would be not only unnecessary, but also confusing and inevitably inaccurate, and so would be inadmissible under Federal Rule of Evidence 403. A defendant is entitled to present his defense in the manner he sees fit, but that principle is subject to constitutional and evidentiary limits. One such limit is Rule 403, which prohibits the defendant from introducing evidence that risks "misleading the jury" or "confusing the issues." Fed. R. Evid. 403. Even in an ordinary criminal case, Rule 403 would typically prohibit a party from calling a witness merely to try to remember what was said a year ago, when video of exactly what was said is available, and particularly if the witness might struggle to accurately relate what previously occurred. That is for obvious reasons. Former President Trump's speech, for example, was over an hour long. It is certain that his testimony would not perfectly match the content of his recorded speech—unless he were simply asked to read it. Yet what is relevant is what Thompson actually heard on January 6, 2021, not the witnesses' recollection of what they said. Thus, any failures in the witness's memory would introduce inaccurate evidence before the jury. It is also certain that former President Trump or Mr. Giuliani, even if they were asked to recite what they previously stated, could not perfectly recreate on the stand the cadence, tone, facial expressions, or gestures that they displayed on January 6. And the jury might confuse

---

would therefore be irrelevant.

[4] Indeed, such behind-the-scenes evidence would be both immaterial and unfairly prejudicial. The jury could wrongly assume the evidence is somehow relevant to Thompson's guilt, since it was presented at trial. And the evidence could invite jurors to inappropriately weigh Thompson's culpability against the perceived culpability of others, risking nullification.

the witnesses' demeanor on the stand with their demeanor in their original statements when evaluating any effect those statements might have had on Thompson. *See, e.g.*, *Rainey v. Taylor*, 941 F.3d 243, 252 (7th Cir. 2019) (noting probative value of the "parties' body language" and "facial expressions" depicted on video). There is therefore significant risk that the jury would either hear statements different than those uttered on January 6 or receive an impression of those statements different from that left on January 6.

There is no increase in probative value from in-court testimony that would justify the risks. Even with a live witness present, Thompson would be unable to meaningfully delve into anything beyond the statements publicly captured on video; the video can be played for the jury if any statements within it are admissible. Thus, as this Court noted at the recent status conference, it would seem "the only potential benefit" Thompson might get "from having these individuals testify in person . . . is to bring them into [the] courtroom and maybe have the fact finder be outraged because they don't like them and somehow let your client off the hook because of their dislike for these individuals." Ex. A at 15 (Tr. of 1/26/22 Status Conf.). That, of course, would be "jury nullification," *id.*, and there is a material possibility of it here.

This Court should preclude Thompson from eliciting such narrowly confined testimony that would likely be confusing and inaccurate relative to the available video evidence and would provide no offsetting gain in probative value.

### III. CONCLUSION

For the foregoing reasons, the Court should preclude Thompson both from pursuing an entrapment-by-estoppel or public authority defense and from eliciting testimony from the subpoenaed witnesses. To the limited extent Thompson can articulate how evidence of what these witnesses said publicly is relevant and not misleading under Rule 403, and assuming he lays proper foundation at trial that he heard those statements, the government would not object

to admission of video evidence of those statements.

          Respectfully submitted,

          MATTHEW M. GRAVES
          United States Attorney
          D.C. Bar No. 481052

          */s/ William Dreher*
          WILLIAM DREHER
          D.C. Bar No. 1033828
          Assistant United States Attorney (Detailed)
          700 Stewart Street, Suite 5220
          Seattle, WA 98101
          (206) 553-4579
          william.dreher@usdoj.gov

          */s/ Jennifer M. Rozzoni*
          JENNIFER M. ROZZONI
          NM Bar No. 14703
          Assistant United States Attorney (Detailed)
          203 3rd Street, Suite 900
          Albuquerque, New Mexico 87102
          (505) 350-6818
          jennifer.m.rozzoni@usdoj.gov