# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00161 (RBW)** |
| **v.** | : | |
| | : | |
| **DUSTIN THOMPSON,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Dustin Thompson ("Thompson") to 70 months' incarceration, $2,000 in restitution, three years of supervised release, and the applicable $195.00 in special assessments. The government is not seeking the imposition of a fine in this case.

## I.     INTRODUCTION

On the afternoon of January 6, 2021, Dustin Thompson, wearing a bulletproof vest, entered the U.S. Capitol Building through a door that had been violently breached by rioters six minutes earlier.[1] Thompson looted the Senate Parliamentarian's office, stealing a bottle of bourbon, and then went outside to find his friend and co-defendant, Robert Lyon, to encourage him to participate in the riot. As he was leaving, Thompson saw officers directing him and other rioters to leave; he testified at trial that he knew the officers wanted him to leave.

---

[1] This Court is intimately familiar with Thompson's conduct that day, having presided over his trial in early April 2022.

But Thompson returned just a few minutes later, this time with Lyon in tow.  Again, he went into the Senate Parliamentarian's office.  While inside, he stole a coat rack, along with an announcer pager used by the U.S. Capitol Police to send emergency alerts throughout the building. At some point while inside, Thompson took a video of himself celebrating the riot, asking others: "This [Anthony] Wiener's laptop?  Find the laptop!"  Thompson also briefly picked up someone else's cellphone off of a staffer's desk.

Thompson and Lyon did not leave until U.S. Capitol Police and other law enforcement officers had nearly pushed the crowd out past the door to the Senate Parliamentarian's office.  And when they did leave, Thompson refused to disengage with the riot.

He first went to the North Doors, where he texted Lyon that he was intent on going back inside, even after Lyon texted Thompson that "some girl died already."  While at the North Doors, Thompson stood at the front of a crowd as rioters rammed stolen police bike racks—used earlier that day by the U.S. Capitol Police for crowd control—into the North Doors like a medieval battering ram.  As the trial testimony established, the few police officers crouched behind those doors were desperate.  Lacking other non-lethal crowd control measures, and facing an incredibly hostile crowd with unknown designs, the officers resorted to spraying the U.S. Capitol building's fire extinguishers at the advancing crowd in an effort to distract and dissuade them.  Thompson was not dissuaded.

Indeed, after remaining near the North Doors for nearly an hour, Thompson eventually moved to one of the few locations featuring even greater violence that day: the lower west terrace. There, Thompson watched as rioters threw heavy objects on officers' heads, beat officers viciously with baseball bats and sticks, and blinded officers with bright lights.  Thompson admitted at trial

2

that he knew what was happening in front of him was wrong. But he did not leave until reinforcement officers arrived and deployed tear gas to clear the terrace.

Only after officers made it impossible for Thompson and Lyon to remain on U.S. Capitol grounds did they depart. Thompson and Lyon attempted to bring their "trophy" home via Uber but were confronted by two U.S. Capitol Police Special Agents, who instructed Thompson to leave. Thompson attempted to take the coat rack with him—and when the officers asked him to stop for further questioning, he fled entirely, leaving his co-defendant (who did not flee) behind.

After being charged in this case, Thompson never accepted responsibility for his conduct prior to trial, even for the misdemeanor charges with which he was charged. Instead, Thompson insisted that he had engaged in his misconduct solely because he had attended the January 6, 2021 "Save America" rally and believed that former President Trump had authorized his illegal conduct. At trial, Thompson testified in his own defense. But Thompson's testimony, as this Court has already stated on the record, was false in parts and disingenuous in others, as explained below. Perhaps most incredibly, Thompson claimed that he had stolen the coat rack—and persisted in attempting to take the coat rack three hours later—to prevent it from being used as a weapon against other law enforcement officers. This Court should not countenance such false, self-serving testimony by a defendant.

Thompson's conduct, of course, cannot be viewed in a vacuum. It took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, halt the certification of the 2020 Electoral College vote count, and force the Vice President of the United States and Members of Congress to seek safety. The rioters injured more than one

hundred law enforcement officers and caused more than 2.7 million dollars in losses.[2]  Each rioter's conduct not only contributed to that outcome, but also encouraged and emboldened others around them to participate as well.  *See United States v. Mazzocco*, 21-cr-54-TSC, Tr. 10/4/2021 at 25 (D.D.C.) (Judge Chutkan: "A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.").

Still, Thompson's case is different than that of most other rioters.  As explained below, his guidelines range, with appropriate enhancements, is 70-87 months.  His theft of government property and presence during the ransacking of a sensitive office, wearing of body armor, flight from law enforcement, refusal to accept responsibility, and perjury during his criminal trial are all factors that are not present in most cases, and that warrant a sentence of 70 months' incarceration, the low end of the applicable guidelines.  All defendants convicted of a felony offense after a trial have to date been sentenced to either sentences within the guidelines range or, in the one exception, a sentence of 120 months, significantly higher than Thompson's.  No post-trial felony defendant has received a sentence lower than 60 months, as is detailed below.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Thompson among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that

---

[2] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.

### 1.  The January 6, 2021 Attack

As set forth in the PSR and the joint stipulations in this case,[3] a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting to certify the vote count of the Electoral College of the November 3, 2020 Presidential election.  By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve an objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the rioters away from the building and the proceedings underway inside. Just before 1:00 p.m., these rioters broke through the police lines, toppled the outside barricades protecting the Capitol Grounds, and pushed past U.S. Capitol Police and supporting law enforcement officers. At approximately 2:00 p.m., rioters forced their way over a second set of barricades and past officers, and advanced to the exterior of the building. Rioters did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows

---

[3] The facts in this subsection are derived from those stipulations.  *See* Dkt. 62-4 at ¶¶ 1-29; PSR ¶¶ 12-40.

of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, around 2:11 p.m., rioters broke into the Capitol Building through doors and windows on the Building's western side, breaking windows and assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.   At around the same time, Vice President Pence quickly fled the Senate Chamber, accompanied by the U.S. Secret Service.

At approximately 2:20 p.m., the U.S. Capitol Police ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. The U.S. Capitol Police ordered a similar lockdown in the House of Representatives Chamber.  As rioters attempted to break into the House of Representatives Chamber by breaking the windows on the chamber door, law enforcement drew their weapons to prevent the rioters from entering the chamber.  At around 2:45 p.m., one rioter was shot and killed while attempting to break into the Speaker's Lobby directly adjacent to the House of Representatives Chamber.  At around 2:47 p.m., rioters broke into the Senate Chamber.

