# EXHIBIT 1

1   through the internet, through every means necessary, and it

2   worked.  Remember, we're talking about "Save America."

3       What else did Trump say, which I'm going to prove to

4   you?  "We will stop the steal."  Those are the dog whistles,

5   the tag lines.  Those are the phrases that were utilized to

6   get otherwise law-abiding citizens to buy into this lunacy

7   and to commit these atrocities, all of which regrettably

8   Dustin was a part of.

9       What else did he say?  We will never give up, we will

10  never concede.  It doesn't happen.  You don't concede when

11  there's theft involved.  Our country has had enough.  We

12  will not take it anymore.  This is the president of the

13  United States at the Save America rally whipping up his

14  electorate, whipping up his constituents to commit these

15  heinous acts.

16      It's not his buddy, Robert Lyon.  It's not some, you

17  know, right wing politico.  It's Donald Trump, himself,

18  spewing the lies and encouraging and inviting and, in fact,

19  using his position to authorize this assault.  That's what

20  happened, and I'm going to prove it to you.  But he didn't

21  stop there.

22      If you don't fight like hell you're not going to have a

23  country anymore.  And the biggest, the most disgusting lie:

24  We are going to the Capitol.  We.  I'll be right there with

25  you, is the clear message.  Let's go.  And what did his, his

1   sycophant, his lawyer, Rudolph Giuliani say, "Trial by

2   combat."

3       This is the garbage that Dustin Thompson is listening

4   to, day after day after day, as he sits in his house with

5   his job gone, his wife working at Victoria Secrets everyday.

6   He goes down this rabbit hole.  He listens to this echo

7   chamber, and he reacts accordingly.

8       And you're going to have to decipher.  It's not did he

9   do it, because he most certainly did, but why.  And was he

10   deprived like many others as a result of a sinister,

11   disgusting, incredibly selfish plot to try to preserve an

12   election that was lost fair and square.  And in order to

13   make this last gas effort, Donald Trump encouraged people

14   like Dustin Thompson to storm the Capitol, and that's what

15   you're going to have to ask yourself.

16       Was he so influenced, so used and abused by our top

17   elected official into acting that he was deprived of the

18   ability to behave corruptly and knowingly.  That's the

19   question.  And that's what I'm going to ask you to decide in

20   a fair and unbiased manner as I know you will.

21       Thank you very much.

22           THE COURT:  The government may proceed with its

23   first witness.

24           MR. DREHER:  Thank you, Your Honor.  The

25   government calls U.S. Capitol Police Officer Jamall

1    were taking a look at Exhibit 201C.  I paused it at the four

2    second mark.  Have you seen this video prior to today?

3    A    Yes, sir.

4    Q    Are you in it?

5    A    Yes, sir.

6    Q    Are you in it right now?

7    A    Yes, sir.

8    Q    Where are you?

9    A    [Witness indicates.]

10   Q    And where within the Capitol building -- what area

11   within the Capitol building does this video depict?

12   A    I'm on the first floor on the west side of the Capitol.

13   Q    And what office is this near?

14   A    I'm on the Senate wing, and I'm near the

15   parliamentarian's office.

16   Q    I'm going to play this for the jury.  And I'll pause it

17   and ask you a couple of questions during the video.

18              [Video played.]

19   BY MR. DREHER:

20   Q    So first, let me pause it there, the 11 second mark,

21   and direct your attention to the set of doors on the video.

22   What was going on right there at those doors?

23   A    So I came up on the door and I noticed an individual

24   that had a PR24, which is our riot sticks, and they were

25   breaking the glass in the door.  I immediately called my

1    communication to get some assistance at the door because at

2    the time I was the only one in that hallway.

3    Q    And just to be clear, the individual that you saw

4    breaking the glass, was that a Capitol police officer?

5    A    No.

6                    [Video played.]

7    BY MR. DREHER:

8    Q    Let me pause it there again at the 41 second mark.

9    What's that stuff coming out of -- away from the door?

10   A    So it was glass that was blowing back inside the

11   building from the glass being struck from the outside.

12   Q    Okay.  I'm going to play it again.

13                   [Video played.]

14   BY MR. DREHER:

15   Q    All right.  So what happened just there?

16   A    So --

17   Q    At the -- I apologize, at the 49 second mark?

18   A    Right.  So the door was locked and the officer, we were

19   standing back because we knew that the glass was being

20   broke, but we didn't believe at that time that the door

21   could be ajar that easily.  So we watched the individual

22   stick his hand in the glass, and he hit the bar and the door

23   immediately opened, which we were surprised.

24   Q    And why did that surprise you?

25   A    The doors are locked with a magnet on top, and they're

1    usually are 15 or 30 second delay in order to push the bar

2    for the door to open, and in that video, you know, it was

3    probably two or three seconds from a hand going in and the

4    door just opened.

5    Q    I'll play the video again.

6              [Video played.]

7    BY MR. DREHER:

8    Q    Let me ask you very quickly pausing now at the one

9    minute, eight second mark.  Were you one of the group of

10   officers near the door at that point?

11   A    Yes, sir.

12   Q    And do you see the individual standing in the corner

13   with a dark shirt and khaki pants right next to the door?

14   A    Yes, sir.

15   Q    Is that a member of the crowd or one of your fellow

16   officers?

17   A    One of my fellow officers.

18             [Video played.]

19   BY MR. DREHER:

20   Q    So let me pause it now at the one minute and thirty-one

21   second mark.  Where are you at this point?

22   A    So just beyond the crowd that you can see, we have, I

23   guess, a semi-wall set up where we're still trying to

24   prevent them from coming down that hallway.

25   Q    When you say "semi-wall," what do you mean?

1    A    It was probably at that time about five or six

2    officers.  And we were kind of like lined up in that tight

3    corridor down there, and we were just trying to prevent them

4    from getting past us.

5    Q    Were the number of officers in the hallway outnumbered

6    by the number of other individuals in the hallway?

7    A    Yes, sir.

8    Q    Okay.  Were any of these people allowed to enter the

9    Capitol building this way?

10   A    No, sir.

11   Q    Do you recall anything that the crowd was saying at

12   this time?

13   A    A few.  I remember them saying that this was their

14   House.  They wasn't here to harm the police officers.  They

15   just wanted us to move out the way.

16   Q    Okay.  When that door was opened, did it trigger an

17   alarm?

18   A    Yes, sir.  The door has an alarm on it that sounds off

19   if the door is breached.

20   Q    And did that alarm actually go off on January 6th?

21   A    Yes, sir.

22   Q    All right.  We're going to take a look now at Exhibit

23   232, which is also one that has been admitted.

24            THE COURT:  That's in evidence also I assume?

25            MR. DREHER:  Yes, sir.

1          Stipulation 39 says:  "The rioters looted the

2     Senate parliamentarian's office and caused significant

3     damage, which is shown in Government's Exhibits 271 through

4     287."

5     BY MR. DREHER:

6     Q    Okay.  Let's look at Exhibit 287.  I'll ask you again,

7     have you had the opportunity to see this video prior to

8     today?

9     A    Yes, sir.

10    Q    What does it show?

11    A    The state of the office after it was entered that day.

12    Q    Okay.  And just to be clear this is the

13    parliamentarian's office?

14    A    That's correct.

15              [Video played.]

16    BY MR. DREHER:

17    Q    Okay.  Would you as a Capitol police officer have

18    allowed the individuals who worked in that office to return

19    to work while the crowd was within the building in that

20    location?

21    A    No, sir.

22    Q    Why not?

23    A    Again, we're there to provide security.  Everyone that

24    entered the building that day had not been screened, so we

25    didn't know whether they were safe to come in the building

1    or not.  And therefore, we wouldn't have allowed the staff

2    or the members to come into that office without having,

3    having people in there that weren't screened.

4            MR. DREHER:  At this time, Your Honor, I'm going

5    to read Stipulations 1 through 3 of Exhibit 31.

6            THE COURT:  Very well.  Again, it's a stipulation

7    of fact and you may consider it as undisputed evidence.

8            MR. DREHER:  "The Senate parliamentarian and two

9    assistant parliamentarians work in rooms S132 and S133 of

10   the U.S. Capitol building.  On January 6th, 2021, one

11   assistant parliamentarian left S132 after 12:00 p.m.  The

12   Senate parliamentarian and the other assistant

13   parliamentarian were in their office until approximately

14   12:30 p.m., when they left the office to commence the

15   certification proceeding that day.

16           "Starting at around 1:35 p.m., the Senate

17   parliamentarian and the assistant parliamentarians were

18   present in the Senate chamber to assist the presiding

19   officer, vice president Michael Pence, during the

20   certification of the vote count of the Electoral College of

21   the 2020 presidential election.  The parliamentarians

22   expected to have access to their office throughout the day,

23   and such access would have assisted them in performing their

24   duties during the certification.

25           "For instance, a few minutes before the Senate

1    A     So my partner and I, Special Agent Bank, were actually

2    trying to respond back to United States Capitol police

3    headquarters building for our next assignment when we saw

4    two individuals that were sitting, sitting on the sidewalk

5    next to the Rayburn area.  That's inside a secured

6    perimeter.  We don't know normally see people out sitting

7    there, number one.

8         Number two, all staff and members were still locked

9    down inside the buildings, so we really weren't encountering

10   anybody outside unless they were law enforcement or part of

11   protest and riots.

12   Q     So what happened then?

13   A     So myself and Special Agent Bank approached them.  I

14   was trying to ensure that they were basically leaving that

15   secure perimeter.  So we approached them and tried to find

16   out if they needed anything or what they were doing there.

