**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Criminal No: 1:21-cr-161-001** |
| | ) | **The Honorable Reggie B. Walton** |
| **DUSTIN BYRON THOMPSON,** | ) | |
| **Defendant.** | ) | |

**<u>DEFENDANT'S POSITION WITH RESPECT TO SENTENCING</u>**

The defendant, Dustin Byron Thompson, by and through undersigned counsel, pursuant to 18 U.S.C. §3553(a) and §6A1.3 of the United States Sentencing Guidelines (hereinafter U.S.S.G.), submits the following Position with Respect to Sentencing.  In accordance with U.S.S.G. §6A1.2, Counsel certifies that he reviewed the Presentence Investigation Report (hereinafter PSR) with Mr. Thompson.  Further, Mr. Thompson objects to the determination that he qualifies for (1) an eight-level enhancement because the offense involved causing or threatening to cause property damage in order to obstruct the administration of justice pursuant to U.S.S.G. §2J1.2(b)(1)(B), (2) a three-level enhancement because the offense resulted in substantial interference with the administration of justice pursuant to U.S.S.G. §2J1.2(b)(2), (3) a two-level enhancement for obstruction of justice pursuant to U.S.S.G. §3C1.1, and (4) does not qualify for a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. §3E1.1. As a result, the appropriate Total Offense Level is 12 with a corresponding guideline range of 10 to 16 months under Criminal History Category I.  However, this guideline range does not adequately address certain specific characteristics of Mr. Thompson and is not an appropriate measure of his culpability in the present case.   Based on the considerations set forth in 18 U.S.C. §3553(a), Mr. Thompson requests that this Court impose a sentence below the low end of this

guideline range.  A sentence of twelve months and one day followed by a three-year term of supervised release is sufficient, but not greater than necessary, to address these considerations.

Mr. Thompson admits and accepts complete responsibility for the series of poor decisions he made beginning with going to the January 6 rally and participating in the illegal activity that followed, then rejecting the reasonable plea offer from the government, and finally not being truthful and candid with the Court at trial.  He is very remorseful for his actions and is taking steps to address how he put himself in this situation.

## I.    Disputed Factors

Pursuant to §6A1.3 of the Sentencing Guidelines the Court shall resolve disputed sentencing factors at a sentencing hearing in accordance with Rule 32(i), Fed. R. Crim. P.  When any factor is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the Court regarding that factor.  The government bears the burden of proving the applicability of a sentencing enhancement. *See, e.g., United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014).

Courts do not interpret the Guidelines in a manner different from their interpretation of statutory text. *E.g.*, *United States v. Martinez*, 870 F.3d 870 F.3d 1163, 1166 (9th Cir. 2017) ("We interpret the Sentencing Guidelines using the ordinary tools of statutory interpretation."). In "statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364, 204 L. Ed. 2d 742, 750-751 (2019). "Where [] that examination yields a clear answer, judges must stop." *Id.* (citing *Hughes Aircraft Co.* v. *Jacobson*, 525 U. S. 432, 438, 119 S. Ct. 755, 142 L. Ed. 2d 881 (1999)). Even where courts consider materials outside the text—such as life experience—they "will never allow it to be used to muddy the meaning of

clear statutory language." *Id.* (internal quotation marks omitted). Thus, the proper inquiry into meaning "will most often begin and end with the text and structure of the Guidelines." *Id.* "The language of the Sentencing Guidelines, like the language of a statute, must be given its plain and ordinary meaning." *United States v. Fulford*, 662 F.3d 1174, 1177 (11th Cir. 2011).

### A.     Property Damage to Obstruct Administration of Justice §2J1.2(b)(1)(B)

The Probation Officer noted in paragraph 81 of the PSR that Mr. Thompson caused or threatened to cause property damage in order to obstruct the administration of justice and recommended an eight-level enhancement pursuant to U.S.S.G. §2J1.2(b)(1)(B).  However, this enhancement is not intended to apply to Mr. Thompson's conduct nor does Congress's certification of the Electoral College vote qualify as the administration of justice.

### 1.     Property Damage for the Express Purpose to Intimidate or Retaliate

First, Mr. Thompson did not cause or threaten to cause property damage in order to obstruct the administration of justice.  Application Note 5 explains that within §(b)(1)(B) the inclusion of property damage is designed to address cases in which property damage is caused or threatened as a means of intimidation or retaliation (e.g., to intimidate a witness from, or retaliate against a witness for, testifying).  Subsection (b)(1)(B) is not intended to apply, for example, where the offense consisted of destroying a ledger containing an incriminating entry.  This section is clearly designed to enhance the sentencing guidelines where property damage is threatened or caused for the express purpose of intimidating or retaliating.  The Note specifies that this section is not intended to apply to property damage that lacks this specific purpose, such as the incriminating ledger.  Neither the PSR nor the government indicate that Mr. Thompson's conduct was for the express purpose of intimidation or retaliation because it was not.

Instead, the PSR suggests that Mr. Thompson qualifies for this enhancement because of the conduct of others or, as the government suggests, he aided and abetted their conduct. The PSR indicates that "the defendant was inside the Senate Parliamentarian's Office with at least a dozen other rioters who were stealing, destroying, or damaging property inside that Office." PSR ¶81. While there is no question that Mr. Thompson stole items from the Senate Parliamentarian's Office, there is no evidence to suggest that he destroyed or damaged the property inside that Office. This is supported by the government's recitation of Mr. Thompson's conduct in its argument for this enhancement. ECF 119 at 25-26.