All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### 2. *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10,

2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108, Tr. 6/30/21 at 14 (D.D.C.) (Judge Chutkan: "This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) (Chief Judge Howell: "The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

The rioters also injured more than a hundred members of law enforcement. *See* Dkt. 62-4 at ¶ 26. Some officers were hospitalized because of their injuries. *Id.*  Some of the rioters wore tactical gear and carried weapons, including tire irons, knives, sledgehammers, bear spray, tasers, and handguns.  Dkt. 62-4 at ¶ 14.  And the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day, who feared for their safety. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries); *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included

wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

### B.     Thompson's Role in the January 6, 2021 Attack on the Capitol

#### 1.     Conduct prior to January 6

Thompson testified at trial that, prior to January 6, 2021, he became deeply enmeshed in conspiracy theories about the 2020 election.  Trial Tr. 491-92.[4]  The potential for violence associated with his views is reflected in Thompson's text messages.  On December 25, 2020, Thompson texted his co-defendant Robert Lyon the following picture:

---

[4] All cited portions of the trial transcript are included in Exhibit 1 to this sentencing memorandum.



On December 30, 2020, Thompson texted "Definitely need more ammo" and attached a screenshot of President-elect Joseph Biden.

On January 5, 2021, Thompson texted his co-defendant Robert Lyon: "Leaving for dc in the morning this is your notice soldier."  Trial Ex. 100 at 1.[5]  When Lyon expressed hesitation, Thompson was firm: "[Another friend] is coming.  Ur gonna drive him."  *Id.*  Lyon eventually agreed, and the two of them drove in Lyon's car from Columbus, Ohio to Silver Spring, Maryland, where they stayed overnight.

### 2.  *Approach to the Capitol*

After arriving in D.C., they traveled to the former President's rally, arriving shortly after 11 a.m.  After Trump finished speaking, Lyon and Thompson walked around the White House and down Pennsylvania Avenue to the Capitol Building, where they crossed the North Lawn and made

---

[5] To avoid confusion, the government has retained the exhibit numbering of its video and photograph trial exhibits in this sentencing memorandum.  Video exhibits cited in this memorandum and in that of Thompson's co-defendant, Robert Lyon (*see* Dkt. 116) will be submitted on a separate CD/DVD or thumb drive submitted to Chambers prior to sentencing.  All non-video exhibits cited in this memorandum are included in Exhibit 2 to this memorandum.

their way to the courtyard outside the Senate Parliamentarian's office.  Thompson was, by this point, wearing a bulletproof vest.  Trial Tr. 526; PSR ¶ 44.

### 3.    *Entry into the Capitol and thefts*

Thompson first broke into the building, without Lyon, at 2:48 p.m., with a mob that had not undergone any security screening.  Trial Tr. 277-78; PSR ¶ 45.  As a result, law enforcement officers did not know if the rioters were armed.  One U.S. Capitol Police officer testified at trial that he felt the butts of several rioters' firearms when in the crowd of rioters that day.  Trial. Tr. 400-01.  The rioters, including Mr. Thompson, entered through a fire door that had been breached just six minutes prior by individuals who violently fought to push U.S. Capitol Police officers deeper into the building, away from the doors.  Trial Tr. 270-273; Trial Ex. 201C.  When Mr. Thompson entered the U.S. Capitol Building, he heard a loud ringing alarm at the doorway.  Trial Tr. 404, 527.  There was broken glass on the ground.  Trial Tr. 398, 528.

Thompson walked into the Senate Parliamentarian's office.  Meanwhile, at least a dozen other rioters were stealing, destroying, or damaging property inside that office.  PSR ¶ 49.  Thompson admitted at trial that he saw the windows of the office had been smashed and that he joined in looting the office.  Trial Tr. 528-530.  During this first entry into the Parliamentarian's office, Thompson stole two bottles of liquor before leaving the Capitol Building at 2:52 p.m.  Dkt. 62-4 at ¶ 40; PSR ¶ 51.  Before leaving, Thompson saw U.S. Capitol Police officers directing him outside; he testified that he knew the officers wanted him and the other rioters to leave.  Trial Tr. 531.



Trial Ex. 226.   Nonetheless, at 2:56 p.m., Thompson re-entered the Capitol Building, having

persuaded Lyon to come with him.   PSR ¶ 52.   Thompson then re-entered the Parliamentarian's

office and stole a coat rack.   PSR ¶ 53.



Trial Ex. 223.   Thompson also admitted at trial that he stole a pager, which belongs to the Senate

Sergeant At Arms.   Trial Tr. 334, 533.   This pager was never recovered by law enforcement

officials but is pictured on Thompson's hip in the following photograph.   Trial Tr. 387-88.



Trial Ex. 124.   At some point while inside the office, Thompson recorded a video of himself.   He

can be seen picking up a cellphone off of a desk and celebrating with other rioters.   The following

screenshots depict Thompson and him holding the cellphone:



Trial Ex. 123 at 0:07, 0:15.  While filming himself, he stated: "Wooo!"  He then asked: "This

[Anthony] Wiener's laptop?  Find the laptop!"  And: "Oh shit, they got water, beer . . . holy shit."

Dkt 62-4 at ¶ 57.

The Senate Parliamentarian and her Assistant Parliamentarians played a key role in the

Congressional certification, including opening the Senate on January 6, 2021, Dkt. 73 at 1,

commencing the certification itself, *id.*, and assisting the presiding officer, Vice President Michael

Pence, during the certification, *id.* at 1-2.  The Parliamentarians expected to return to their offices

to work throughout the day: they "expected to have access to their office throughout the day and

such access would have assisted them in performing their duties during the Certification."  *Id.* at

2.  But their offices were thoroughly trashed by the rioters.  "[S]everal pieces of office equipment

13

. . . , including computers, printers, and several phones, were broken. Some phones were stolen. Papers and official documents had been scattered on the floor. One set of doors . . . could not be properly locked or even closed, which made the office an unsecure location for sensitive documents." Dkt. 73 at 2. Without their office computers, "the Parliamentarians had only one laptop to complete their work" after the rioters were cleared on January 6. *Id.*; *see* PSR ¶¶ 48a, 50. The following photographs depict the damage:





Trial Exs. 274, 286.[6]  Trial Exhibit 287, a video taken the night of January 6, is perhaps the best

depiction of the damage wrought.  *See* Trial Ex. 287.

### 4.     *The North Doors*

Thompson and Lyon left the building at 3:01 p.m., with Thompson carrying the stolen coat

rack.  PSR ¶ 55.  They made their way to the north end of the Capitol Building.  Around 3:30 p.m.,

Thompson left Lyon with the coat rack to go to the North Doors of the Capitol Building.  PSR

¶ 56.  While there, Thompson was at the front of the crowd as rioters rammed bike racks that had

been used by the U.S. Capitol Police for crowd control into the North Doors:

---

[6] Trial Exhibit 286 was not offered into evidence at Thompson's trial.  It is an open-source
photograph.



Trial Ex. 235A at 2; *see also* Trial Ex. 235.  Officers inside the North Doors had no non-lethal weaponry with which to hold back the crowd, and thus had to improvise and resort to spraying a fire extinguisher at the crowd.  Trial Tr. 435-37.

Thompson was also part of crowd defying law enforcement officers who were spraying the crowd with oleoresin capsicum spray (Thompson is wearing the sweatshirt with the green hand on the back in the photograph below):



Trial Ex. 236.