17        They advised they were trying to get an Uber, so we

18   informed them that an Uber would not be able to get to them

19   there.  We provided additional directions for them on where

20   they could actually meet up with the Uber.  Because again,

21   since it was a secure perimeter, vehicles that are not

22   authorized are not able to get into that area.

23   Q     Okay.  And just to clarify was Mr. Thompson one of the

24   two individuals that you saw at that location?

25   A     Yes.

1    Q    Okay.  Who was the other individual?

2    A    It was his friend, Mr. Lyon.

3    Q    Robert Lyon?

4    A    Yes.

5    Q    What did you do next after having that brief

6    conversation?

7    A    So after we gave them directions they started to leave

8    that area.  However, Mr. Thompson reached for a coatrack

9    that was right next to him.  And recognizing it as something

10   that would actually belong inside the Capitol Building, we

11   told him to leave it.  He complied.  They began walking

12   away.  My partner and I conferred and decided to actually

13   conduct a stop of both Mr. Thompson and Mr. Lyon at that

14   point.

15        So we both started to proceed -- Special Agent Bank was

16   able to approach Mr. Thompson.  Mr. Lyon was a little bit

17   further down the road, so I started catching up to him.  And

18   I had called out to him to get his attention to stop.  He

19   did.  He turned around.

20        About that time, Mr. Thompson began running past me.

21   So I actually -- as soon as I realized that it was Mr.

22   Thompson was running away, I started running after him.

23        Shortly after we had turned the first corner there was

24   actually a member of D.C. Fire Department who had actually

25   also tried to assist me in chasing after Mr. Thompson.  A

1    little bit further after that we were heading down

2    Washington Avenue when I lost him heading towards the

3    Fairchild Building.

4    Q    Okay.  Let me back up just one step from what you were

5    just describing.  What were you and your partner wearing as

6    you approached Mr. Thompson and Mr. Lyon on January 6th?

7    A    So we were both wearing our bulletproof vests.  I had,

8    we both also had on our United States Capitol Police ray

9    jackets that do say "police" on them.  And then my partner

10   also had an external vest carrier that says "police"

11   directly on the front of it.  And then on the front of the

12   jackets it actually has a decal that identifies us as

13   Capitol Police, special agents.

14   Q    Okay.  How far did you and the D.C. Fire department

15   employee chase Mr. Thompson before you lost him?

16   A    So I chased after him for a couple of blocks.  The

17   member from D.C. Fire, I'm not fully sure where he

18   originally came from.  All of a sudden I just saw him

19   passing me trying to assist, so he probably was only there

20   for maybe a block or two.

21   Q    Okay.

22        MR. DREHER:  At this time, I'm going to read

23   Stipulations 49 through 51 of Exhibit 30.

24        "At approximately 6:00 p.m. on January 6, 2021,

25   two U.S. Capitol Police special agents approached Thompson

1    Q    Okay.  And you also mentioned a bulletproof vest.  Is

2    it, is that the item underneath his black sweatshirt in this

3    image?

4    A    Yes.

5    Q    Was he wearing that when you encountered him on the

6    night of January 6th?

7    A    Yes, he was.

8    Q    What's that next to him?

9    A    It appears that it is a coatrack.

10   Q    Okay.  And let me ask you, what is this item clipped

11   to -- do you know what this item is that's clipped to his

12   pocket?

13   A    Yes, so this is an announcer pager that belongs to the

14   Senate Sergeant-at-Arms.

15   Q    And how are you able to identify it as that?

16   A    So based off of the clip, as well as there's two knobs

17   at the top of the pager, and there's also a sticker that if

18   you were able to see in clearly actually would say Senate

19   Sergeant-at-Arms.  It's very distinct.  It has red on the

20   right, white on the left with a bar code.

21   Q    Is other property within the U.S. Capitol Building,

22   does it also receive that sticker?

23   A    Yes.

24   Q    Did you recover any physical evidence from the stop of

25   Mr. Lyon on the night of January 6th, 2021?

1            THE COURT:  Very well.

2            [Video played.]

3    BY MR. DREHER:

4    Q    Have you seen this video prior to today Special Agent

5    O'Neill?

6    A    Yes.

7    Q    All right.  Just to help the jury understand where this

8    is, what's being depicted in this video?

9    A    So currently this is actually showing the, some of the

10   staging that was set up for the inauguration, and it is on

11   the west front of the Capitol.

12   Q    So going back to Government's Exhibit 5, page 2, can

13   you identify where on, on Capitol grounds roughly this video

14   would have been taken?

15   A    Around number nine.

16   Q    Number nine, okay.  And where is that in relation to

17   the lower west tunnel that the jury saw the video of prior

18   to today?

19   A    So the lower west tunnel is right where number nine is.

20   Q    Okay.  Let me pause it there at the four second mark.

21   Can you see the lower west tunnel at this point on the

22   screen?

23   A    Yes.

24   Q    Can you circle it for the jury?

25   A    [Witness complies.]

1          MR. DREHER:  Let the record reflect that the

2    witness has identified, circled the lower west tunnel on the

3    left side of the screen.

4          THE COURT:  Yes.

5    BY MR. DREHER:

6    Q    Can you see Mr. Thompson on the screen?

7    A    Yes.

8    Q    Where is he?

9    A    He's on the right side.

10   Q    About how far away from the tunnel is he at that point?

11   A    Approximately 30 feet or so.

12   Q    Based on your review of CCTV footage, do you know

13   approximately what time the events in this video occurred?

14   A    Starting after about 4:50 in the afternoon.

15   Q    Okay.

16          [Video played.]

17   BY MR. DREHER:

18   Q    I apologize.  I'll stop it at the 11 second mark.  Are

19   there still law enforcement officers inside that tunnel at

20   this point?

21   A    Yes.

22   Q    What about out on the terrace out here, are there --

23   have law enforcement made it out there yet?

24   A    No.

25          [Video played.]

```
 1   BY MR. DREHER:

 2   Q    Let me just pause that.  Can you see an individual

 3   right at the tunnel entrance on the left side of the tunnel

 4   entrance?

 5   A    Yes.

 6   Q    What does that individual appear to be holding?

 7   A    It appears to be a baseball bat.

 8              [Video played.]

 9   BY MR. DREHER:

10   Q    Let me pause it.  Just a second too late there.

11        Do you see an individual with some kind of red clothing

12   on his arm right at the entrance to the tunnel?

13   A    Yes.

14   Q    And what does he appear to be holding in his hand?

15   A    A police helmet.

16              THE COURT:  A what?

17              THE WITNESS:  Police helmet.

18   BY MR. DREHER:

19   Q    At the 1:02 mark, can you see the defendant again on

20   the screen?

21   A    Yes.

22   Q    Can you circle him for the jury?

23   A    [Witness complies.]

24              MR. DREHER:  Let the record reflect that the

25   witness has identified the defendant on the lower right of
```

1    the video at the 1:02 mark.

2              THE COURT:  Yes.

3              [Video played.]

4    BY MR. DREHER:

5    Q    The 1:15 mark, did you hear what that individual was

6    saying in the video?

7    A    Yes, she was yelling "traitor."

8              [Video played.]

9    BY MR. DREHER:

10   Q    Let's look at Government's Exhibit 242A, which has been

11   admitted.  What does this video depict, Special Agent

12   O'Neill, what area, I should say?

13   A    So again, it's the exterior of the lower west tunnel.

14   This is just a little bit later.

15   Q    Okay.  About how much later than the prior video do you

16   think?

17   A    A few minutes.

18   Q    And that's based on your review of the CCTV of this

19   area?

20   A    Yes.

21   Q    Does the defendant appear in -- in the longer version,

22   I should say, of this open source video?

23   A    Yes.

24   Q    Okay.  And if we look at now Exhibit 242B, which was

25   also admitted, how many pages are in this exhibit?

1    A    Two.

2    Q    All right.  And are these screen shots from the longer

3    video from which Exhibit 242A was taken?

4    A    Yes.

5    Q    Where's the defendant on the first page of Exhibit

6    242B?

7    A    On the right-hand of the screen.

8    Q    Okay.  With the green hand on the back of his

9    sweatshirt?

10   A    Yes.

11   Q    What about on the second page of Exhibit 242B?

12   A    Again, he's on the right-hand side of the screen.

13   Q    During your review of these videos in this area, do you

14   see the defendant standing anywhere other than that general

15   area up until the point where he leaves the area?

16   A    Based on the open source videos he's pretty much

17   remains in that area.

18   Q    Okay.  Let's go back then to 242A, and I'll play that

19   for the jury.

20              [Video played.]

21   BY MR. DREHER:

22   Q    Let me pause it there at the 52nd mark.  What about

23   that entrance or window that is depicted at the fifty second

24   mark of the video?

25   A    So that's a room off to the side of the lower West

1    Terrace door.

2    Q     Is the public allowed to access that room from that

3    entrance?

4    A     No.

5                [Video played.]

6    BY MR. DREHER:

7    Q     Let me just pause it there again.  Again, did you

8    see -- what are these individuals using in their

9    interactions with law enforcement officers here?

10   A     A lot of it's anything that they could find, grab,

11   brought with them, baseball bats.  They'll use the police

12   shields against officers as well as other random items.

13               [Video played.]

14   BY MR. DREHER:

15   Q     Pausing at the one minute 32 second mark.  Do you see

16   the individual holding up some kind -- I don't know exactly

17   know what it is, some kind of light producing object?

18   A     Yes.

19   Q     And where he's pointing at?

20   A     At officers' eyes.

21               [Video played.]

22   BY MR. DREHER:

23   Q     Now, let's take a look at Government's Exhibit 246A.

24               [Video played.]

25

1    BY MR. DREHER:

2    Q    I'll pause it there at the three second mark.  What

3    does that show at the three second mark?