In its position, the government provides definitions for the term "damage" and concludes that those definitions support a conclusion that property damage includes theft. However, it is important to note that the language of this enhancement specifically includes the language "causing or threatening to cause injury to a person or property damage", two distinct potentially criminal actions, to the exclusion of the language "causing or threatening to commit a theft", a third distinct potentially criminal action. §(b)(1)(B). The Background explains that this section addresses numerous offenses of varying seriousness that may constitute obstruction of justice including stealing or altering court records. Clearly, the Sentencing Commission contemplated that theft of property may constitute obstruction of justice but declined to include theft in the language of §(b)(1)(B). If this Court gives the meaning of the Sentencing Guidelines its plain and ordinary meaning, as it must, then Mr. Thompson's theft of items from the Senate Parliamentarian's Office is not covered by this section.

The government also argues that U.S.S.G. § 1B1.3(a) (1)(A) encompasses both the defendant's own acts or omissions and those whom the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused. The government relies on Mr. Thompson's

4

stipulations that he joined the rioters in the office who caused significant property damage (ECF 119 at 25-26) and that he yelled "This Weiner's laptop? Find the laptop!" (see Trial Ex. 123). First, it is important to reiterate that Mr. Thompson did not participate in the destruction of property. Second, it is not appropriate to apply this section under an aiding and abetting theory because he did not assist or encourage others to destroy property. Nevertheless, assuming arguendo that the Court adopts the government's argument that property damage includes theft or that Mr. Thompson aided and abetted the other rioters who destroyed property, Mr. Thompson did not act with the express purpose to intimidate or to retaliate and the enhancement does not apply.

## 2.     Obstruct the Administration of Justice

The question of whether the January 6 riot obstructed the administration of justice has been addressed by courts in this district with conflicting conclusions. However, Mr. Thompson urges this Court to adopt the rationale detailed in Judge McFadden's Memorandum Opinion in *U.S. v. Hunter Seefried*, 1:21-cr-287 (October 29, 2022) ECF 123, and find that the electoral certification on January 6, 2021, did not involve the administration of justice. Mr. Thompson adopts by reference, and summarizes below, the arguments contained in the sentencing pleadings submitted on behalf of Mr. Seefried, see ECF 114 and 119, and Judge McFadden's analysis contained in the court's Memorandum Opinion, see ECF 123.

### a.     Text

Section 1512(c)(2) provides that "whoever corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so" faces a fine or up to 20 years imprisonment. 18 U.S.C. § 1512(c)(2). The "official proceeding" at issue in these cases is the certification of electoral votes. During this proceeding, the "certificates and papers purporting to be certificates

of the electoral votes . . . [are] opened, presented, and acted upon in the alphabetical order of the States." 3 U.S.C. § 15. Then, tellers "make a list of the votes as they [] appear" and "the result . . . [is] delivered to the President of the Senate," who announces the outcome of the election. *Id.* Finally, a list of the votes is entered in the House and Senate journals. *See id.* Most courts in this district have held that the certification qualifies as an "official proceeding" under § 1512(c). *See, e.g., United States v. Hale-Cusanelli*, 2022 WL 4300000, at *1 (D.D.C. Sept. 19, 2022).

In order to discern the plain meaning of the phrase "administration of justice", Judge McFadden first looks to dictionary definitions to analyze the phrase in context. Black's Law Dictionary defines the phrase "administration of justice" as "[t]he maintenance of right within a political community by means of the physical force of the state" and "the state's application of the sanction of force to the rule of right." Administration of Justice, Black's Law Dictionary (11th ed. 2019). Similarly, "due administration of justice" is defined as "[t]he proper functioning and integrity of a court or other tribunal and the proceedings before it in accordance with the rights guaranteed to the parties." *Id.*

Judge McFadden held that "[t]hese definitions suggest that the "administration of justice" involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights… [and] [t]he certification does not share the characteristics of these definitions." *Seefried*, 1:21-cr-287, ECF 123 at 4.

Judge McFadden again turned to Black's Law Dictionary which defines "obstructing the administration of justice" and "interfering with the administration of justice" as "[t]he skewing of the disposition of legal proceedings, as by fabricating or destroying evidence, witness-tampering, or threatening or intimidating a judge." *Perverting the Course of Justice*, Black's Law Dictionary (11th ed. 2019) (cross-referencing these phrases). This definition is probative because

§ 2J1.2 uses the terms "obstruct" and "interference" when discussing what a defendant might impermissibly do to the "administration of justice." *Seefried*, 1:21-cr-287, ECF 123 at 5. This definition further corroborates that the "administration of justice" involves something like a legal proceeding, such as a trial or grand jury hearing. The certification does not resemble a trial or similar judicial proceeding where evidence could be falsified or destroyed, witnesses could be tampered with, or a judge could be intimidated so as to interfere with the disposition of parties' legal rights. *Id.*

### b.    Context

Recognizing that not all "meanings appropriate to particular contexts are to be found in the dictionary…", Judge McFadden reasoned that a reader therefore must look to context to determine "which of several possible senses a word or phrase bears." Id. at p6 (quoting Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 356 (2012) (Scalia & Garner)).  In order to understand the context, Judge McFadden first uses a methodology called "corpus linguistics" to assess the customary usage of the phrase at the time the Sentencing Commission crafted the guidelines and second looks to the commentary of § 2J1.2. *Seefried*, 1:21-cr-287, ECF 123 at 9.

"Corpus linguistics is an empirical approach to the study of language that uses large, electronic databases" of language gathered from sources. Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L. J. 788, 828 (2018); see also Lawrence B. Solum, *Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record*, 2017 B.Y.U. L. Rev. 1621, 1643 49 (2017) (explaining why the method helps clarify linguistic meaning). Judge McFadden described his methodology in great detail and ultimately concluded that "there is essentially no evidence that either judges, lawyers, or speakers more

generally used the term "administration of justice" to refer to legislative proceedings like the certification of the electoral count." *Seefried*, 1:21-cr-287, ECF 123 at 13-14.