At 4:03 p.m., Lyon texted Thompson when Thompson was still at the North Doors. Lyon, with the coat rack, messaged Thompson: "We need to get the fuck out with this trophy." Trial Ex. 100 at 4. Thompson replied: "Follow the tear gas n ill find me." *Id.* Lyon said: "Im fighting people off". *Id.* Thompson said: "Leave by the tree let's g0". *Id.* Lyon replied: "Im bout to get shot or arrested for this bs. People WANT IT." *Id.* Thompson replied: "Going inside" and "Sell it $500". *Id.* Lyon replied: "Some girl died already," to which Thompson replied: "Was it Pelosi"? *Id.* at 5. During this time, Thompson was still at the North Doors of the U.S. Capitol, encouraging the crowd of rioters attempting to breach those doors. He texted Lyon this picture of the doors at 4:06 p.m.:



Trial Ex. 118.

### 5.     *The Lower West Terrace*

Thompson eventually left and reunited with Lyon.  His wife texted him a screenshot at

4:24 p.m. showing a CNN image of Trump with a banner headline: "TRUMP ADDRESSES

RIOTERS HE UNLEASHED: 'IT'S TIME TO GO HOME'".  Trial Ex. 120.  She included

specific directions for how they could take public transit to their hotel.  Trial Ex. 100 at 6.

Still, they did not leave the area.  Instead, around 4:30 p.m., Thompson went to the lower

west terrace, where one of the most violent confrontations on January 6 occurred.  The battle for

control over the lower west terrace entry into the U.S. Capitol had, by that point, been ongoing for

nearly two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law

enforcement officers.  Thompson stood and watched as rioters, among other things, threw heavy

objects onto officers' heads, viciously beat officers with baseball bats, sprayed irritants at officers, and shined lights in officers' eyes. *See* Trial Tr. 366-72, Trial Exs. 240A, 242A, 245A, 246A (video of Thompson watching several such assaults between approximately 4:40 p.m. and 5:05 p.m.). At 4:56 p.m., while these episodes of violence against officers were playing out mere feet in front of him, Thompson texted Lyon: "I'm taking our country back". Trial Ex. 100 at 7.

Thompson did not leave the terrace until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 p.m. and deployed tear gas into the crowd.

### 6.       Confrontation with U.S. Capitol Police Special Agents and Thompson's flight

At approximately 6 p.m. that night, two U.S. Capitol Police Special Agents approached Thompson, who still had the coat rack, and Lyon while they were sitting on the sidewalk at the northwest corner of South Capitol Street and C Street, SW. Thompson and Lyon told the Special Agents they were waiting for an Uber. When Thompson and Lyon began to leave, Thompson picked up the coat rack. At that point, the Special Agents recognized the coat rack as one that appeared to have been taken from the U.S. Capitol Building, and instructed Thompson to drop it. Thompson did so, but then fled on foot. The agents were unable to locate Thompson, who later took an Uber back to his hotel room in Silver Spring. PSR ¶¶ 60-62; Trial Tr. 329-331.

At 8:04 p.m., Thompson texted Lyon the video Thompson had filmed of himself inside the Senate Parliamentarian's office earlier that day. Thompson's wife, S.T., replied: "I will not post bail". Trial Ex. 100 at 8. At 8:26 p.m., Lyon sent a text message to Thompson that stated: "Maybe dont send incriminating shit to my phone might get warranted or something lol." *Id.* Thompson replied by texting Lyon the photograph shown above of Thompson posing for a photograph with the coat rack and pager just outside of the U.S. Capitol Building. *Id.*

19

### C.      The Charges

On January 22, 2021, Thompson was charged by complaint. On January 25, 2021, he turned himself in at the district court in Columbus, Ohio. He was subsequently indicted, and on February 9, 2022, he was charged by superseding indictment with Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 as to Count One; Theft of Government Property and Aiding and Abetting, in violation of 18 U.S.C. §§ 641 and 2 as to Count Two; Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) as to Count Three; Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) as to Count Four; Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) as to Count Five; and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) as to Count Six.

### D.      Thompson's testimony at trial

At trial, Thompson testified (among other things) to the following:

*First*, Thompson testified that he took an Uber to the rally and was "down at the rally" by "10:00 a.m.," and that "while [he was] there at the rally, [he] heard some statements from … Rudolph Giuliani" that there should be "trial by combat."  Trial Tr. 521.  Indeed, he testified to that effect on both direct examination and cross examination.  *See* Trial Tr. 499-500, 521.  He further testified that he could see Giuliani on a screen and could hear him notwithstanding the crowd at the rally.  Trial Tr. 521-22.  On rebuttal, a government witness explained that both Thompson's Uber records and the GPS data on his phone established that Thompson's Uber ride did not arrive near the rally until roughly 11:05 a.m., at least twelve minutes *after* Giuliani made

20

the statements in question, and that Thompson was actually in the Petworth neighborhood of Washington, D.C. during Mr. Giuliani's statements.  Trial Tr. 575-582.

*Second*, Thompson testified that he took the coat rack because "I felt like someone else was going to use it as a weapon," Trial Tr. 509, and so he "was just moving it out to a safer place" so nobody could "either break it or use it against the police."  Trial Tr. 533.

*Third*, Thompson testified that when he was "at the north doors" of the Capitol building "about four o'clock p.m.," Thompson "did not want to get inside the building at that point," notwithstanding the text message he sent Lyon stating: "Going inside," which was quickly followed by a picture of the North Doors.

*Fourth*, Thompson testified that he did not "tr[y] to walk away with the coat rack" when he was instructed to leave the area by two U.S. Capitol Police Special Agents.  Trial Tr. 541. Special Agent Jaclyn O'Neill, who encountered Thompson on the evening of January 6, 2021, had testified earlier in the trial that Thompson had "reached for a coatrack that was right next to him" and that Thompson only left the coat rack after the agents "told him to leave it." Trial Tr. 330. Moreover, Thompson signed a stipulation prior to trial that he submitted to the Court in which he admitted that "The Special Agents directed [Thompson and Lyon] to leave the area.  When Thompson and Lyon began to leave, Thompson picked up the coat rack.  At that point, the Special Agents instructed Thompson to drop the coat rack."  Dkt. 62-4 at 9.

As explained below, each of Thompson's four statements was materially false.

### III.   STATUTORY PENALTIES AND SENTENCING GUIDELINES

#### A.  The Statutory Penalties

**Imprisonment and other penalties.**  As noted by the U.S. Probation Office in the PSR, Thompson faces up to 20 years' imprisonment, a term of supervised release following

imprisonment of up to three years, and a fine of up to $250,000 for his conviction on Count One.

PSR ¶¶ 146, 157, 179.  Thompson faces up to one year's imprisonment, a term of supervised

release of up to one year, and a fine of up to $100,000 for each conviction on Counts Two through

Four.  PSR ¶¶ 147-149, 158, 180.  Finally, Thompson faces imprisonment of up to six months and

a fine of up to $5,000 for each conviction on Counts Five and Six.  PSR ¶¶ 150-151, 159, 181.