4    A    So additional law enforcement had arrived.  This is the

5    outside area of the lower West Terrace, so it's the same

6    area just a different angle.

7    Q    Okay.  So the entrance that is on the screen right now

8    at the three second mark, what entrance is that?

9    A    The lower West Terrace entrance.

10           THE COURT:  You didn't indicate if this was in

11   evidence.  I assume it is?

12           MR. DREHER:  It is, Your Honor.

13           THE COURT:  Very well.

14           [Video played.]

15   BY MR. DREHER:

16   Q    Let me stop it at the 25 second mark.  What's all that

17   smoke from?

18   A    So that was additional things that Virginia State

19   Police had brought with them for additional munitions to

20   basically try to assist with clearing out the crowd.

21           THE COURT:  What state police did you say?

22           THE WITNESS:  Virginia State Police.

23   BY MR. DREHER:

24   Q    And approximately what time is this occurring?

25   A    A few minutes after 5:00 p.m.

1              THE COURT:  Redirect?

2                    **REDIRECT EXAMINATION**

3    BY MR. DREHER:

4    Q    Special Agent O'Neill, you were asked some questions

5    about weapons just now.  Based on your review of the

6    footage, did the defendant submit to a pat-down search when

7    he entered the Capitol Building?

8    A    No, he did not.

9    Q    Was he frisked by law enforcement officers in any of

10   those videos that you watched?

11   A    No, he was not.

12   Q    What about when you encountered him at night, at 6:00

13   p.m., that night did you frisk him then?

14   A    No.

15   Q    Why weren't you able to frisk him?

16   A    Because he ran.

17   Q    Okay.  Do you know whether he had any weapons on his

18   person?

19   A    No.

20   Q    You had testified earlier about something called an

21   enunciator.  Did you notice that enunciator on the

22   defendant's person when you saw him at 6:00 p.m. that night?

23   A    No, I did not.

24   Q    So it was only later when you saw the image of him that

25   you saw that on his belt?

1   A     That is correct.

2   Q     During the time that he was at the Capitol Building, do

3   you know whether Mr. Thompson was aware that he was being

4   filmed by CCTV footage?

5   A     I'm -- I don't know if he was aware.

6                MR. DREHER:  No further questions.

7                THE COURT:  Any questions from the jury?

8                [No response.]

9                THE COURT:  Thank you, Miss.

10               THE WITNESS:  Thank you, Your Honor.

11               [Witness excused.]

12               THE COURT:  Next witness.

13               MR. DREHER:  The government calls United States

14   Capitol Police Officer Ronald Lucarino.

15               Thereupon,

16                    OFFICER RONALD LUCARINO,

17   having been called as a witness for and on behalf of the

18   Government, and having been first duly sworn by the Deputy

19   Clerk, was examined and testified, as follows:

20               THE WITNESS:  I do.

21                       **DIRECT EXAMINATION**

22   BY MR. DREHER:

23   Q     Good morning.

24   A     Good morning.

25   Q     Please introduce yourself to the jury.

1    Q    Okay.

2              THE COURT:  Can you clear his markings?

3              MR. DREHER:  I apologize, yes, Your Honor.

4    BY MR. DREHER:

5    Q    I'm going to skip forward here to the 252 mark.  So

6    that's actually the 249 mark.  What is that on the ground,

7    if you know, underneath this individual's feet, just sort of

8    just to the left of the Senate parliamentarian's door?

9    A    The broken glass.

10   Q    And do you know where that came from?

11   A    There was some kind of, as you can see looking at the

12   bottom of the screen, you can see it a little bit better on

13   your left-hand side.  There's glass that used to be there

14   that was just either just kicked or hit and just smashed.

15   And I believe it protected something beyond there either a

16   picture or something that was in the Capitol Building, I'm

17   not sure what the --

18   Q    Okay.  Do you see any Capitol police officers on the

19   screen at this point?

20   A    Yes, I see two on the left-hand side.

21   Q    Do you know any of those officers?

22   A    I know one of them.  I don't know who the second one

23   is, though.

24   Q    Let me know when you see yourself on the screen if that

25   happens at any point.

1   A    Well, that was one of two things.  It was either less

2   than lethal ammunition that was either being shot at us or

3   being shot at them or some kind of OC spray.

4   Q    This video has no sound, was it this quiet in the

5   hallway when you were there?

6   A    No, no, it was very loud.  Not only the amount of

7   people loud, but that door alarm that was on that fire door

8   was just buzzing.  And inside the Capitol Building it's very

9   deafening because it's -- it kind of echos almost everything

10  because of the way it's built.  So it was just almost three

11  times like what you would imagine.

12  Q    Let me pause it at the four minute 32 second mark.  Now

13  do you see any officers on the screen?

14  A    Yes.

15  Q    Where are they?

16  A    They're all pretty much in that little almost V shape

17  form at the top of the screen pushing that crowd back.

18  Q    Do you know whether those were all Capitol police

19  officers?

20  A    They were not, no.

21  Q    Who else, what other types of officers were there?

22  A    We had Metropolitan in that crowd, and we had Metro

23  Transit Police in that crowd also.

24  Q    And when you say "Metropolitan," just to be clear, what

25  are you referring to?

1    A    [Witness complies.] It would be in this corner right

2    here.

3    Q    So outside of the building on the very left top portion

4    of the building, that's where you just marked, is that

5    correct?

6    A    Yes, ma'am.

7    Q    Okay.  So you get to the north doors, what do you see?

8    A    So as soon as I get to the north door I realize that

9    there's two officers standing in complete crowd dispersion

10   gear, which is protective gear.  And there's a lot of people

11   on the outside of the doors trying to make their way into

12   the building.  At that point in time I realized that nobody

13   really knows what to do because this is the first time that

14   a lot of people have ever experienced something like this.

15        So I get on the radio and I'm asking if we have any

16   less than lethal help which is basically anything less than

17   using our weapons to deter, trying to get them away from

18   being in that area.  When I went over radio and I asked for

19   that they came back over the radio and said that we don't

20   have any more, less than lethal stuff, we're out.  So I

21   improvised and I grabbed the fire extinguisher.

22   Q    Okay.  I'm going to stop you there.  I'm putting on the

23   screen what has been marked and admitted as Exhibit 118.

24   Can you describe this for the jury?

25   A    Yes, ma'am.  That's the north door, so that, that's the

1    outside of the north door.  And then there's another set of,

2    there's another set of double doors on the inside, and it's

3    a big wooden vestibule, but it's broken up between two

4    doors.

5    Q    I'm going to be putting on the screen what has been

6    marked and admitted as Exhibit 247.  Can you describe this

7    for the jury?

8    A    Yes, that's the inside of the north door.

9    Q    Do you know who took that photograph?

10   A    I took that photograph.

11   Q    You took it?

12   A    Yes, ma'am.

13   Q    And why did you take it?

14   A    To remember what was going on that day.

15   Q    All right.  So you, your fellow officers have no more

16   non-lethal devices, so you grab a fire extinguisher, is that

17   correct?

18   A    Yes, ma'am.

19   Q    And what do you do with that fire extinguisher?

20   A    So there was something in the doorway that wasn't

21   allowing us to open the door fully.  So I was able to plug

22   the hose of the fire extinguisher out the door and start

23   spraying into the crowd, which ultimately got the crowd away

24   from that doorway.  And then while doing that, I end up

25   spraying myself because they sprayed something into the

1    doorway and I saw it come in, so I went to go brace myself

2    for the spray and end up spraying myself with the fire

3    extinguisher.  So I end up going to de-con myself, which is

4    clean myself off, and one of the other officers took over

5    that fire extinguisher and continued using it to disburse

6    the crowd or try to disburse the crowd.

7    Q    And I just put back up Exhibit 118.  You said there was

8    something in the door?

9    A    Yes, ma'am.

10   Q    Is that in this photograph?

11   A    Yes, ma'am.

12   Q    Okay.  Can you circle that for the jury, please?

13   A    [Witness complies.]

14   Q    Okay.  You've circled the handles of the inner door in

15   Exhibit 118, is that correct?

16   A    Yes, ma'am.

17   Q    There appears to be something there that -- and that

18   did not allow you to open the door?

19   A    No.

20   Q    Officer Reyes, I'm going to back this up just for a

21   moment.  I'm putting up on the screen what has been marked

22   and admitted as Exhibit 235.  We're going to watch a little

23   bit of it, and then I'll stop it and ask you some questions.

24            [Video played.]

25

1  A    Yes.  This is Mr. Thompson messaging Mr. Lyon at 4:03

2  saying, "Going inside."  And then again Mr. Thompson a few

3  seconds later at 4:03 saying, "Sell it, $500."

4  Q    And when Mr. Thompson is saying, "sell it," do you,

5  based on your investigation, know what he's referring to?

6  A    Yes, he is referring to the coatrack.

7  Q    I'm going to have you describe text message number 27

8  for the jury, please?

9  A    This is Mr. Lyon messaging Mr. Thompson at 4:04 saying,

10  "Some girl died already."

11  Q    And do you know what Mr. Lyon was referring to when he

12  said that to Mr. Thompson?

13  A    Yes.  I believe he's referencing the shooting of Mrs.

14  Babbitt earlier in the Capitol Building.

15       MS. ROZZONI:  And at this time I'm going to be

16  reading from Exhibit 30, which has been admitted already,

17  Stipulation number 23.

18       "At around 4:45 p.m., one rioter was shot and

19  killed while attempting to break into the Speaker's lobby

20  directly adjacent to the House of Representatives' chamber."

21  BY MS. ROZZONI:

22  Q    So in response to Mr. Lyon's text about some girl dying

23  already, I'm going to have you look at texts 29 and 30.