Turning to the commentary of § 2J1.2, it supports a narrower interpretation of the "administration of justice" than the government suggested in *Seefried* and the present case. Here, the government argues that the "administration of justice" is synonymous with "official proceeding." ECF 119 at 24.  As discussed above, the Background of this section lists examples of offenses to which this Guideline applies. See U.S.S.G. § 2J1.2 cmt., Background.  Judge McFadden observed that these offenses fit with the Court's definition of "administration of justice" and evoke traditional notions of judicial or enforcement proceedings and are consistent with the Court's corpus linguistics analysis while none of them relate to a legislative proceeding. *Seefried*, 1:21-cr-287, ECF 123 at 17.

### c.      Precedent

Judge McFadden observed that Seefried relied on *United States v. Aguilar*, in which the Supreme Court construed the phrase "due administration of justice" in another section of the same statute, 18 U.S.C. § 1503. *Id.* at 18-19 (citing See 515 U.S. 593, 598–99 (1995)). Section 1503 makes it a crime to "corruptly . . . influence[], obstruct[], or impede[], or endeavor[] to influence, obstruct, or impede, the due administration of justice[.]" 18 U.S.C. § 1503. This particular clause in the statute follows other prohibited conduct, most of which pertain to judicial proceedings. *See id.* (forbidding the influencing, intimidating, or impeding any juror or officer who may be "serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate," or injuring any such officer).

Ultimately, *Aguilar's* reasoning suggests that the "administration of justice" in § 1503 is analogous to a "judicial or grand jury proceeding." *Id.*  Seefried also cited various appellate

decisions that follow *Aguilar* to interpret the "due administration of justice" in § 1503 to mean "interfering with the procedure of a judicial hearing or trial." *Id.* at 19 (citations omitted). Finally, Judge McFadden held that text, context, and precedent suggest that the government reads the "administration of justice" too broadly and the enhancement does not apply. *Id.* at 20.

###### B.   Substantial Interference with Administration of Justice §2J1.2(b)(2)

The Probation Officer noted in paragraph 82 of the PSR that the offense resulted in the substantial interference with the administration of justice, specifically the proceeding before Congress to certify the Electoral College vote, and recommended a three-level enhancement pursuant to U.S.S.G. §2J1.2(b)(2)).  However, this enhancement is also not intended to apply to Mr. Thompson's conduct nor does Congress's certification of the Electoral College vote, as discussed above, qualify as the administration of justice.

Application Note 1 of this section explains that "substantial interference with the administration of justice" includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources. The modifying phrase "substantial interference" appears only in the three-level enhancement. *Compare* § 2J1.2(b)(2), with id. (b)(1)(B) (eight-level enhancement referencing only the "administration of justice").

In *Seefried*, Judge McFadden explains and rejects the government's argument there and other cases that the enhancement applies. *Seefried*, 1:21-cr-287, ECF 123 at 15-17.  The last portion of the definition, "the unnecessary expenditure of substantial Governmental or court resources," does not expand the application of this enhancement beyond judicial proceedings.

Judge McFadden reasoned that to do so would allow the government to apply this enhancement to any case that resulted in the unnecessary expenditure of government resources. *Id.* at 16.

### C.    Acceptance of Responsibility §3E1.1

The Probation Officer noted in paragraph 68 of the PSR that Mr. Thompson does not qualify for a reduction for acceptance of responsibility pursuant to U.S.S.G. §3C1.1 because he put the government to its burden of proof at trial by denying essential factual elements of guilt. Application Note 1 describes appropriate considerations in determining whether a defendant qualifies for this reduction including: truthfully admitting the conduct comprising the offenses of conviction, voluntary surrender to authorities promptly after commission of the offense, and post-offense rehabilitative efforts. However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility, but the fact that a defendant's challenge is unsuccessful does not necessarily establish that it was either a false denial or frivolous. §3C1.1 n.1(A).

Application Note 2 indicates that conviction by trial does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.

The easiest way for Mr. Thompson to have received a reduction for acceptance of responsibility would have been to accept the plea agreement offer that he received from the government.  This agreement, like Mr. Lyon's, would have allowed Mr. Thompson to plead guilty to two misdemeanor charges and agree to a minimum sentence of sixty days thereby limiting his exposure to incarceration significantly.  It is not uncommon for defendants to reject

plea offers regardless of how favorable.  In this case, Mr. Thompson received a favorable plea offer, it was his own choice to reject it, and he accepts responsibility for that choice.

However, while Mr. Thompson may have received effective assistance of counsel at trial, present counsel has concerns about the advice that Mr. Thompson received prior to trial.  It appears to counsel, that after prior counsel relayed the plea offer to Mr. Thompson, there was no substantive conversation about whether to accept or reject it.  It appears there was no substantive conversation about the likelihood for success at trial or the strength of the government's case.  Most importantly, it appears that Mr. Thompson did not know how much his guidelines would increase if convicted on felony Count One compared to the plea offer.  Instead, it appears that prior counsel intended to take this case to trial from the outset regardless of the plea offer and also wanted this case to be the first trial.[1]  Certainly, Mr. Shamansky enjoyed the press attention including his appearance on MSNBC during which he admitted that he was not aware that his defense strategy had already been tested at trial and failed.[2]  In this context, Mr. Thompson was scared to go to jail, so he rejected the plea offer without understanding the likely consequences or receiving cautionary advice from counsel.