**Restitution.**   With respect to Count One, restitution is discretionary under the Victim

Witness Protection Act of 1982.  *See* 18 U.S.C. § 3663(a).  With respect to Counts Two, Three,

and Four, restitution is mandatory under the Mandatory Victims Restitution Act, because offenses

under 18 U.S.C. §§ 641 and 1752 are "offense[s] against property" that resulted in pecuniary loss

for the Architect of the Capitol—here, Thompson's theft and the destruction in the Capitol

Building.  *See* 18 U.S.C. § 3663A(c)(1)(A)(ii).   Under these statutes, the use of a "reasonable

estimate" or reasonable approximation of restitution is sufficient, "especially in cases in which an

exact dollar amount is inherently incalculable."  *United States v. Gushlak*, 728 F.3d 184, 196 (2d

Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019).

Here, the government recently estimated that the overall losses suffered by the Architect

of the Capitol, the Office of the Chief Administrative Officer of the United States House of

Representatives, and the Office of the Secretary of the United States Senate were, in total,

$1,832,840.28, based on letters from those entities attesting to the losses each suffered as a result

of January 6 (that number is distinct from the overall estimated loss of over $2.7 million, as

explained in footnote 2 above).  Those letters are attached as Exhibit 3.  The government believes

restitution in the amount of $2,000 is appropriate for Mr. Thompson specifically.  That is the

amount his co-defendant, Robert Lyon, agreed to pay, and the amount that felony defendants who

have pled guilty to similar charges (including violations of 18 U.S.C. § 1512(c)(2)) have agreed to

pay.  It is also the amount that has been ordered in three of the four post-trial defendant felony sentencings to date (those of Guy Reffitt, Thomas Robertson, and Anthony Williams); Judge Mehta ordered restitution of $2,060 in the fourth case, that of Thomas Webster.  *See United States v. Webster*, 21-cr-208-APM, Dkt. 110 at 7 (D.D.C. Sept. 9, 2022), *United States v. Robertson*, 21-cr-34-CRC, Dkt. 140 at 7 (D.D.C. Aug. 17, 2022); *United States v. Reffitt*, 21-cr-32-DLF, Dkt. 170 at 7 (D.D.C. Aug. 2, 2022); *United States v. Williams*, 21-cr-377-BAH, Dkt. 131 at 8 (D.D.C. Sept. 16, 2022).

### B.  The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.  *Id.* Those Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.  *Id.*; *see also Rita v. United States*, 551 U.S. 338, 349 (2007).

The government agrees with the Sentencing Guidelines calculation set forth in the PSR, which results in a sentencing guidelines range of 70-87 months.  PSR ¶ 152.  The U.S. Probation Office calculated Thompson's total offense level under the Sentencing Guidelines as follows:

**Count One (Obstruction of an Official Proceeding):**

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2J1.2(a)) | 14 |
| Injury, Threats, or Property Damage (U.S.S.G. § 2J1.2(b)(1)(B)) | +8 |
| Substantial Interference (U.S.S.G. § 2J1.2(b)(2)) | +3 |
| Obstruction (U.S.S.G. § 3C1.1) | +2 |
| Total Offense Level | 27 |

*See* PSR ¶¶ 80-89.  According to the PSR, Counts 1, 2, 3, and 4 group in this case because the victims are the same.  The government notes that the applicable victim for Counts 1, 3, and 4 is Congress, while the victim for Count 2 is the Senate Sergeant at Arms.  However, as explained in the sentencing memorandum for Robert Lyon, Dkt. 116 at 12 n.6, the government treats those two entities as the same victim for purposes of grouping.  Because these counts grouped, the PSR does not set out the guidelines calculations for the other three counts.[7]  The total offense level is therefore 27.  The government elaborates on each of the three special offense characteristic enhancements below.

1.      **Thompson's offense "involved causing . . . property damage, in order to obstruct the administration of justice" under U.S.S.G. § 2J1.2(b)(1)(B).**

Section 2J1.2(b)(1)(B) provides for an eight-level enhancement to the guidelines range for a defendant convicted of violating 18 U.S.C. § 1512(c)(2) if the defendant's offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."  For purposes of this offense characteristic, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B). Thompson does not object to the application of this enhancement, and it applies here for at least two reasons.

*First*, because Thompson stole property, the injury/property enhancement applies based upon his own acts under Section 1B1.3(a)(1)(A)'s definition of "relevant conduct" in the

---

[7] As a technical matter, the guidelines require that the adjusted offense level for each count be calculated prior to determining whether those counts group.  U.S.S.G. § 1B1.1(a)(4).  However, because it makes no difference here, the government did not object to the PSR's omission of a guidelines calculation for other counts.

guidelines.  *See* U.S.S.G. § 1B1.3(a)(1)(A).  "[D]amage" in Section 2J1.2(b)(1)(B) can be interpreted to include loss of usefulness.  *See* American Heritage Dictionary of the English Language (5th ed. 2020) ("Destruction or a loss in value, usefulness, or ability resulting from an action or event."); Oxford English Dictionary (2021) ("Injury, harm; *esp.* physical injury to a thing, such as impairs its value or usefulness.").  These definitions support a reading of "property damage" that includes theft because, when property is stolen, the owner is harmed in his use and enjoyment of the property.  Moreover, theft of property that is not recovered interferes with the owner's use of the property at least as much as physical damage to or destruction of property.

Here, Thompson admitted in his testimony at trial that he stole a coat rack, a bottle of bourbon, and a radio/pager used by the Capitol Police command to send emergency alerts to offices within the building.  Trial Tr. 509, 510, 511-12, 529, 532-33.  The coat rack was recovered later that day by Capitol Police Special Agents.  But the radio/pager was never recovered.  Trial Tr. 387-88.  Thus, Thompson's theft of the radio/pager, at least, makes this offense one that involves property damage.

*Second*, U.S.S.G. § 1B1.3(a) (1)(A) encompasses both the defendant's own acts or omissions and those whom the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused.  Per the stipulations in this case, Thompson joined a crowd of "at least a dozen other rioters" who "were stealing, destroying, or damaging property" within the office while Thompson was present. Dkt. 62-4 at 7.  The rioters "caused significant damage." *Id.*  Indeed, "several pieces of office equipment in the Senate Parliamentarian's Office, including computers, printers, and several phones, were broken.  Some phones were stolen. . . . One set of doors to S-132 could not be properly locked or even closed, which made the office an unsecure location for sensitive documents." Dkt. 73 at 2.  Thompson also testified that he saw the crowd knocking over

furniture and saw the broken windows in the Parliamentarian's office, and that he "participated in the riot going on inside the Senate Parliamentarian's office." Trial Tr. 530. By joining a crowd of rioters inside the Senate Parliamentarian's office, and then shouting (as his cellphone video depicts) to celebrate the rioting occurring within the office, including shouting "This Wiener's laptop? Find the laptop!", *see* Trial Ex. 123, Thompson strongly encouraged, and thereby aided and abetted those rioters immediately around him who were damaging property.[8]

### 2.   *Thompson's offense resulted in "substantial interference with the administration of justice" under U.S.S.G. § 2J1.2(b)(2).*

The government and U.S. Probation Office agree that Section 2J1.2(b)(2)'s three-level enhancement for "substantial interference with the administration of justice," a phrase that broadly encompasses "the unnecessary expenditure of substantial governmental or court resources," applies here. U.S.S.G. § 2J1.2, cmt. n.1. Thompson does not object to the application of this enhancement.