24  A    In response to that text message, Mr. Thompson says to

25  Mr. Lyon at 4:05, "Was it Pelosi?"  Mr. Thompson then sends

1   another text message to Mr. Lyon at 4:06, which is another

2   screen shot of himself at the north door.

3   Q    And we're going to put up Exhibit 118, which has been

4   previously marked and admitted.  What is Exhibit 118?

5   A    Sure.  This is a picture Mr. Thompson sends to Mr.

6   Lyon, and this is the north doors of the Capitol.

7   Q    Going back to Exhibit 100, I'm showing you text number

8   36, can you describe this for the jury?

9   A    Sure.  As previously stipulated, this is from Sarah

10  Thompson, Mr. Thompson's wife, and this is sent to Mr. Lyon

11  on January 6th at 4:24 and it is another screen shot.

12  Q    And I'm going to move to that screen shot as Exhibit

13  120.  Is this exhibit --

14           THE COURT:  One moment.  We need to take a short

15  break.  One of the jurors forgot his mask.

16           MS. ROZZONI:  Absolutely.

17           THE COURT:  Five minute break.

18           [Thereupon, Jury exits the courtroom at

19       1:59 p.m.]

20           [Thereupon, recess taken at 1:59 p.m.,

21       resuming at 2:03 p.m.]

22           [Thereupon, Jury enters courtroom at

23       2:05 p.m.]

24           [Special Agent Brian Thomas resumed the

25       witness stand.]

```
 1   Q    You're vaccinated, correct?

 2   A    Yes.

 3   Q    Take off your mask, please.

 4   A    (Witness complies.)

 5   Q    You're Dustin Thompson?

 6   A    I am.

 7   Q    How old are you?

 8   A    Thirty-eight.

 9   Q    And you grew up in central Ohio?

10   A    Yeah, I was born in Chillicothe, but I moved to

11   Columbus fairly shortly after.

12   Q    Okay.  Keep your voice up so everybody can hear you,

13   all right?

14   A    Yep.

15   Q    And your parents separated early?

16   A    Correct.

17   Q    And your mom ultimately married your current stepdad,

18   who is -- what does he do for a living?

19   A    He's an orthopedic surgeon.

20   Q    All right.  So growing up, where did you go to high

21   school?

22   A    I went to Upper Arlington High School.

23   Q    I want you to keep your voice up, please, so everybody

24   can hear you.

25   A    Upper Arlington High School.
```

1   Q    So, you get laid off.  Tell these folks what that was

2   like and what you did and where your head was?

3   A    I mean, it was hard at first, like, I mean, I've always

4   had a job.  And then with like the pandemic and everything,

5   it just -- I couldn't go anywhere, couldn't do anything, no

6   one was hiring, so just kind of stuck at home.  And I kind

7   of got involved in conspiracy theories and going down the

8   rabbit hole on the internet.

9   Q    Let's slow down there.  So your normal existence comes

10  to a halt, right?

11  A    Correct.

12  Q    You're at home, and you've got, what, plenty of time on

13  your hands, I'm assuming?

14  A    Yes.

15  Q    And no job opportunities, correct?

16  A    Correct.

17  Q    And so at this point you're still, your marriage plans

18  are still in play, right?

19  A    Yeah.

20  Q    And so what's a day look like for you, you get up, and

21  what do you do, you start --

22  A    I was looking into like stocks and day trading for a

23  little bit, like some Robin Hood stuff.  I was on

24  unemployment so I played with trying to make the most of

25  that money.  So I would -- and that would give me like

1    almost a reason to get up at 9:00 a.m. to look at stocks and

2    stuff.

3    Q    Keep your voice up.  So you started to trade some

4    stocks, and then how did you start to get into this rabbit

5    hole that you just described, this internet mentality, what

6    drew you to all that information or misinformation, however

7    you want to characterize it?

8    A    It was just like the, I mean, I would just have to say

9    the President, at that time Trump, he was saying a lot of

10   things that were, looking back on it now I would say like

11   outlandish, but at the time were intriguing.

12   Q    Well, how in the world did you get interested in this

13   stuff?  I mean, what about it was making sense to you back

14   then?

15   A    Just like, it just seemed like everyone was against him

16   and that he needed someone to stand up for him, and I was

17   trying to be that, like --

18   Q    Say that again?

19   A    Like it just seemed like everyone was against Trump,

20   and I didn't see why.

21   Q    Well, you -- so you began to gravitate towards him

22   because you saw him as sort of an underdog?

23   A    Yeah, yeah, and -- yeah.

24   Q    And so when you get on the internet as 2020 started to

25   move along, what kind of information were you consuming

```
 1   point, do you know that there's going to be an insurrection

 2   and an engagement of the Capitol building?

 3   A    I do not.

 4   Q    Had you been still following the online chatter about,

 5   about the event?

 6   A    I just thought it was going to be a rally for -- Trump

 7   was going to talk and a bunch of people were going to attend

 8   and show support for him.

 9   Q    Okay.  So you and Robert stay the night in Maryland,

10   the 5th, correct?

11   A    Yes.

12   Q    You get up early on the 6th, right?

13   A    Yeah.

14   Q    And then what do you do?

15   A    We got an Uber to the Washington monument because we

16   didn't know exactly where to go, we just --

17   Q    I'm sorry?

18   A    We just got an Uber to the Washington monument, it's

19   where we told him to take us.

20   Q    You got an Uber to the monument?

21   A    Yes.

22   Q    I'm having a hard time hearing, keep your voice up.

23   A    Sorry.  Yes, we got an Uber to the Washington monument.

24   Q    Okay.  And what time do you figure that you arrived at

25   the rally?
```

1    A    Ten a.m.

2    Q    Okay.  And so there were multiple speakers at this

3    rally, correct, it went on for hours?

4    A    Yes, it did.

5    Q    All right.  And you attended it in its entirety?

6    A    Yes.

7    Q    So, did you hear Rudy Giuliani?

8    A    I did.

9    Q    Did he make mention of, among other things, we have

10   to -- it's going to be trial by combat?

11   A    I did hear that.

12   Q    And what did that mean to you as you stood there

13   listening -- first of all, did you know who Rudy Giuliani

14   was?

15   A    New York governor.

16   Q    You thought he was the governor?

17   A    Or not, yeah, I just knew he was a New York guy.

18   Q    Okay.  And you knew he was the president's lawyer or

19   did you?

20   A    No.

21   Q    Okay.  So you were not aware of that?

22   A    Correct.

23   Q    And then at some point does Trump himself take the

24   stage?

25   A    Yes, he does.  It was, I think after Rudy Giuliani,

1  because the sons talked and then Trump talked.

2  Q    Okay.  So as you looked around you, the crowd consisted

3  of thousands of people, right?

4  A    Oh, yeah.

5  Q    And some of them were dressed up and made up and

6  swinging flags around as depicted in the videos?

7  A    Yeah.

8  Q    Now, you know, rather than play the entire video, I

9  want to ask you a few questions about what you might have

10  heard.

11  A    Okay.

12  Q    And I'm going to refer to Government's Exhibit 330.  Do

13  you remember if Trump talked about giving up or never

14  conceding?

15  A    Yeah, he said he would never concede, the election was

16  stolen.

17  Q    He said he would never concede, the election was

18  stolen?

19  A    That democracy, the way that this country runs is a

20  threat and at risk of being destroyed.

21  Q    And at this point you still believed the notion that

22  was -- that you had gleaned from Trump and from internet

23  sources that the election was fraudulent?

24  A    Correct.

25         MR. DREHER:  Objection again, Your Honor.

1          THE COURT:  It is leading, sustained.

2          MR. SHAMANSKY:  I'll rephrase.

3  BY MR. SHAMANSKY:

4  Q    What did you glean from the sources that you had

5  followed?

6  A    That the election was rigged to put Biden in office.

7  Q    How in the world did you come to that -- why did you

8  believe --

9  A    Because I was hearing it for months leading up to that

10 event that if he loses, it's not because he didn't have

11 enough votes, it was because it was stolen from him.

12 Q    And as you were standing there with Trump, did he

13 suggest to you that he had won the second election, the one

14 that was the subject of this rally?

15 A    Yes.

16 Q    Did he talk about -- did he make comparisons between

17 America and countries he called third world countries, do

18 you recall?

19 A    That they have better elections than we do, there's

20 more integrity in an election.

21 Q    Did he use terms such as "disgraceful"?

22 A    That the -- in the United States election, yes.

23 Q    How did that make you feel?

24 A    Angry.  You know, it was like stuff said that -- and I

25 thought it was true.

1   Q    And were there a collective sort of vibes he was

2   speaking, was the crowd responding to him?

3   A    It was a very positive atmosphere at the rally.

4   Q    And did he get into some discussion, as you recall,

5   about monuments coming down and getting rid of the

6   Washington monument?

7   A    Yes, because they were going to take down the George

8   Washington monument, and you can't cancel culture.

9   Q    And did you believe that these were notions that -- did

10  it make any sense to you?

11  A    Yeah, like I thought they were just going to try and

12  like erase history and rewrite it.

13  Q    And at points during this diatribe, this speech, did

14  you feel drawn in or empowered or did you feel --

15  A    Yeah, no, I was -- I felt like I was with like-minded

16  people, and it was -- you just have to have a positive

17  attitude.

18  Q    With Trump talking, you're stronger, you're smarter,

19  you got more going than anybody, how did that make you feel?

20  A    Good.

21  Q    Had anybody told you that during the last year?

22  A    No.

23  Q    And did you get the feeling as the -- as the speech

24  went on that there was going to be a task to carry out, that

25  there was a more, more -- more expected of you than just sit

1    and listen?

2    A    When he said that we're going to march on the Capitol

3    and --

4    Q    Let's stop right there.

5    A    Okay.

6    Q    He said we're going to march on the Capitol, is that

7    what you heard?