Mr. Thompson's prior counsel originally sought to pursue a defense strategy that former President Trump authorized Mr. Thompson's conduct during his speak on January 6.  After being confronted with the fact that Trump did not have the authority to do so, he persisted in this ill-advised theory of defense that the speeches Mr. Thompson listened to on January 6 made him believe his conduct was lawful.  Mr. Thompson entered into considerable stipulations with the government contained in both ECF 73 and Trial Stipulations submitted immediately prior to trial.

---

[1] "None of the defendants in the breach of the Capitol has gone to trial, and Shamansky said he hopes 'ours is the first.'" How many Ohioans have pleaded guilty in Jan. 6 attack on Congress? (dispatch.com) (January 5, 2022)  This is one of countless articles in which Shamansky is quoted discussing this case.
[2] 'Groomed:' Attorney argues Trump to blame for his client storming the Capitol (msnbc.com) (April 13, 2022)

Perhaps due to inadvertence by prior counsel, these stipulations admitted the elements of all the charges and completely undermined his theory of defense.  Specifically, prior counsel agreed to stipulations that conceded Mr. Thompson possessed the necessary intent for all counts.  Arguably, these stipulations do not admit the "corrupt intent" required for Count One but, as discussed below, that was an impossible needle to thread for prior counsel.  Prior counsel also agreed to a jury instruction regarding the statements of others that acknowledged neither former President Trump nor Rudolph Giuliani actually had the power to authorize or make legal the crimes charged in this case. ECF 83 at 12.  Frankly, prior counsel's theory of defense was irreparably hobbled from the outset of trial by Mr. Thompson's admissions through stipulations. As a result of these stipulations and the limiting instruction, Mr. Thompson accepted responsibility for and truthfully admitted his conduct prior to trial and any inconsistent testimony during trial was not material.

To prove Count One, Obstruction of an Official Proceeding, the government was required to prove that Mr. Thompson attempted to or did obstruct or impede any official proceeding and he acted corruptly. *See Jury Instructions*, ECF 83 at 25. "Corruptly means to act knowingly, with intent to obstruct… an official proceeding and with the consciousness of the wrongdoing of the act. *Id.* at 27.  "Consciousness of wrongdoing" means an understanding or awareness that what the person is doing is wrong or unlawful. *Id.*

Mr. Thompson stipulated that the Certification was an "official proceeding" under Section 1512(c)(2). See attached Trial Stipulations at ¶7[3].  He further stipulated that his conduct described in paragraphs 32-34, 36, 38-42, and 44-46 of the Trial Stipulations, was disorderly and

---

[3] Two documents containing trial stipulations were submitted to this Court.  The first appear in ECF 73 and the second was submitted to the Court immediately prior to trial but do not appear on the docket.  Throughout this pleading, counsel refers to the latter as Trial Stipulations.  A copy of the latter is also attached for the Courts reference.

disruptive and that he intended to and did impede, disrupt, and obstruct the Certification. *Id.* at ¶48. At this point, it would appear that Mr. Thompson stipulated to the elements of Count One. Importantly, Mr. Thompson admitted that he intended to obstruct the Certification through his disorderly and disruptive conduct which satisfies the element that he acted corruptly or understood that his actions were unlawful. This conclusion is supported by the stipulations that the rioters presence in the Capitol Building was unauthorized (*Id.* at ¶27), that Mr. Thompson entered and remained in a "restricted building or grounds" (*Id.* at ¶32), and that Mr. Thompson knowingly entered the Capitol Building and was not authorized to enter or remain in the restricted area of the Capitol Grounds or to enter the Capitol Building (*Id.* at ¶34). Finally, When Thompson entered the restricted area, he knew U.S. Capitol Police had closed it to the public and that, in general, it can be unlawful to enter such closed area without permission. ECF 73 at ¶9. These stipulations admit that Mr. Thompson acted with corrupt intent, to wit: to knowingly engage in disorderly and disruptive conduct by entering restricted buildings or grounds without authorization (where it is generally unlawful to enter without authorization) with the intent to obstruct an official proceeding. As a result, Mr. Thompson's testimony was not material because he already stipulated to the elements of Count One.

To prove Count Two, theft of government property, the government must demonstrate that the defendant took a coat rack, that the coat rack belonged to the United States, and that he intended to deprive, without right, the United States of the use of the coat rack, ECF 83 at 29. "While inside the Senate Parliamentarian's Office, Thompson stole a coat rack. … Thompson knew that the coat rack was the property of the United States, and deprived the owner of the coat rack of its use." *Id.* If this stipulation was intended to preserve a defense argument that Mr. Thompson lawfully took the coat rack then it should have mirrored the language of the jury

instruction and used the word "took" in place of the word "stole".  Certainly, one might take a

piece of government property with justification and that would not be stealing.  Instead, the

parties stipulated that Mr. Thompson stole the coat rack.

To prove Count Three, Entering or Remaining in a Restricted Building or Area, the

government was required to prove that Mr. Thompson knowingly entered or remained in a

restricted building or grounds without lawful authority. ECF 83 at 30.  Mr. Thompson stipulated

that he entered or remained in a restricted building or grounds (Trial Transcript ¶32) and that he

knowingly did so without authorization (Id. at ¶34).  The limiting instruction also conceded that

neither Trump nor Giuliani actually had the power to authorize Mr. Thompson's conduct. ECF

83 at 12.