Judges within this district have applied § 2J1.2(b)(2)'s three-level enhancement to defendants who committed felony obstruction offenses under 18 U.S.C. § 1512(c)(2) on January 6, 2021. Chief Judge Howell did so after an exhaustive refutation of arguments to the contrary in the *Rubenacker* sentencing. *United States v. Rubenacker*, 21-cr-193-BAH, Tr. 5/26/22 at 61-76

---

[8] Similarly, Thompson is responsible for "all acts … of others involved in jointly undertaken criminal activity" with Thompson if those acts were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). That provision does not require evidence of pre-planning or conspiracy. Here, the other rioters' conduct was in line with Thompson's goal and reasonably foreseeable to Thompson. The first time he visited the office, he saw "broken windows" in the office; saw that other rioters had "knocked over furniture" and "scattered papers all over the floor," and admitted at trial that he then "participated in the riot going on inside the Senate parliamentarian's office." Trial Tr. 529-530. Yet Thompson then returned to the office a second time and again participated in the riot by stealing the coat rack.

(D.D.C.) (sentencing hearing). Judges Friedrich, Moss, and Cooper have all similarly applied Section 2J1.2(b)(2) at sentencings where the issue was disputed. *See Reffitt*, 21-cr-32-DLF, Tr. 8/1/22 at 33-36, 38-39 (sentencing hearing); *Robertson*, 21-cr-34-CRC, Tr. 8/11/22 at 16-20 (D.D.C.) (sentencing hearing); *United States v. Miller*, 21-cr-75-RDM, Tr. 5/23/22 at 10-19 (D.D.C.) (sentencing hearing). At least two judges (Judges Moss and Lamberth) have also applied the enhancement when it was undisputed because the parties agreed on its applicability in a plea. *See, e.g., United States v. Duke Wilson*, No. 21-cr-345 (D.D.C.) (Judge Lamberth); *United States v. Paul Hodgkins*, No. 21-cr-188 (D.D.C.) (Judge Moss); *United States v. Scott Fairlamb*, No. 21-cr-120 (D.D.C.) (Judge Lamberth); *United States v. Jacob Chansley*, No. 21-cr-3 (D.D.C.) (Judge Lamberth).

As Thompson stipulated, his conduct obstructed Congress's certification (delaying it by several hours, for example) and impeded the Senate Parliamentarian and her staff's ability to complete their work related to that certification. *See* Dkt. 62-4 at ¶ 48; Dkt. 73 at 1-2. That delay caused the unnecessary expenditure of substantial governmental resources. Therefore, the three-level enhancement under Section 2J1.2(b)(2) applies.

### 3.    *Thompson committed obstruction of justice under U.S.S.G. § 3C1.1*

The government and U.S. Probation Office, which was provided transcripts of Thompson's trial testimony, also agree that this Court should apply Section 3C1.1's two-level enhancement for obstruction of justice. *See* U.S.S.G. § 3C1.1. Application Note 4(B) of Section 3C1.1 states that "committing . . . . perjury" is one type of conduct to which the two-level obstruction enhancement applies. *United States v. Dunnigan*, 507 U.S. 87, 92-95 (1993) (confirming that perjury merits the obstruction enhancement under Section 3C1.1); *see* U.S.S.G. § 1B1.1(b) ("The court shall then consider … any other policy statements or commentary in the guidelines that might warrant

consideration in imposing sentence.").[9]

Whether Thompson committed either type of conduct must be shown only by preponderance of the evidence. It is true that "[a]t one time," the D.C. Circuit required proof of perjury for 3C1.1 purposes by clear-and-convincing evidence. *United States v. Makki*, 47 F. Supp. 2d 25, 29 n.3 (D.D.C. 1999) (citing *United States v. Montague*, 40 F.3d 1251, 1253 (D.C. Cir. 1994)). But that "was based on a reading of the then-effective Application Note 1 to § 3C1.1, which stated that with regard to 'alleged false testimony or statements by the defendant, such testimony or statements should be evaluated in a light most favorable to the defendant.'" *Id.* (quoting *Montague*, 40 F.3d at 1253). "The U.S. Sentencing Commission, however, eliminated the distinction in 1997 when it amended Application Note 1 'so that it no longer suggests the use of a heightened standard of proof [when the court applies an enhancement for perjury].'" *Id.* (quoting U.S.S.G. Appendix C, amend. 566 (1997)). The D.C. Circuit subsequently stated that it had "construed the amendment to mean that while proof of perjury by clear and convincing evidence had formerly been required, such allegations could now be proven by a preponderance of the evidence." *United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004) (citing *United States v. McCoy*, 242 F.3d 399, 407 n.14 (D.C. Cir. 2001)). While *Montague* has not, to the government's knowledge, been expressly overruled, the government is not aware of it having been cited favorably in a perjury 3C1.1 case that involved the post-1997 guidelines.[10] Regardless of

---

[9] Application Note 4(F) adds that "providing materially false information to a judge" is another type of conduct that merits the two-level enhancement.

[10] In the Second Circuit, which also applied a clear-and-convincing standard before 1997, courts appear to have moved back to a preponderance standard due to the Sentencing Commission's amendment. *See United States v. Jasper*, 291 F. Supp. 2d 248, 259-261 (S.D.N.Y. 2003), *aff'd*, 108 F. App'x 18 (2d Cir. 2004); *see also United States v. Thundershield*, 474 F.3d 503, 509 (8th Cir. 2007) (discussing the pre-1997 heightened burden cases like *Montague* and then stating

which standard applies, however, the evidence is more than sufficient to find that Thompson committed perjury.

Thompson committed perjury if he gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94. A "material" statement is one that concerns "information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 n.6. The Court should make specific findings at sentencing as to each element of perjury.

At trial, Thompson committed perjury when he made the statements described below under oath. These statements were false, concerned a material matter, and were made with the willful intent to provide false testimony. After trial, this Court stated with respect to Mr. Thompson's testimony:

> And I would candidly say I thought his testimony was very troubling. I thought it was totally disingenuous. I thought he was not truthful. I don't believe he was sincere in reference to what he said.

Trial Tr. 647. The Court later reiterated: "[I]n my view I don't think he was candid when he testified." Trial Tr. 649. The government agrees with the Court.