8    A    Correct, yeah.

9    Q    Who is the "we"?

10   A    Him, Pence.

11   Q    Who's "him"?

12   A    President Trump.

13   Q    So you're standing there with these other like-minded

14   folks with flags waving and there are just positive vibes,

15   is that how you describe it?

16   A    Yeah.

17   Q    And he said "we" --

18   A    Uh-huh.

19   Q    -- are going to march on the Capitol?

20   A    Yes.

21   Q    And so did you believe that?

22   A    I did.  I, yeah, I was like, I did not know at the time

23   that we were going to go to the Capitol, but when he said

24   that, I did, like I realized that that was what was going to

25   happen.

1   Q    And at this point, and you knew he was the president of

2   the United States, right?

3   A    Yes.

4   Q    Does that lend him any sense of credibility in your

5   mind or any sense of knowledge or wisdom or how did that

6   make you feel?

7   A    I mean, if the president's giving you like almost an

8   order to do something, I felt obligated to, to do that.

9   Q    As you stood there, were you the only -- I mean, could

10  you tell that, that -- were there others responding

11  positively to this message?

12  A    The crowd was very positive.

13  Q    Did the president indicate, while you were standing

14  there, anything about the state of the news media in this

15  country?

16  A    Yeah, the fake news.

17  Q    What does that mean, the fake news, well, what did it

18  mean to you then?

19  A    That they lie about him, and just say things that

20  aren't true because they don't like him.

21  Q    And you believed that, didn't you?

22  A    I did.

23  Q    Well, why did you believe it?

24  A    It just seemed believable.  He's the president.

25  Q    And so when you hear this message -- and let me just

 1   back up quickly.  Peppered throughout this speech, do you

 2   recall references to states wanting to re-vote and all kinds

 3   of shenanigans about ballot boxes and this and that?

 4   A    Just that he said he wasn't going to concede the

 5   election until they like audited certain states' votes.

 6   Q    And that sounded credible to you?

 7   A    Yes.

 8   Q    And as the speech wore on and got down to the -- near

 9   the end, do you recall the president imploring you to stand

10   up for the Constitution and for the good of the country?

11   A    Yes.

12   Q    And then do you recall him saying if you do not, he's

13   going to be very disappointed in you?

14   A    Yes.

15   Q    How did that make you feel?

16   A    Like I had to do something to gain his respect or like

17   his approval.

18   Q    Didn't you feel like you'd been the subject of a hoax,

19   I mean, it felt real to you at that point?

20   A    It did.

21   Q    And so as it got down to about the hour and nine minute

22   mark, when you heard the words, "Fight, we fight like hell,"

23   and if you don't fight like hell, you're not going to have a

24   country anymore?

25   A    Correct.

1    you to behave in that fashion?

2    A    I mean, besides being ordered by the president to go to

3    the Capitol, I don't know.  I was just caught up in the

4    situation and it just was way out of hand.

5    Q    When he told you that you had to fight like hell,

6    apparently some of these people, it didn't appear to me, I

7    should ask it this way:  Did it appear to you that people

8    were following that directive?

9    A    Yes.

10   Q    Now, we've watched a lot of closed-circuit video and

11   other video that describes, I don't know, free ware, or

12   something, open source.  You know, of course, this was the

13   worse possible behavior, right?

14   A    Absolutely, deeply ashamed.

15   Q    As you watched these videos of yourself prancing around

16   the parliamentarian's office, how do you -- looking back on

17   it, what in the world is going through your head?

18   A    I mean, honestly I don't even know.  I wasn't thinking,

19   like, clearly.

20   Q    You were thinking clear enough to snatch the coat rack,

21   right?

22   A    Yeah.  I mean, it was by the door, actually I took it

23   because I felt like someone else was going it use it as a

24   weapon.

25   Q    Say that again, I didn't hear.

1   A    It was by the door, and I just grabbed it on the way

2   out because I felt like someone else was going it use it as

3   a weapon.  When I was in there, the things that I saw just

4   horrified me.

5   Q    Well, you weren't so horrified that you didn't take a

6   picture now woohoo, right?

7   A    Yes.

8   Q    What did you do that for?

9   A    I was thinking that somehow I was making a difference.

10  Q    You thought you were -- you felt like you were fighting

11  like hell?

12          MR. DREHER:  Objection, Your Honor.

13          THE COURT:  I'll sustain the objection.

14  BY MR. SHAMANSKY:

15  Q    Did you feel -- how did you feel?

16  A    I mean, I'm not a violent person, I never have been,

17  but I guess it was my way of fighting.

18  Q    And you ripped off a bottle of booze?

19  A    Yes, sir.

20  Q    That alcohol wasn't yours, was it?

21  A    No.

22  Q    And you took it anyway, right?

23  A    I did.

24  Q    Was it your intention to follow the president's order

25  to fight like hell and disrupt?

1    A    Yes, I was definitely going to -- I wanted to be more

2    of an observer, but I just kind of got sucked into the whole

3    thing.

4    Q    You hung around for hours, right?

5    A    I did.

6    Q    And did you attempt to conceal your identity?

7    A    No.

8    Q    Where did you get that outfit with the green hand on

9    it?

10   A    It's from a concert.

11   Q    It's a rock band or something?

12   A    Yeah.

13   Q    And so you did nothing to conceal your identity, right?

14   A    No.

15   Q    You knew there were cameras everywhere, correct?

16   A    Yes.

17           MR. DREHER:  Objection, Your Honor.

18           THE COURT:  Sustained, I'll sustain the objection.

19   BY MR. SHAMANSKY:

20   Q    Did you know there were cameras everywhere?

21   A    Of course, I did.

22   Q    Was it a secret?

23   A    No.

24   Q    And so after you, you snatched the coat rack, the

25   bottle of booze and that little beeper, you went outside?

1    A    Yes.

2    Q    And how did you feel, sitting here today, having

3    listened to law enforcement personnel trying to maintain law

4    and order protecting you?

5    A    Just I felt I was just disgraceful, I was beside

6    myself, it's --

7    Q    Say that again?

8    A    Disgraceful, like I can't believe the things that I

9    did.  I extremely regret them.

10   Q    And so, as I understand from the government's

11   testimony, were you outside with this rack with your cohort

12   when the cops came up?

13   A    No, when I -- no, like at 6:00 p.m., is that what

14   you're talking about?  Yeah, we were trying to -- there was

15   the 6:00 p.m. curfew, we were trying to figure out how to

16   leave, both of our phones were dead, we didn't know where to

17   go.  The last message I sent out was for -- the location we

18   were at.

19   Q    And you're depicted in these videos, you're clearly

20   inside the parliamentarian's office, correct?

21   A    Yes.

22   Q    You were in other areas of the Capitol, right?

23             MR. DREHER:  Objection again, Your Honor.

24             THE COURT:  It is sustained.

25

1   don't know why I did that.  I learned that I got to be

2   responsible for my own actions, and I can't let other people

3   tell me what to do even if they're the president.

4            MR. SHAMANSKY:  That's all I have, Your Honor.

5            THE COURT:  Cross-examination.

6            MR. DREHER:  Just a moment, Your Honor.  Court's

7   indulgence.

8            [Brief pause.]

9                          **CROSS-EXAMINATION**

10  BY MR. DREHER:

11  Q    Good afternoon, sir.

12  A    Thanks.

13  Q    You're 38 years old?

14  A    I am.

15  Q    So you were 37 years old on January 6th of 2021?

16  A    I was 36, I believe.

17  Q    You were 36?

18  A    Uh-huh.

19  Q    Okay.  You were married at the time?

20  A    I was.

21  Q    An adult?

22  A    Yes.

23  Q    You had a college degree?

24  A    Yes.

25  Q    You've held numerous jobs?

1    Q    So you got there around 10:00 a.m.?

2    A    Yeah.

3    Q    Right?  You, while you were there at the rally, you

4    heard some statements from someone named Rudolph Giuliani,

5    Rudy Giuliani?

6    A    Correct.

7    Q    Okay.

8         MR. DREHER:  At this time, Your Honor, the

9    government moves to admit Exhibit 317.

10        MR. SHAMANSKY:  No objection.

11        THE COURT:  Very well.

12        [Thereupon, Government's Exhibit No. 317

13     admitted into evidence.]

14        THE COURT:  Is that a defense or government?

15        MR. DREHER:  It's a government, Your Honor.

16        THE COURT:  Government's Exhibit 317?

17        MR. DREHER:  317, Your Honor.

18   BY MR. DREHER:

19   Q    All right.  So you were down at the rally?

20   A    I was.

21   Q    And when Mr. Giuliani made those comments, I think you

22   said it was, "Let's have trial by combat," is that right?

23   A    Yes.

24   Q    Okay.  So could you see him from where you were

25   standing?

1  A    No, it was on a screen.

2  Q    Okay.  And was it hard to hear him because of all the

3  noise from the crowd?

4  A    No, we had speakers and it was on the radio.

5  Q    Okay.  So you actually -- you can remember that you

6  were able to hear it, notwithstanding the crowd around you?

7  A    Yes.

8  Q    All right.  Then after the speech by President Trump,

9  you testified that you walked to the Capitol building,

10 right?

11 A    Yes.

12 Q    It took a long time, didn't it?

13 A    It did.

14 Q    It took about an hour or so, maybe longer?

15 A    Yeah.

16 Q    Could have taken a cab home?

17 A    I don't think I could've figured out to get out of

18 there at that point.

19 Q    You don't think you could have figured out how to take

20 a cab home at that point?

21 A    I mean, I wasn't ready to leave.  I wanted -- I was

22 going with the crowd.

23 Q    Mr. Thompson, you heard when your wife called you a

24 very intelligent person, right?