To prove Count Four, Disorderly or Disruptive Conduct in a Restricted Building or

Grounds, the government was required to prove that Mr. Thompson engaged in disorderly or

disruptive conduct, knowingly and with the intent to impede orderly conduct of government

business or official functions, in a restricted building or grounds, and did in fact impede or

disrupt the orderly conduct of such business or official functions.  ECF 83 at 33.  Trial

stipulation 48 tracks the elements of this instruction exactly. Trial Stipulations at ¶48.

To prove Count Five, Disorderly or Disruptive Conduct in a Capitol, the government

must prove the same elements as Count Four except inside the United States Capitol building.

ECF 83 at 36.  As with Count Four, the language of stipulation 48 tracks the elements of this

instruction exactly. Trial Stipulations ¶48.

Finally, to prove Count Six, Parading, Demonstrating, or Picketing in a Capitol Building,

the government was required to prove that Mr. Thompson was willfully and knowingly inside

the U.S. Capitol Building and paraded, demonstrated, or picketed. ECF 83 at 39.  The term

"demonstrate" refers to conduct that would disrupt the orderly business of congress. Id.  As with Counts Four and Five, stipulation 48 tracks the elements of this instruction. Trial Stipulation ¶48.

### D.   <u>Obstruction of Justice §3C1.1</u>

The Probation Officer noted in paragraph 67 of the PSR that Mr. Thompson obstructed justice by making materially false statements during his trial testimony and recommended a two-level enhancement pursuant to U.S.S.G. §3C1.1.  However, in light of the factual stipulations described above, any false statement was not material, does not rise to the level of obstruction, and Mr. Thompson should not receive an enhancement.  The sentencing guidelines provide for an increase in the defendant's offense level where "the defendant willfully obstructed… the administration of justice… and the obstructive conduct related to (A) the defendant's offense of conviction and relevant conduct; or (B) a closely related offense. §3C1.1.  Application Note 4(B) indicates that this adjustment applies to committing, suborning, or attempting to suborn perjury if such perjury pertains to conduct that forms the basis of the offense.  Application Note 6 defines material evidence as evidence, fact, statement, or information that if believed, would tend to influence or affect the issue under determination.  However, according to Application Note 7, this adjustment is not applicable if the defendant is convicted of an offense covered by §2J1.2 Obstruction of Justice. Even if this Court holds that §2J1.2 does not apply then §3C1.1 would still not apply because his statements were not material.  As an initial matter, Mr. Thompson admits that he was neither truthful nor candid with the Court during his testimony.  However, the statements discussed below were not material and as a result, do not rise to the level of obstruction.

### 1.   **Statements at the Rally**

The government argues that Mr. Thompson's testimony relating to how he witnessed Giuliani's statements at the rally constitute perjury because they were material to his defense that Giuliani's statement, along with Trump's statements and what he heard at the rally led him to believe his conduct at the Capitol later that day had been requested by the President and was lawful.  However, notwithstanding this ill-advised defense strategy, as described above, prior counsel agreed to a number of stipulations that contradicted this defense and instead satisfied the elements of Count One.  Further, Mr. Thompson acknowledged in the limiting instruction that neither Trump nor Giuliani had the power to authorize or make legal the crimes charged in this case. ECF 83 at 12.

### 2.    Theft of the Coat Rack

The government next argues that Mr. Thompson's testimony about why he stole the coat rack and whether he tried to walk away with it later is material "because the only unresolved issue in the case was whether it was unlawful to steal the coat rack." ECF 119 at 30.  Simply stated, Mr. Thompson stipulated that he stole the coat rack, it was not an issue at trial.  Trial Stipulations at ¶42.

### 3.    Intent to Re-enter at the North Doors

The government argues Mr. Thompson's testimony that he did not intend to re-enter the Capitol building at the north doors is perjury because he sent a text message to Lyon at 4:03 p.m. stating "Going inside." Trial Ex. 100 at 6-7.  The government contends that this testimony was material to the question whether he remained on the Capitol grounds and was attempting to get back inside which was relevant to his state of mind and whether he knew his conduct was unlawful. ECF 119 at 31

As discussed above, Mr. Thompson stipulated that he knowingly engaged in disorderly and disruptive conduct by entering restricted buildings or grounds without authorization with the intent to obstruct an official proceeding.  It is also important to note that while Mr. Thompson may have intended to enter the building when he texted Lyon at 4:03 p.m., ultimately he did not.

## II.     Considerations Under §3553(a)

It is well settled that the Sentencing Guidelines are advisory following the Supreme Court's decision in *United States v. Booker*, 125 S.Ct. 738, 757 (2005). While Federal Courts must still consider the defendant's sentencing exposure under the guidelines, the court is now free to "tailor the sentence in light of other statutory concerns". *Booker*, at 764-65; see also *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005) (the court shall consider the sentencing guidelines range as well as other relevant factors set forth in 18 U.S.C. §3553(a) before imposing sentence). As a result, this Court may consider permissible statutory factors such as: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from future crimes of the defendant, and to provide the defendant with reasonable rehabilitative opportunities; the kinds of sentences available; the guideline range; the need to avoid unwanted sentencing disparities; and the need for restitution. Upon consideration of these factors, a sentencing court may find that a case falls outside the "heartland" contemplated by the guidelines, that "the guidelines sentence itself fails properly to reflect the §3553(a) considerations", or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 345-46 (2007). Under recent decisions of the United States Supreme Court, *see e.g., Gall v. United States, 552 U.S. 38 (2007); Kimbrough v. United States,*

*552 U.S. 85 (2007)*; and the United States Court of Appeals for the Fourth Circuit, *see e.g., United States v. Pauley, 511 F.3d 468 (4th Cir. 2007)*; other considerations exist that demand a lower sentence than that suggested by the Sentencing Guidelines. Therefore, if this Court considers Mr. Thompson's offense conduct in the context of these factors, it is appropriate to impose a sentence of twelve months and one day.