*First*, Thompson testified twice that he was "down at the rally" by "10:00 a.m.," and that "while [he was] there at the rally, [he] heard some statements from … Rudolph Giuliani" that there should be "trial by combat." Trial Tr. 521. This testimony was material because Thompson had testified that he heard Giuliani's statement, along with Trump's statements, and that what he heard at the rally that morning led him to believe his conduct at the Capitol later that day had been requested by the President and was lawful. Trial Tr. 500-506. In addition, Thompson's attorney

---

that "[c]ases decided under the post–1997 version of § 3C1.1 apply a preponderance-of-the-evidence standard").

had specifically quoted Giuliani's "trial by combat" statement in his opening statement as one of the things that influenced Thompson's conduct.  Trial Tr. 262-263.

But Thompson's testimony was false.  On rebuttal, a government witness explained that both Thompson's Uber records and the GPS data on his phone established that Thompson's Uber ride did not arrive even near the rally until roughly 11:05 a.m., at least twelve minutes *after* Mr. Giuliani made the statements in question, and that Thompson was actually in the Petworth neighborhood of Washington, D.C. during Giuliani's statements.  Trial Tr. 575-582.  Thompson thus had not witnessed Giuliani's statements in person at the rally (or, likely, at all).  His testimony cannot be construed as a mere mistaken memory, because Thompson on cross-examination painted a detailed (false) picture of how he listened to Giuliani's statements while at the rally: he watched Mr. Giuliani's statements with the crowd; he saw Giuliani on a big screen; he had no trouble hearing him over the noise from the crowd.  Trial Tr. 521-22.

*Second*, Thompson testified that he took the coat rack because "I felt like someone else was going to use it as a weapon," Trial Tr. 509, and so he "was just moving it out to a safer place" so nobody could "either break it or use it against the police."  Trial Tr. 533.  This testimony was material because the only unresolved issue in the case was whether Thompson knew that his conduct, including his theft of the coat rack, was unlawful or wrong.  Thompson's testimony was an apparent attempt to establish that he did not think his taking of the coat rack was wrong, and that he did not intend to violate the law.  And it certainly was not due to faulty memory or confusion: this was Thompson's key explanation for his theft that day.

But this testimony was also obviously false.  Thompson admitted that he still had the coat rack at least *three hours later*, around 6 p.m., several blocks away, when he was stopped by U.S. Capitol Police Special Agents, and when there was no danger to officers or to the coat rack.  *See*

Dkt. 62-4 at 9.  That refutes Thompson's testimony that he was only "moving it out to a safer place" to avoid it being used as a weapon against the police.  Trial Tr. 533.  Indeed, when the Special Agents told him to leave Capitol grounds altogether, Thompson stipulated that he "picked up the coat rack," Dkt. 62-4 at 9, and the special agent who encountered him similarly testified that he tried to leave with the coat rack—both of which would have been unnecessary if his motive was to protect the police rather than steal the coat rack.  Trial Tr. 330.

Thompson's claim that he entered the Capitol building a second time to take a random, single *coat rack* from inside the Capitol to protect others is also incredible on its face and can be disbelieved (as the jury disbelieved it) on that basis alone.  There was no evidence Thompson ever saw anyone use or suggest using a coat rack as a weapon, and Thompson left other coat racks in that very office.  And Thompson actively participated in a riot that he could see was putting the police officers at great risk of injury.

*Third*, Thompson testified that when he was "at the north doors" of the Capitol building "about four o'clock p.m.," that he "did not want to get inside the building at that point."  Trial Tr. 535-536.  This testimony was material to the question whether Thompson remained on Capitol grounds and was attempting to get back inside the building even an hour after he entered and stole the coat rack, bourbon, and a radio/pager, which was relevant to his state of mind and whether he knew his conduct was unlawful.  And again, this testimony cannot be construed as a result of mistake or confusion—Thompson otherwise recognized the area and admitted he was present there, and was clear about his purported intent not to enter: "I had already been inside, I had no interest in going back in." Trial Tr. 535.

This testimony was also false.  Thompson sent a text message at 4:03 p.m.—that is, almost exactly the time at which, he testified under oath, he did not intend to go inside—to his co-

defendant, stating: "Going inside." Trial Tr. 455-56; Trial Ex. 100 at 6-7. Thompson stipulated prior to trial that he was at the North Doors at this time. *See* Dkt. 62-4 at ¶ 46. Three minutes later, he texted a picture of the North Doors of the Capitol building, the precise location where he testified he had no intent to re-enter the building. *See* Trial Ex. 100 at 6-7. The photo of the North Doors that he sent is Trial Exhibit 118. *See supra* 32. Thompson plainly did intend to go back inside at that point.

*Fourth*, Thompson testified that he did not "tr[y] to walk away with the coat rack" when he was instructed to leave the area by two U.S. Capitol Police Special Agents. Trial Tr. 541. This testimony was material to Count Two and whether Thompson intended to deprive the United States of the use of the coat rack. It was also false. As recounted above, Thompson entered into a trial stipulation that conceded the accuracy of Special Agent O'Neill's testimony that Thompson attempted to take the coat rack with him when she encountered Thompson at 6:00 p.m. on January 6. Dkt. 62-4 at 9; Trial Tr. 330. And again, it cannot be construed as faulty memory: Thompson was reminded on the stand that he had heard Special Agent O'Neill's testimony, but stuck to his claim that he had not reached for the coat rack. Trial Tr. 542.

These four portions of Thompson's testimony were false, concerned a material matter, and were made with the willful intent to provide false testimony. The two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 therefore applies to Counts One through Four.

The government notes that Thompson made several other statements under oath that were not credible on their face, such as:

(1) he simply found a bulletproof vest by a trashcan near the Washington Monument, and then took it and put it on only because "once I had it, I wasn't going to carry it, I was going to wear it." Trial Tr. 525;

(2) he did not see a single place to stop and eat lunch on a Wednesday afternoon during his hour-long walk from the White House, through Farragut Square, down Pennsylvania Avenue to the Capitol Building—which was material to whether he felt compelled to go to the Capitol following former President Trump's speech. Trial Tr. 523-534; and

(3) even though he had the "stolen coat rack by [his] side," he stopped and asked U.S. Capitol Police officers for directions after leaving the Capitol, Trial Tr. 540.

Regardless of whether these statements would also qualify as perjurious, that Mr. Thompson was willing so casually to make such claims while testifying under oath can influence this Court's ultimate sentence.

### 4.    *Acceptance of Responsibility*

Thompson objected to the PSR on the ground that he was entitled to a two-level offense level reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility.  Such an adjustment, the guidelines commentary makes clear, "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."  U.S.S.G. § 3E1.1, application n.2.

Thompson does not dispute that legal principle, but claims he did not deny the essential factual elements of guilt at trial.  According to Thompson, he "essentially admitted every element of each charge including his intent," while "his counsel sought to make a narrow legal argument." PSR at 36.  But Thompson is wrong.  While he did stipulate to many of the relevant facts—which can be considered in his favor under 18 U.S.C. § 3553—he did *not* stipulate to the disputed, key fact at trial: his intent.  As this Court will recall, Thompson's defense at trial was that he lacked the criminal *mens rea* to have committed certain offenses, most importantly the felony obstruction offense in Count One, because Thompson claimed he believed that his conduct that day was lawful

due to the public statements of President Trump.  That is a denial of the *fact* of Thompson's *mens rea*, not a "legal argument" divorced from the factual elements (such as a claim that a statute does not cover the admitted factual conduct, or that the admitted conduct is constitutionally protected).