25 A    I did.

1  Q    And you agree to that, you are a very intelligent

2  person?

3  A    Sometimes.

4  Q    You've got college degrees?

5  A    I do.

6  Q    You were 36 and married at the time?

7  A    Yes.

8  Q    You were able to get yourself home from that rally if

9  you had decided not to go to the Capitol building, right?

10 A    Yes.

11 Q    Could have gotten on a bus?

12 A    I didn't see any buses.

13 Q    Could have gotten on the subway?

14 A    I don't know where the subway is, I've never been to

15 D.C. before January 6th.

16 Q    Do you think it's possible you could have used your

17 phone to figure out where public transportation was that

18 day?

19 A    Yes.

20 Q    Okay.  You could have just stopped for lunch in

21 Washington, D.C., right?

22 A    I didn't see anywhere to -- we got a hotdog from a

23 street cart.

24 Q    Sorry, Mr. Thompson.  All the way from the White House

25 down to the Capitol building, did you just say you didn't

1    see anywhere where you thought you could stop for lunch on

2    January 6th?

3    A    Correct.

4    Q    Okay.  You didn't stop for lunch, right?

5    A    No.

6    Q    You kept going?

7    A    I did.

8    Q    And President Trump wasn't there standing right next to

9    you, was he?

10   A    No, he wasn't.

11   Q    No.  You didn't see him anywhere around, right?

12   A    I saw some black cars I was told that he was in that

13   were headed towards the Capitol.

14   Q    Okay.  Was President Trump with you the entire time

15   that you were walking down to the Capitol building?

16   A    No.

17   Q    Okay.  So President Trump wouldn't have known if you

18   hadn't gone to the Capitol, right?

19   A    Right.

20   Q    He didn't know whether or not you were going to go or

21   any of the other individual rioters?

22   A    I think he anticipated it.

23   Q    Okay.  He didn't force you to go.  He didn't force you

24   to walk every step of the way to the Capitol building, did

25   he?

```
1   A     No.

2   Q     You chose to do that?

3   A     I was following presidential orders, but yes.

4   Q     That's a yes, you did choose to do that yourself,

5   right?

6   A     I did.

7   Q     All right.  I was a little confused about your

8   testimony about this bulletproof vest.  Did you testify on

9   direct examination that you found a bulletproof vest near

10  the Washington monument?

11  A     I did.

12  Q     And it wasn't yours?

13  A     Correct.

14  Q     And you took it?

15  A     Yeah.

16  Q     I thought you told me that stealing was wrong, Mr.

17  Thompson?

18  A     I mean, it was by a trash can, and we had stayed after

19  the rally to see if anyone took it, no one did.  So we just

20  thought someone didn't want it, didn't want to carry it or

21  something so we just -- I -- we took it.

22  Q     Mr. Thompson, you testified that no one had made you

23  feel as loved as President Trump had at that speech in the

24  last year, something like that, right?

25  A     It was very moving, yeah.
```

1    Q    And was it because of that emotional vulnerability that

2    you felt the need to put on a bulletproof vest before

3    walking to the Capitol?

4    A    Well, I, once -- once I had it, I wasn't going to carry

5    it, I was going to wear it.

6    Q    Oh.  So it was just more convenient to wear the

7    bulletproof vest that you had stolen at that point?

8    A    It's better to be safe than sorry.

9    Q    Right.  Because the bulletproof vest protects you

10   against bullets, right?

11   A    Yep.

12   Q    Or other kinds of violence, stab wounds, right?

13   A    Yeah.

14   Q    And you wore it on the way to the Capitol because you

15   anticipated there might be that kind of violence, right?

16   A    I thought there might be.

17   Q    But you went anyways?

18   A    I did.

19   Q    All right.  So let's talk about what happened when you

20   got to the Capitol building.  You got on the Capitol

21   grounds, right?

22   A    Yes.

23   Q    At that point you knew that the Capitol had been closed

24   by the U.S. Capitol Police?

25   A    Yes.

1   Q    And when you went into the Capitol building the first

2   time, you heard a, like a loud alarm ringing at the door,

3   right?

4   A    Yes.

5   Q    Couldn't miss it?

6   A    Yeah.

7   Q    Did that seem normal to you, to walk into a building

8   with the alarm going off like that?

9   A    Nothing, 'cause what I saw at the Capitol when I got

10   there seemed normal.

11   Q    Okay.  So nothing seemed normal, but you chose to go

12   inside anyways, right?

13   A    Yes.

14   Q    And President Trump wasn't standing next to you at the

15   doors to the Capitol building forcing you to go inside, was

16   he?

17   A    No.

18   Q    You, Dustin Thompson, are the one who chose to do that?

19   A    I did.

20   Q    When you got inside, there was broken glass on the

21   ground, right?

22   A    I didn't see it.

23   Q    You didn't see any of the broken glass on the ground?

24   A    No.

25   Q    All right.  Let's take a look at Government's Exhibit

1    225.  You see this photograph, right?

2    A     I do.

3    Q     And you see the broken glass on the ground, right?

4    A     I do.

5    Q     Now looking at page 2 of Government's Exhibit 225, you

6    see yourself in this picture?

7    A     Yes.

8    Q     You're about to walk into the Senate parliamentarian's

9    office?

10   A     Yes.

11   Q     And you are walking directly over that broken glass on

12   the ground, is that right?

13   A     I can't see my feet in that picture either.

14   Q     Okay.  So you're not sure when you walked in that area

15   whether you were walking over that broken glass, is that

16   your testimony?

17   A     Yes.

18   Q     All right.  So you had no idea that day that -- that

19   there had been property destruction inside the Capitol, is

20   that what you're saying?

21   A     No, I wasn't aware of that.

22   Q     Did you see the broken windows in the Senate

23   parliamentarian's office?

24   A     Yes.

25   Q     And when you went into the parliamentarian's office,

1  there were at least a dozen other people in there, right?

2  A    Yes.

3  Q    They had knocked over furniture?

4  A    Yes.

5  Q    They had scattered papers all over the floor?

6  A    Yes.

7  Q    These people didn't work at the Capitol building, did

8  they?

9  A    No.

10 Q    Okay.  It was a riot, right?

11 A    Yes.

12 Q    And you were a part of it?

13 A    I was just trying to observe it, I guess.

14 Q    So you were just trying to observe the riot?

15 A    Yes.

16 Q    Sir, the first time that you went inside the

17 parliamentarian's office, you walked out with a bottle of

18 bourbon, right?

19 A    Yes.

20 Q    That bottle of bourbon was not yours, was it?

21 A    No.

22 Q    You stole it from the Senate parliamentarian's office?

23 A    Yes.

24 Q    You looted the Senate parliamentarian's office, is that

25 right?

1    A    Yes.

2    Q    Okay.  So wouldn't you agree with me that you

3    participated in the riot going on inside the Senate

4    parliamentarian's office?

5    A    Yes.

6    Q    You saw yourself on video earlier today, right, the

7    video you took inside the parliamentarian's office?

8    A    Yes.

9    Q    You're walking around, you're shouting?

10   A    Yes.

11   Q    You're yelling?

12   A    Yes.

13   Q    You picked up a cellphone, you remember that part?  You

14   picked up a cellphone from a desk?

15   A    I did.

16   Q    That's not your cellphone, is it?

17   A    No.

18   Q    No.  Why did you feel entitled to pick up someone

19   else's cellphone off the desk in the Senate

20   parliamentarian's office?

21   A    I couldn't tell you.

22   Q    Did you hear, when you heard that, when that video was

23   played, the video you took, did you hear at the end of the

24   video when the guy was talking about beating on the cops?

25   A    No.

1  Q    You don't recall that?

2  A    I heard it in the video, I don't recall it at the time.

3  Q    Okay.  But he said that close enough to you that it was

4  picked up on the video that you recorded, right?

5  A    Yes.

6  Q    All right.  When you left the first time after having

7  stolen a bottle of liquor, you saw police officers in the

8  hallway, right?

9  A    I did.

10  Q    I'm sorry, you said you did, right?

11  A    Yes.

12  Q    Yes.  And they were pointing like this at the door,

13  right?

14  A    Yeah.

15  Q    They were directing everybody out of the building?

16  A    Yes.

17  Q    You knew that those officers wanted you to leave the

18  building?

19  A    Yeah.

20  Q    Other times during the day you had been pepper sprayed

21  by law enforcement, right?

22  A    Not directly, but indirectly, yes.

23  Q    You could smell the pepper spray?

24  A    Yes.

25  Q    You had seen law enforcement officers using pepper

1    spray against other members of the crowd there that day?

2    A    Yes.

3    Q    You got tear gassed by the cops that day, right?

4    A    Yes.

5    Q    And you knew that the cops, the police officers there

6    were doing that to get you to disburse, is that right?

7    A    Correct.

8    Q    To get you to leave?

9    A    Yes.

10   Q    Because you knew that they didn't want you to be there

11   anymore?

12   A    Right.

13   Q    Right?  Because you knew it wasn't lawful to be there

14   anymore?

15   A    Right.

16   Q    All right.  Five minutes after you left the

17   parliamentarian's office with the bottle of bourbon, you

18   walked back in, right?

19   A    Yes.

20   Q    Even though the officers had just pointed you out the

21   door, right?

22   A    Yeah.

23   Q    And when you walked back in this time, you stole this

24   coat rack, right?