A.   Nature and Circumstances of the Offense

This Court is familiar with Mr. Thompson's conduct having presided over his trial.  Prior to January 6, 2021, Mr. Thompson became deeply engaged in conspiracy theories about the 2020 election. He adopted the often violent rhetoric of these theories which is reflected in his text messages that were presented at trial.  In its position, the government referenced a photo of an individual carrying a rifle sent by Mr. Thompson to Mr. Lyon and a text that they will need more ammo.  While this language is concerning and there is no justification, it also reflects what has unfortunately become common rhetoric within the Republican party that even appears in political advertisements.

On January 5, 2021, when Mr. Thompson and his co-defendant Robert Lyon traveled from Columbus, Ohio to Silver Spring, Maryland, to attend former President Trump's rally, Mr. Thompson did not bring any weapons or other "tactical" implements such as zip ties, tactical gear, or body armor.  Mr. Lyon provided transportations to Mr. Thompson for the first leg of their journey using his own vehicle.

On January 6, the pair took an Uber to the rally arriving shortly after 11:00 a.m.  After former President Trump completed his remarks, Mr. Thompson and Mr. Lyon walked to the Capitol Building.  On the way to the Capitol Building, Mr. Thompson found a bullet proof vest and put it on.  Nothing in the record suggests that he brought this vest with him from Columbus.

Once at the Capitol Mr. Thompson did not menace, chase, or assault law enforcement. While he entered the Capitol Grounds and eventually the Capitol Building, he did not participate in breaching any of the fences, barriers, doors, windows, or other access points.  At 2:11 p.m. the Capitol Building was breached by rioters on the western side and by 2:30 p.m. rioters had forced their way inside the Capitol on the western and eastern side.  At 2:48 p.m. Mr. Thompson entered the Capitol Building.  When he entered through the North Side Door it had already been breached by rioters and alarms were sounding.  He walked a short distance, perhaps tens of feet, and turned right into the first office also at 2:48 p.m. While inside he stole a bottle of alcohol. Mr. Thompson was inside the Capitol Building for four minutes until 2:52 p.m. Trial Exhibit 226 shows Mr. Thompson leaving the building at the direction of two law enforcement officers without incident.

At 2:56 p.m. Mr. Thompson and Mr. Lyon entered the Capitol Building through the same entrance and returned to the same office.  While inside, Mr. Thompson stole a coat rack valued at between $400 and $500 dollars.  At 3:01 p.m. the two left the Capitol Building.  While inside, they did not menace, threaten, or attack any law enforcement officers.  In total, Mr. Thompson was inside the Capitol Building for nine minutes. He did not attempt to go to other locations in the building, he did not attempt to locate any politicians or employees, he did not destroy any property, and he did not menace, threaten, or attack any law enforcement officers.

Later at approximately 4:00 p.m. Mr. Thompson was present at the North Doors of the Capitol Building near the front of the crowd.  However, he did not attempt to breach this entrance and never re-entered the Capitol Building.

At approximately 4:30 p.m. Mr. Thompson was at the Lower West Terrace where he watched the crowd of rioters confront law enforcement until approximately 5:00 p.m. when he

left and eventually re-united with Lyon.  At approximately 6:00 p.m. Capitol Police Special

Agents approached Mr. Thompson and Mr. Lyon while they waited for an Uber.  When they

began to leave, Mr. Thompson picked up the coatrack and the Special Agents instructed him to

drop it.  Mr. Thompson complied with the instruction then fled the scene.

        **B.**       **History and Characteristics of the Defendant**

Mr. Thompson is thirty-eight years old and, prior to his incarceration, resided with his

wife in Columbus, Ohio.  They have been together for fourteen years and got married on January

1, 2020.  Mr. Thompson was born in Ohio and his parents divorced when he was three.  His

father lives in New England and they rarely saw each other while he was growing up.  When Mr.

Thompson was approximately seven years old, his mother remarried.  However, his stepfather

was abusive towards he and his mother and they divorced when Mr. Thompson was

approximately thirteen years old.

When Mr. Thompson married, he was employed by an environmentally friendly pest

management company doing pest control.  He obtained this employment when he called the

county bee inspector because there was a honeybee hive on his property.  Instead of getting rid of

the hive he decided to learn how to care for the it and this eventually led to employment doing

pest control.  Part of his work included removing swarms of bees from properties and relocating

them to land adjacent to a soybean farm to assist with pollination.

Unfortunately, on March 17, 2020, Mr. Thompson was laid off due to the pandemic.  He

remained unemployed until January of 2021.  As with many, this was a very difficult time for

Mr. Thompson.  In the early months of the pandemic, Mr. Thompson attempted to generate

income through stock trading.  However, he was not successful due to the volatility of the

market.  Gradually, he spent more time watching more time watching political news on T.V. and

reading about politics online.  His drinking also increased as the pandemic persisted, and his job search was not successful.

Mr. Thompson has always been interested in history.  He graduated from the University of Ohio with a degree in History and Psychology.  In college he focused on military history from 1940 to present because of how it demonstrates American exceptionalism.  He felt patriotic studying that timeframe because there are so many examples of how the United States truly unified to overcome enormous challenges compared to how divided and partisan things are today.  Mr. Thompson regrets that he contributed to the division that exists in the United States and wants to make amends.