Moreover, the guidelines commentary makes clear that "[c]onduct resulting in an enhancement under § 3C1.1 . . . ordinarily indicates that the defendant has not accepted responsibility for his conduct."   U.S.S.G. § 3E1.1, application n.4.   As explained above, Thompson's perjurious statements warrant a Section 3C1.1 enhancement, and so Thompson is precluded from receiving acceptance of responsibility for that reason too.

### 5.   Criminal history and guidelines range

The U.S. Probation Office calculated Thompson's criminal history as a category I, which the government does not dispute. PSR ¶ 104. Accordingly, the U.S. Probation Office and government calculate Thompson's total adjusted offense level as 27, and his corresponding Guidelines imprisonment range at 70-87 months. PSR ¶ 152.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, §

3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms. By its very nature, the attack defies comparison to other events.

Nonetheless, this Court should look to a number of critical factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction or theft; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence or obstructed justice; (6) the length of the defendant's time inside of the building, and where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

In this case, these factors, in combination, counsel in favor of a lengthy custodial sentence.

*First*, prior to reaching Capitol grounds, Thompson "thought there might be" "violence" at the Capitol.  Trial Tr. 526.  But rather than not go, Thompson either brought from home or (as he claimed at trial) found a bulletproof vest and put it on, to protect himself from "bullets" or "stab wounds." *Id.*

*Second*, Thompson entered the Capitol building through a set of doors that were opened by a group of rioters who had smashed the glass, opened the emergency lock bar, and then violently

fought past officers to gain a foothold in the hallway. Thompson was almost certainly aware of that violent entry, since he was milling in the courtyard outside at the time and entered just a few minutes later.

*Third*, Thompson then walked into the Capitol past a loud, blaring alarm, as video and witness testimony established at trial. *See* Ex. 248 at 0:49-0:59. Thompson saw a scene of chaos and a mob chanting at outnumbered U.S. Capitol Police officers. He walked over or next to broken glass on the ground. Trial Tr. 527-528; Trial Ex. 225 at 1-2. When he went inside the Parliamentarian's office, Thompson admitted he saw broken windows, toppled furniture, scattered papers, and rioters looting the office. Trial Tr. 528-29. But rather than leave, Thompson gleefully participated in the riot, as he admitted. Trial Tr. 529-530 (admitting he "looted" the office and "participated in the riot"). He recorded a video of himself celebrating with other rioters, grabbing a cellphone, and asking other rioters to continue to ransack to "find [Anthony Wiener's] laptop." Dkt. 62-4 at ¶ 57. And in doing so, he encouraged the conduct of other rioters in the office.

*Fourth*, Thompson stole—not once, but twice—from the office. He took bourbon, a coat rack, and a radio/pager used for emergency alerts. He left once, after he saw officers directing him to leave and knew they wanted him to leave, and then returned to steal again. Thompson viewed this as an opportunity for lawless behavior. And he intended to take full advantage. His entry into and participation in the ransacking of a sensitive office within the Capitol Building alone differentiates Thompson from many other rioters.

*Fifth*, Thompson remained on Capitol grounds for hours, and attempted to re-enter the building through the North Doors, where he witnessed other rioters engage in a fierce standoff with law enforcement officers defending that location. The rioters rammed bike racks against the doors while officers, lacking other non-lethal crowd-control tools, resorted to spraying a fire

extinguisher at the rioters. Thompson's testimony at trial that he was "just being a peaceful observer" and in fact "couldn't believe it was actually happening," Trial Tr. 536, while at the North Doors is not credible in light of his presence at the front of the crowd, *see* Trial Ex. 235A, his presence near the front of other crowds being pepper sprayed by law enforcement or spraying back at law enforcement, *see* Trial Exs. 236-37, and his text messages at the time stating he was "going inside" and, later, that he felt he was "taking our country back," Trial Ex. 100 at 11, 13.

*Sixth*, unlike most rioters that day, Thompson was confronted by law enforcement that night. Yet when given the chance to leave, Thompson *still* attempted to take the coat rack with him. And when he was then instructed to stop, Thompson fled from law enforcement to evade arrest, leading officers—who were needed to clear the area so the certification could resume—on a multi-block chase south of the U.S. Capitol building.

Two factors cut in Thompson's favor. His length of time inside the building—roughly 9 minutes total—is on the lower end relative to some other rioters. That said, both Thompson and Lyon only left once officers were clearing the hallway; within minutes of them leaving the Senate Parliamentarian's office, officers completely cleared it of rioters. It is thus impossible to know how long Thompson would have stayed inside the building had their rioting been uninterrupted. That is especially so for Thompson, who returned to the building at least once, then went to another entrance (the North Doors) and remained there for roughly an hour while others tried to ram their way inside. Thompson texted Lyon that he was "going inside" at that point. Thus, it was not for lack of trying that Thompson's tenure in the U.S. Capitol building was so short.

Second, Thompson did not engage in violence that day, even if his presence encouraged others around him to engage in violence. There is also no evidence he explicitly called for others to engage in violence while there, though of course the government's insight into his conversations

with other rioters is limited.  Certainly, though, Thompson intended to be present when violence was inflicted on law enforcement officers defending the Capitol.

### B.  The History and Characteristics of the Defendant

Thompson was 36 years old at the time of his offense.  Trial Tr. 516.  His stepfather was an orthopedic surgeon.  Trial Tr. 488.  He went to a "[s]uburban, nice high school with good educational opportunities," *id.* at 489, then went to Ohio State University, where he graduated with a degree in psychology and history, *id.*  He was married at the time of his offense.

Thompson has a history of arrests and convictions of moderate seriousness: a 2005 conviction for illegal use or possession of drug paraphernalia, PSR ¶ 101; a 2005 conviction for disorderly conduct, PSR ¶ 102; and a 2008 DUI-type conviction, PSR ¶ 103.  He was also arrested for other offenses in 2008 and 2014 that resulted in no convictions, and again for trespass in June 2020.  Thompson completed his diversionary period for the June 2020 trespass arrest just days before his conduct on January 6, 2021.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

It is difficult to overstate the seriousness of the January 6, 2021 attack.  It was an attack on the rule of law and a "national disgrace." *United States v. Stotts*, 21-cr-272, Tr. 11/9/21 at 31 (D.D.C.) (Judge Kelly). "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[11]  This Court already has a firm appreciation for this sentencing factor.