25   A    Yes.

```
 1   Q    And you also took that little radio from inside that

 2   office, right?

 3   A    Yes.

 4   Q    Now, you said something on direct examination, I just

 5   want to make sure I understand.  You testified on direct

 6   examination under oath that you took this coat rack from the

 7   Senate parliamentarian's office because you were afraid that

 8   someone else was going it use it as a weapon, is that right?

 9   A    I guess "not afraid" wouldn't have been the right word.

10   I assume somebody would either break it or use it against

11   the police.

12   Q    Oh, I see, so you were the hero of that situation, is

13   that correct?

14   A    No.

15   Q    You were actually protecting the officers by going in

16   and removing coat racks on the off chance that someone else

17   was going to use it as a weapon against law enforcement

18   officers, is that your testimony?

19   A    No.

20   Q    I'm sorry, no, that's not what you were doing?

21   A    No, I was just, I was just moving it out to a safer

22   place.

23   Q    I see.  So you were just moving it out of the way?

24   A    Yes.

25   Q    Right?  You just wanted to get it out of the hands of
```

```
 1    those particular rioters in that office, right?

 2    A    Yeah.

 3    Q    And that's why you still had it with you at six o'clock

 4    p.m. that night, three and a half hours later, off Capitol

 5    grounds?

 6    A    Yeah.

 7    Q    Just to make sure that no one used it as a weapon

 8    against the police, right?

 9    A    Yeah.

10    Q    All right.  I'd like to just ask you, you talked a lot

11    about some of the things that President Trump said, former

12    President Trump said during his speech, right?

13    A    Yes.

14    Q    It was a pretty long speech?

15    A    Yeah.

16    Q    It was over an hour long, he talked a lot, right?

17    A    He does.

18    Q    Said a lot of things during that speech?

19    A    Yep.

20    Q    He talked about immigration reform, right?

21    A    (No response.)

22    Q    Let me put it another way, he talked about the wall,

23    right?

24    A    Yeah.

25    Q    He talked about the Supreme Court?
```

1   A     Yeah.

2   Q     Yeah, he talked about a lot of stuff, right?

3   A     Yep.

4   Q     You'd agree with me that not once during that hour long

5   speech did President Trump say it is now legal to steal from

6   the United States Capitol building?

7   A     Correct.

8   Q     All right.  Let's take a look at Government's Exhibit

9   235B.  I apologize, it's actually the second page, first

10  page of 235A.  You're in this picture, right, Mr. Thompson?

11  A     Yes.

12  Q     That's you on the left?

13  A     Yes.

14  Q     Right next to this crowd?

15  A     Next to the what?

16  Q     This crowd?

17  A     Yes.

18  Q     And at this point you still wanted to get inside the

19  building, right?

20  A     No.  I had already been inside, I had no interest in

21  going back in.

22  Q     Okay.  I just want to understand.  You're testifying

23  that when you were at the north doors about four o'clock

24  p.m., you did not want to get inside the building at that

25  point?

```
1    A     Correct.

2    Q     Okay.  You were just standing by the doors, I guess to

3    make sure that nobody else hurt the cops, is that right?

4    A     No, I was just observing.

5    Q     You were just being a peaceful observer, is that what

6    I'm hearing?

7    A     At that point, yes.

8    Q     Okay.  Right after this happens, right, you remember

9    when these individuals here on the second page of this

10   exhibit pick up a police bike rack and ram it like a

11   medieval battering ram against the doors of the United

12   States Capitol building, you remember that?

13   A     Yes.

14   Q     And you just wanted to be nearby as a peaceful

15   observer?

16   A     I actually walked away right after this because I just

17   couldn't believe it was actually happening, but yes.

18   Q     I'm sorry, this was the moment where you decided you

19   couldn't believe what was happening?

20   A     Yeah.

21   Q     Okay.

22   A     I felt I was too close to the situation, I guess, at

23   that point.

24   Q     I see.  You didn't go home, though, did you?

25   A     No.
```

1  fight like hell at the Capitol," right?

2  A    Yep.

3  Q    Now, I understand that you testified a few other things

4  about what happened later that night at around six o'clock,

5  so I just want to make sure that I understand them

6  correctly, okay?

7      Did you say that you tried to contact law enforcement

8  prior to 6:00 p.m. that day?

9  A    No.

10  Q    Okay.  So when law enforcement walked up to you --

11  A    I'm sorry, the Capitol Police, yes, I did, I tried to

12  get directions on where to go because of the curfew and how

13  to leave.

14  Q    So after you left Capitol grounds.

15  A    Yes.

16  Q    You've still got this stolen coat rack by your side,

17  right?

18  A    Yes.

19  Q    And at this point it's later on in the evening, right?

20  A    It's dark, yes.

21  Q    Yeah.  President Trump, he's not there with you, right?

22  A    No, he's not.

23  Q    No.  So you are the one who chose to keep carrying this

24  stolen coat rack off Capitol grounds?

25  A    I don't think I got off Capitol grounds with it.

1   Q    Okay.  You're the one who chose to carry it away from

2   the United States Capitol building, right?

3   A    Yes.

4   Q    And are you testifying that with that stolen property

5   in your possession you attempted to contact the United

6   States Capitol Police for directions?

7   A    I did, yes.

8   Q    Okay.  And you used your phone to try to contact them?

9   A    No, in person.

10  Q    In person?

11  A    Yes, to get directions.

12  Q    Okay.  And when the two Capitol Police special agents,

13  one of whom you saw testify today, right?

14  A    Right.

15  Q    When they approached you at six o'clock p.m. and told

16  you where to go, you tried to walk away with the coat rack,

17  right?

18  A    No.

19  Q    You're testifying that you did not attempt to pick up

20  the coat rack and walk away with it?

21  A    No.

22  Q    Sorry, sir, you're going to have to clarify.  What are

23  you testifying --

24  A    It was there, I just got up and walked away from it

25  when they said this is where you have to go, you can't get

```
 1   an Uber here, and so I just started walking in that
 2   direction.
 3   Q    Well, you heard Special Agent O'Neill testify earlier,
 4   right?
 5   A    Yes.
 6   Q    And you heard her say that they told you to leave, and
 7   then you picked up the coat rack and started walking away
 8   with it?
 9   A    No.
10   Q    So you're testifying that's not true?
11   A    Correct.
12   Q    Okay.  You did, though, run away?
13   A    After they told me where to go, and then they wanted to
14   talk to me again, I ran away, yes.
15   Q    Yeah.  Robert Lyon didn't run away, right?
16   A    No, he didn't.
17   Q    Only you?
18   A    Yes.
19   Q    And you testified on direct examination it's because
20   you thought maybe you were going to be arrested for what you
21   had done that day, right?
22   A    Yes.
23   Q    How did you call the Uber at that point?
24   A    I got to a hotel and I borrowed someone's phone.
25   Q    Borrowed someone's phone.  Okay.  So you didn't have,
```

1    Q    So if there was no one at the podium the camera was

2    still on?

3    A    That's correct.

4    Q    So from your observation of that video were you able to

5    determine when Rudolph Giuliani spoke to the crowd?

6    A    Yes, I was able to do that by reviewing again the time

7    and the gaps between when they were speaking that

8    Mr. Giuliani start speaking approximately around 10:50 a.m.

9    Q    I'm going to be putting before the jury what has been

10   already marked and admitted as Government's Exhibit 317.

11   Agent Thomas, what is Exhibit 317?

12   A    Sure.  This is a tweet from Twitter by an individual

13   named Brandon Wang.  And what we have here is a short clip

14   from Mr. Giuliani's speech when he says, "Let's have trial

15   by combat."  And if you look at the bottom here you can see

16   the timestamp of the tweet is approximately 10:53 a.m. on

17   January 6th.

18        So again, you know, assuming it's going to take an

19   individual a few seconds to at least post a clip, you can

20   assume that Mr. Giuliani said "Let's have trial by combat,"

21   slightly before 10:53 a.m.

22   Q    I'll just play Exhibit 317.

23        [Rudy Giuliani video played.]

24   BY MS. ROZZONI:

25   Q    Agent Thomas, I'm going to direct your attention now to

```
1   Exhibit 314.  Exhibit 314 has already been marked and
2   admitted.  Can you describe to the jury what Exhibit 314 is?
3   A    Sure.  This is a Google Maps overview basically of,
4   yes, basically what we have here is a Google Maps overlay,
5   showing the latitude and longitude coordinates of
6   Mr. Thompson's cellphone device basically.  We requested
7   this through legal process from Google and they provided it.
8   And the yellow dots are representing various GPS waypoints
9   that Google provided us of Mr. Thompson's cellphone's
10  approximate location.
11  Q    Okay.  Just backing up for a moment, legal process was
12  sent to Google, is that correct?
13  A    That's correct.
14  Q    Okay.  And that legal process requested longitude and
15  latitude information about Mr. Thompson's phone?
16  A    Yes.
17  Q    Okay.  So location information, is that correct?
18  A    Correct.
19  Q    And so Exhibit 314, how many pages are in Exhibit 314,
20  if you know?
21  A    Four pages.
22  Q    Okay.  And right now we've got page four on the screen.
23  What does this particularly show the jury?
24  A    Sure.  So this data again, we requested this data for
25  January 6th specifically.  And basically it's showing you
```

1   that around 10:23 a.m., Mr. Thompson's phone is located in

2   Maryland, in the Silver Spring area.  And as you can see

3   after 10:23, it starts to move south towards the District of

4   Columbia getting down to the area of interest kind of around

5   11:04 a.m.

6   Q    Okay.  And then I'm going to back you up to, I'm going

7   to back you up here to it's page 3 of Exhibit 314.  What

8   does this depict for the jury?

9   A    So again, these are additional waypoints of

10  Mr. Thompson's phone showing from approximately 11:06 to

11  11:51.  This is kind of showing the path of where he went

12  once he arrived in the Washington, D.C. area.