His interest in history also led to curiosity about conspiracy theories.  It started as a harmless hobby that eventually included political news and commentary. He supported President Trump because he seemed to be a strong leader and gradually adopted more of his rhetoric.  This tended to alienate him from his friends and even his wife.  After he was laid off in March of 2020, Mr. Thompson became deeply engaged in conspiracy theories about the 2020 election which further alienated him from his friends and family.  He adopted the extremist rhetoric and rejected commonsense facts, in other words, he rejected truth and candor. All of this led to his decision to go to the January 6 rally, march to the Capitol Grounds, and enter the Capitol Building.  Mr. Thompson's trial testimony, as the Court observed, also mirrored his ideology's disregard for candor notwithstanding the stipulations to which he had agreed.

After his arrest, Mr. Thompson sought mental health treatment, was diagnosed with depression, and participated in therapy one to two times per month until his incarceration.  This therapy helped with his depression, but it did not give him real insight into his conduct on January 6.  When this Court remanded Mr. Thompson to the custody of the U.S. Marshall

following trial, it was a wakeup call.  Mr. Thompson hired new counsel and began to work with an individual that specializes in cult deprograming.  While incarcerated he has participated in regular discussions designed to challenge his ideology and belief structure, then help him understand how and why he developed the beliefs that led him to make the decisions that he did.

During this process, Mr. Thompson was confronted with facts about the "stolen election" conspiracy theory among others and how psychological manipulation is used to indoctrinate the followers of a conspiracy.  Mr. Thompson learned how depression causes isolation which, when paired with belief in a conspiracy, gradually causes more isolation.  He learned how the websites he was relying on for news would use algorithms to facilitate his trip down the proverbial conspiracy rabbit hole with more and more extreme articles.  Consequently, it becomes easier to dismiss ideas and facts that do not fit with one's narrative.  Mr. Thompson also gained the insight that one of the motivations he had for attending the January 6 rally was simply to be around people who agreed with him as opposed to his friends and family members. To help others understand why he participated in the January 6 riot, Mr. Thompson volunteered to meet with the U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol and expects to be interviewed immediately prior to sentencing.

Understandably, Mr. Thompson may not receive a reduction for acceptance of responsibility. However, a defendant's true remorse, whether exceptional or not, is a valid basis for a downward variance. And district courts may vary downward based on remorse without regard to whether the acceptance of responsibility adjustment under U.S.S.G. §3E1.1 is applied. *E.g.*, *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008).  Mr. Thompson regrets his actions and is deeply sorry for his conduct.  He accepts full responsibility for his actions on January 6 and during the trial.  There is no excuse or justification for his conduct. Since being

remanded to the custody of the U.S. Marshalls, Mr. Thompson has diligently worked to make amends for his conduct and make real change in his life and ideology.

### C.      <u>Equity, Fairness, and Deterrence</u>

A sentence of twelve months and one day is more than sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from future crimes.  Mr. Thompson has a Criminal History Category I and only has a minor criminal history from his early twenties.  When he was twenty-four, he received four days of incarceration for operating a vehicle while impaired.   A sentence of twelve months and one day will send a clear message to Mr. Thompson that any future crimes will not be tolerated.  This sentence along with continued participation in mental health counseling and cult deprograming continue to rehabilitate Mr. Thompson while also minimizing the likelihood of recidivism.  Mr. Thompson's willingness to discuss his circumstances and the counseling in which he is participating will also help others avoid the decisions that Mr. Thompson made and help protect the public from future similar crimes.  This is especially important considering the most recent election cycle where politicians continued to espouse conspiracy theories and deny election results with often violent rhetoric.

A defendant's harsh pretrial confinement is a basis for a downward variance (and even a departure). *United States v. Jayyousi*, 657 F.3d 1085, 1118 (11th Cir. 2011) (a court "may reduce a sentence to account for the harsh conditions of pretrial confinement"); *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (same); *Bains v. United States*, 2009 U.S. Dist. LEXIS 2018, at *8 (D.N.J. Jan. 12, 2009) (poor conditions of pretrial condition "properly treated as grounds for a variance"). Since this Court remanded Mr. Thompson to the custody of the U.S. Marshalls on April 14, 2022, he was transferred to the Alexandria Adult Detention Center.  There he spent

approximately two weeks in complete isolation pursuant to quarantine policies with occasional time out of his cell for personal hygiene. For the next five months, he was housed in administrative sequestration and only allowed to leave his cell for two hours per day. Recently, Mr. Thompson was selected to work as a trustee in that unit which allows him to leave his cell more frequently to help with cleaning and meal distribution. Considering his prior mental health diagnosis, this has proven to be a challenging time for Mr. Thompson and a constant reminder of the consequences of his actions and decisions.

**D.**      **The Guideline Range / The Need to Avoid Sentencing Disparities**

Section 3553(a) requires courts to fashion a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6). The government adopted nine factors that it suggests the Courts consider to help place each defendant on a spectrum as to their fair and just punishment. The government also uses these same factors to assist with determining what plea offers to extend to which defendants. Taking these factors into consideration, Mr. Thompson's offense conduct is the most analogous to his codefendant Mr. Lyon and they received similar plea offers. Mr. Thompson's included a floor of sixty days while Mr. Lyon did not include a floor. These sixty days represent the difference that the government perceived between their conduct. A sentence of twelve months and one day, nine times greater than Mr. Lyon's, will adequately reflect the distinctions between their cases.