---

[11] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

In this case, both general deterrence and specific deterrence require a significant custodial sanction. 18 U.S.C. § 3553(a)(2)(B)-(C). Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was intended to, and did, interfere with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing in *Hodgkins*, No. 21-cr-188:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. 7/19/21 at 69-70; *see also United States v. Gallagher*, 21-cr-41, Tr. 10/13/2021 at 37 (D.D.C.) (Judge Nichols: "Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred."); *Mazzocco*, 21-cr-54-TSC, Tr. 10/4/2021 at 24 (Judge Chutkan: "What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this

---

Testimony.pdf

country. That mob was trying to overthrow the government.").  It is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process— that their actions will have consequences, as this Court has noted. *United States v. Mariposa Castro,* 21-cr-299-RBW, Tr. 2/23/2022 at 41-42 (D.D.C.) (Judge Walton: "[I]f people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.").  This is the most important factor that this Court must consider.

A custodial sentence is also necessary to deter Thompson specifically.  Thompson fled even after being specifically instructed to stop when U.S. Capitol Police Special Agents saw him with a suspected stolen coat rack.  He did not turn himself in until a warrant issued for his arrest. He did stipulate many of the facts in the case.  Many of those facts would have been easily proven by the government using video evidence, but others did streamline the trial and prevent the government from having to call additional witnesses.  But then Thompson testified in his own defense and made a number of false or highly dubious statements, as detailed above, in an attempt to escape and deflect responsibility.

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its

determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and

fairness moving forward.  Here, the government's recommendation (70 months) is at the low end of the guidelines range (70-87 months).

### F.  The Need to Avoid Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases unrelated to January 6, 2021.  Moreover, the "best way to curtail 'unwarranted' disparities" in many cases "is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

No case involves the precise set of aggravating facts as this case.  But the most analogous defendant to Thompson is Anthony Williams, the only other post-trial defendant who, like Thompson, was convicted after trial of Section 1512(c)(2)'s felony obstruction offense, but was not charged with or convicted of any other felonies (such as assaults, obstructing officers, obstruction of justice, or carrying a deadly or dangerous weapon).  *See Williams*, 21-cr-377-BAH, Dkt. 120 at 27 (Government's sentencing memorandum).  Williams' guidelines range was 57-71 months, lower than Thompson's because unlike in this case, the government did not seek the two-level enhancement for obstruction under Section 3C1.1 of the guidelines that applies due to Thompson's perjury.  *See id.*  Otherwise, the guidelines calculation for Williams was essentially the same as what the PSR and government propose in this case.  *See id.* (Chief Judge Howell later adopted the government's guidelines calculation).  Chief Judge Howell sentenced Williams to 60 months, three months above the low end of his guidelines range.

The two cases are comparable.  Williams, like Thompson, has several prior arrests and convictions, but was still criminal history category I.  *Id.* at 28.  Neither Williams nor Thompson brought a weapon onto Capitol grounds, and neither Williams nor Thompson assaulted an officer. *See id.* at 7-25 (describing facts of Williams's case).  Both encouraged other rioters.  Williams helped and encouraged other rioters to use bike racks to scale a staircase to gain entry to the Capitol Building, *id.* at 10-13; Thompson sought out Lyon and led him inside, and exhorted the other rioters in the Senate Parliamentarian's office to loot the office to, for example, "Find the laptop!" Thompson and Williams both entered the Capitol Building using entrances from the northwest courtyard: Thompson through the door to the Parliamentarian's hallway, and Williams through the Senate Wing doors, *id.* at 16.  Unlike Williams, Thompson then stole from inside the Capitol (twice), and entered a more sensitive area, the office of the Senate Parliamentarian, as it was being ransacked.  Although Williams did not steal from the Capitol Building or enter any offices, he entered the Capitol earlier and stayed longer (roughly an hour, *id.* at 23), and at one point joined a crowd in resisting being pushed out of the building.  *See id.* at 21-23.  Thompson fled from the police when ordered to stop; Williams did not, but had more concerning social media posts leading up to January 6, and crowed about his conduct on social media after, *see id.* at 7-9, 23-24. Thompson testified falsely under oath about material facts on direct examination and did not relent on cross-examination; while Williams was untruthful in the view of the government on direct examination, it did not seek the 3C1.1 enhancement.  Thompson's case is akin to Williams', and a sentence commensurate with Williams' is appropriate.[12]

---

[12] The cases of the other post-trial felony defendants who have been sentenced to date involved factors not present in this case: violence, destruction of evidence, threats toward or obstruction of police officers, or carrying dangerous weapons on Capitol grounds.  Those defendants have received longer sentences than the 70 months recommended here.  *See Webster*, 21-cr-208-APM,

By contrast, Thompson's case is not comparable to that of his co-defendant, Robert Lyon, as Thompson's significantly higher guidelines range reflects.  Most notably, Thompson was convicted of a felony offense (obstructing Congress's certification of the vote in violation of 18 U.S.C. § 1512(c)(2)), while Lyon pled guilty to misdemeanors.  Their conduct on January 6 also differed dramatically.  Thompson is significantly older than Lyon, and instigated the pair's travel to D.C. on January 6.  Thompson wore a bulletproof vest on January 6, anticipating violence, but Lyon did not.  As detailed in the government's sentencing memorandum in Lyon's case, Lyon appears to have warned Thompson not to enter the Capitol building prior to Thompson doing so. *See* Dkt. 116 at 10, 24 (quoting Lyon's text message corroborating as much).  Nonetheless, Thompson entered, then left and apparently convinced Lyon to join him.  Thompson stole from the Senate Parliamentarian's office twice—Lyon never did.  Thompson sought to re-enter the building at the North Doors, while Lyon did not.  When confronted by the two U.S. Capitol Police Special Agents, Thompson fled, while Lyon stayed put.  Lyon then largely cooperated with the Special Agents, identifying Thompson, and consenting to the search of his phone, which provided the FBI with text messages that were used against Thompson at trial.  Finally, Thompson went to trial and perjured himself on the stand.  Lyon took responsibility for his conduct, pled guilty, and did not testify falsely under oath.

---

Dkt. 110 at 3 (sentence of 120 months); *id.* Dkt. 104 (sentencing memorandum describing case involving assault on police officer); *Robertson*, 21-cr-34-CRC at Dkt. 140 at 3 (sentence of 87 months); *id.* Dkt. 124 (sentencing memorandum describing case involving carrying a dangerous weapon, post-trial destruction of evidence, and obstruction of police officers); *Reffitt*, 21-cr-32-DLF, Dkt. 170 at 3 (sentence of 87 months); *id.* Dkt. 158 (sentencing memorandum describing case involving carrying a firearm, threats to witnesses, destruction of evidence, and obstruction of police officers).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.      Conclusion

Balancing the § 3553(a) factors, the government recommends that this Court sentence Thompson to 70 months' incarceration, $2,000 in restitution, three years of supervised release, and the required $195.00 in special assessments.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052


*/s/ William Dreher*
WILLIAM DREHER
D.C. Bar No. 1033828
Assistant United States Attorney (Detailed)
700 Stewart Street, Suite 5220
Seattle, WA 98101
(206) 553-4579
william.dreher@usdoj.gov