13  Q    And to orient the jury can you circle where the White

14  House is on page 3 of Exhibit 314?

15  A    [Witness complies.]

16  Q    Okay.  And for the record you've circled a building in

17  the upper left corner of page 3 of Exhibit 314.  And then

18  can you also circle where the Washington monument is,

19  please.

20  A    [Witness complies.]

21  Q    You've made a circle in the lower left-hand corner, is

22  that correct?

23  A    Yes.

24  Q    Okay.  Now I do have a question.  It appears that from

25  let's see, exhibit, excuse me, from between 11:24 and 11:51,

1    Mr. Thompson went across buildings.  Can you explain that

2    line and why that sometimes happens in these charts?

3    A    Sure.  With the geolocation data Google obtains this

4    information from the phone beaming off of cellphone towers.

5    Sometimes these geolocation coordinates are going to be very

6    close to spot on, but other times you know based on the

7    signal strength you're going to get a range.  So it could be

8    up to a thousand meters off.  These are not specific

9    locations.  They're off by a minor variance, so he's not

10   walking through buildings.

11   Q    Okay.  And so this was as you said page 3 is from 11:06

12   to 11:51, and then going up to page 1 what does this depict?

13   A    Sure.  This is from approximately 12:04 p.m. to

14   1:06 p.m.  And there's additional geolocation points just

15   kind of showing Mr. Thompson's whereabouts in the vicinity

16   kind of in between the White House and the Washington

17   monument just kind of walking from one side to the other.

18   Q    And does this depict again a little bit of that

19   variance that you were just discussing?

20   A    Yes.

21   Q    Okay.  And finally, this is page two of Exhibit 314,

22   what does this depict?

23   A    This location data shows Mr. Thompson's approximate

24   path from 1:10 p.m. to 2:23 p.m., just showing how he kind

25   of goes up and around the White House till about 2 p.m.

1    before heading over towards Capitol grounds and arriving

2    near Capitol grounds around 2:23.

3    Q    Thank you.  I'm now going to be showing what's been

4    marked and admitted as Exhibit 313.  Agent, was process also

5    served on Uber?

6    A    Yes.

7    Q    What was that process requesting?

8    A    It was requesting a, some private information for an

9    account and all associated trip information for the account

10   as well for Mr. Thompson.

11   Q    Okay.  So I'm putting up what has been marked and

12   admitted as Exhibit 313.  So was this one of the pieces of

13   information that you received as a result of that service of

14   process?

15   A    Yes.

16   Q    Okay.  And what does this indicate to you that you --

17   what does this indicate to you?

18   A    Sure.  This indicates this is Mr. Thompson's account.

19   And I know that based on the account name, the phone number,

20   and email address which have been stipulated as belonging to

21   Mr. Thompson.

22   Q    And this was a number of pages, is that correct?

23   A    Yes.

24   Q    Okay.  And now I'm going to be putting up what has been

25   previously marked and admitted as Exhibit 312.  Can you

1    describe the information that is in Exhibit 312?  First of

2    all, where did it come from?

3    A    Yes, it's from the Uber search warrant that was

4    submitted.  So what we have here is specifically we were

5    interested in rides requested on January 6th, so we have

6    here is the pick up time and the drop off time.  So

7    basically this shows that Mr. Thompson was picked up at

8    10:33 a.m., and then if you look a few columns over here you

9    can see drop off and inputted drop off locations or pick up

10   locations, excuse me.

11         So pick up locations, so the actual pick up

12   latitude and longitude that's provided that location comes

13   back to by running through Google Maps.  You can enter it,

14   latitude and longitudes.  It shows that he is picked up from

15   an area right near a hotel in Silver Spring, Maryland at

16   10:33 a.m.  And then as the other timestamp indicates he is

17   dropped off at 11:05 a.m.  And if you go all the way over

18   kind of to the end there it shows the actual drop off

19   latitude and longitude.  And this comes back to

20   approximately the corner of Ninth and E Street which is

21   right by FBI headquarters.

22   Q    Thank you.  And now I'm going to be putting up what has

23   marked and admitted as Government's Exhibit 315.  And before

24   we go through it and I play it what is Exhibit 315?

25   A    Again, this is the geolocation data of Mr. Thompson's

1   phone.  And this is kind of an overlay showing his

2   geolocation from 10:23 a.m. to 2:23 p.m.

3   Q    Okay.  But does it include -- there's a gap, correct,

4   between 11:04 when he's dropped off and then the 1:10 p.m.?

5   A    Yes.

6   Q    So I'm going to play this once.  [Video played.]  I'll

7   let that play out.

8            Now agent, just briefly talking about that yellow

9   line, are those waypoints likely more accurate than the

10  other waypoints that we looked at on those other, where the

11  purple and the blue for those time periods that we talked

12  about earlier?

13  A    Yes, because he's in a vehicle moving down so it gives

14  you more like straight path of the direction he's heading.

15  Q    And it appears to follow exactly where a car would go?

16  A    Yes.

17  Q    And again, that happens with the GPS and coordinates

18  and the information we receive, is that right?

19  A    Yes.

20  Q    I'm going to play this one more time [Video played.]

21  Can you tell the jury the timestamp of where we've paused

22  this?

23  A    Yes, we're looking at 10:53 a.m.

24  Q    And it's 23 seconds into this video on this exhibit, is

25  that correct?

1    A    Yes.

2    Q    Okay.  Where is Mr. Thompson at 10:53 a.m. on January

3    6th?

4    A    So this location would be considered the Petworth area

5    of Washington, D.C.  If you look to the right you can kind

6    of see it's right next to where Children's National Hospital

7    is located.

8    Q    And about how far away is that area from where the

9    rally was taking place?

10   A    This is approximately four miles away from where the

11   rally would be taking place.

12   Q    So is Mr. Thompson at the rally at 10:53 a.m.?

13   A    No, he was not.

14        MS. ROZZONI:  That's all I have, Your Honor.  Pass

15   the witness.

16        THE COURT:  Cross-examination.

17                      **CROSS-EXAMINATION**

18   BY MR. SHAMANSKY:

19   Q    Good morning, Agent Thomas.

20   A    Good afternoon.

21   Q    So the, are you aware if this rally Save America rally

22   was broadcast?

23   A    Yes.

24   Q    It was on the radio, correct?

25   A    I'm not sure if it was on the radio.

1    democracy but only about power.  And as a result of that

2    it's tearing this country apart.  And I think our country is

3    a country worth saving.  And if people feel that they can do

4    what happened on January 6, 2021, I know in reference to

5    some of the cases I've had where individuals have actually

6    pled guilty, and I get you know letters from all over the

7    country people are just outraged in how they feel our system

8    is not taking seriously what happened on that day because of

9    their fear of the future of this country.

10          And I must say I have real concerns.  I mean

11   number one, although he ultimately turned himself in he only

12   turned himself in after he was identified as a perpetrator

13   having fled.  And I would candidly say I thought his

14   testimony was very troubling.  I thought it was totally

15   disingenuous.  I thought he was not truthful.  I don't

16   believe he was sincere in reference to what he said.  And I

17   have my real concerns about flight and also about

18   dangerousness.

19          Because if somebody is weak-minded enough to buy

20   in on what was being said and then come all the way from

21   Ohio here and involve himself in the conduct that he did,

22   and he was doing it gleefully, I just have my real concerns

23   about him.  And I think a lot of the American public feel

24   like now he's gone to trial.  He's had his day in court.

25   He's been convicted, why is he still walking free.

 1              MR. SHAMANSKY:  May I address that, Your Honor?

 2              THE COURT:  Yes.

 3              MR. SHAMANSKY:  I do not frankly disagree with

 4    most of what you said.  His level of sincerity, of course, I

 5    would take issue with.  I'd ask the Court to consider in

 6    terms of his behavior while he's been on release.  It's been

 7    impeccable in terms of following court orders, being

 8    available, doing as he's told, staying out of trouble,

 9    working every day.

10              Additionally Judge, and you're as aware of this as

11    anybody.  He through me, through his counsel and we

12    streamlined and stipulated the case.  Didn't dispute the

13    conduct, but rather tried to put it in context and explain

14    you know why he committed these heinous acts.  I don't

15    disagree with you for a nanosecond about how serious this

16    is.  Not for one bit.  But what I can undoubtedly assure

17    you, Judge, is he does not present a risk of flight I don't

18    believe based on his history, character and condition

19    because he's always shown and he's taken a respectful

20    approach.

21              And again we could have put the government through

22    a thousand hoops had we so chosen.  We didn't do that.  We

23    stipulated the case and tried to make it as easy on the

24    American people in terms of reaching a decision as possible,

25    so I'd ask you to consider that.

1          Also Your Honor I know the sentencing process is

2     lengthy, and of course, great discretion rest with you.  But

3     on balance, Judge, I don't believe based on his character or

4     his recent history and character and his understanding of

5     the wrongful nature of his activity that he would be

6     disappointing you or be a risk of flight or be a danger to

7     commit any more of these foolish acts if you would allow him

8     to remain free pending sentencing.  Thank you, sir.

9          THE COURT:  Well I --

10         MR. SHAMANSKY:  Judge, I forgot one thing.  He's

11    also in counseling.  He's taking his medication.  Not that

12    that's an excuse or a crutch, but it is something that he's

13    done to try to help get his mind right for lack of a better

14    term.

15         THE COURT:  Well he did flee, and his conduct in

16    my view was reprehensible.  I mean he didn't do some of the

17    things the other people did as far as violence is concerned,

18    but I consider the fact that he fled.  And in my view I

19    don't think he was candid when he testified.  And the

20    inevitable reality is that whether he does time now or does

21    time later he's got to do time.  I just don't think you can

22    do what he did and what the other folk did and get convicted

23    and expect to be free.

24         It's a consequence, like my mother always told me

25    you make your bed you got to lie in it.  He will be detained