Obviously, there is a distinction between the way Mr. Lyon accepted responsibility through a guilty plea and Mr. Thompson through trial stipulations. However, during allocution at sentencing Mr. Lyon struggled to accept responsibility for his actions and choices. Instead, Mr. Lyon suggested that he would not have engaged in criminal conduct but for the influence of

Mr. Thompson.  He claimed that his age made him more susceptible to the influence of Mr. Thompson.  However, Mr. Lyon was 27 years old at the time, not 18 or 19 years old, and he provided the transportation to the D.C. area. Similarly, there is a distinction between the significance of the lies Mr. Lyon told FBI agents and the lies Mr. Thompson told this Court during his testimony that were not material.  Taking into consideration the circumstances with prior counsel, the question before the Court is how to quantify those distinctions.  A sentence of twelve months and one day, nine times greater than Mr. Lyon's, will adequately reflect the distinctions between their offense conduct, the way they accepted responsibility, and significance of their untruthful statements.

There are many cases that put Mr. Thompson's offense conduct in context even though they were resolved through a plea.  In *United States v. Jason Riddle*, 21-cr-304 (DLF), the defendant pled guilty under Sections 641 and 40 U.S.C. § 5104(e)(2)(G). Riddle "stole a bottle of wine from that office and drank the wine while watching the destruction of the office." *Id.* at ECF No. 31 at 2, Gov't Sent. Memo. He also "stole the Parliamentarian's Senate Procedure book." Id. He also gave an interview to the local media where he described what his actions and he stated the he had no regrets." *Id.*

In *United States v. Mostofsky*, 21-cr-138-JEB (D.D.C. 2021). Mostofsky participated in a scrum of protesters pushing on a barricade held in place by police officers, entered the Capitol Building, and then stole a police vest and shield. He pled guilty to civil disorder under § 231(a)(3), misdemeanor theft of government property, and entry into a restricted area. He was sentenced to eight months' incarceration.

In *United States v. Moises Romero*, 21-cr-677-TSC (D.D.C. 2021). Romero pled guilty to a § 231(a)(3) offense. He "entered the restricted Capitol Grounds and took videos of rioters

assaulting officers with poles and a fire extinguisher in the West Plaza. He joined a group of

rioters that pushed past police to occupy bleachers set up for the inauguration, and later led a

group that forcibly pushed through a makeshift police barricade at the Senate Wing Door to gain

entrance to the Capitol, grabbing the edge of an officer's riot shield in the process. After

spending about 15 minutes celebrating, taking videos, and entering Senator Merkley's office,

Romero left the building, only to return to the east side of the Capitol, joining yet another group

of rioters trying to gain entrance to the Capitol through the Rotunda Doors. The next day,

Romero posted a video on social media, proudly displaying himself inside and around the

Capitol Building." 21-cr-677, ECF No. 29, p. 2. Romero was sentenced to a year and a day of

incarceration.

The government argues that the most analogous case to Mr. Thompson's is that of

Anthony Williams because he was also convicted after trial of Section 1512(c)(2)'s felony

obstruction offense.  However, unlike Mr. Thompson who received a misdemeanor plea offer,

Mr. Williams received an offer to plead to the felony and agree to a guideline range of 15 to 21

months.  From the outset, based on the nine factors the government identified, the government

viewed the offense conduct for these defendants dramatically differently.

Mr. Williams was sentenced to 60 months. Unlike Mr. Thompson, Mr. William's had

three juvenile delinquency adjudications and eight adult criminal convictions including burglary

and arson. *U.S. v Williams*, 21-cr-377-BAH, ECF 120 at 28. Unlike Mr. Thompson, Mr.

Williams assisted with the first wave of rioters storming the Capitol Building by using bicycle

racks to help them access the Northwest stairs where they were able to overrun police. *Id.* at 30.

Unlike Mr. Thompson, Mr. Williams was in the first wave of rioters to breach the Capitol

Building. Id. Mr. Williams remained inside the building for almost an hour, during which time

he assisted a group of rioters as they overran the police line in the Crypt and celebrated by smoking marijuana. Id. Mr. Thompson on the other hand was inside the Capitol Building for a total of nine minutes, he only walked tens of feet into the building at most, and he did not menace, threaten, or break through a police line. Mr. Wilson also actively resisted and mocked law enforcement when they tried to remove him from the Rotunda. *Id.* Mr. Thompson, on the other hand, did not engage with law enforcement as they instructed him to leave. After the riot, Mr. Williams boasted about being one of the first to breach the Capitol, overrunning the police in the Crypt, and resisting them in the Rotunda on social media. *Id.* Mr. Thompson did not.

**III.    Conclusion**

For the foregoing reasons, Mr. Thompson respectfully requests that this Court impose a sentence of twelve months and one day followed by 3 years of supervised release.

Mr. Thompson further requests that this Court recommended that he serve his sentence in a facility close to his family in Columbus, Ohio, and participate in the RDAPT substance abuse program.

Respectfully submitted,

By: */s/ Andrew M. Stewart        .*
ANDREW M. STEWART, ESQ.
Virginia State Bar No. 68683
Attorney for the Defendant
2111 Wilson Boulevard, 8th Floor
Arlington, VA 22201
Phone: 703-248-0626
Fax: 703-248-8971
andrew.m.stewart.esq@gmail.com

<u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on the 13th day of October, 2022, I electronically filed the foregoing motion with the clerk of the court using the CM/ECF system, which will send an electronic copy to the following:

William Dreher
Assistant United States Attorney (Detailed)
700 Stewart Street, Suite 5220
Seattle, WA 98101
(206) 553-4579
william.dreher@usdoj.gov

                     By: *<u>/s/ Andrew M. Stewart</u>*     .
                     ANDREW M. STEWART, ESQ.
                     Virginia State Bar No. 68683
                     Attorney for the Defendant
                     2111 Wilson Boulevard, 8th Floor
                     Arlington, VA 22201
                     Phone: 703-248-0626
                     Fax: 703-248-8971
                     andrew.m.stewart.esq@gmail.com