**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00161 (RBW)** |
| **v.** | : | |
| | : | |
| **DUSTIN THOMPSON,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this response to the defendant Dustin Thompson's sentencing memorandum. The government filed its sentencing memorandum when both parties' sentencing memoranda were due, on September 19, 2022. Dkt. 119. Thompson did not file his sentencing memorandum until four days ago. *See* Dkt. 145. In his sentencing memorandum, Thompson raises two new guidelines objections that he failed to raise in response to the draft pre-sentence report (PSR). *Compare* Dkt. 145 at 1 (objecting to the 8-level and 3-level enhancement under 2J1.2), *with* Dkt. 113 at 35-36 (summarizing the defendant's objections to the draft pre-sentence report, which did not include objections to either enhancement). He also added significant new arguments, relative to his PSR objections, in support of his objections to the application of a 2-level enhancement for perjury and his claim that he is entitled to a 2-level reduction for acceptance of responsibility. *Compare* Dkt. 145 at 10-17, *with* Dkt. 113 at 35. The government responds only to this new information.

I.      **The Court Should Apply the Eight-Level Enhancement for Causing or Threatening Injury or Property Damage to Obstruct the Administration of Justice, and the Three-Level Enhancement for Substantial Interference With the Administration of Justice.**

The Court should apply Section 2J1.2(b)(1)(B)'s eight-level enhancement for causing or threatening to cause injury or property damage in order to obstruct the administration of justice. *See* U.S.S.G. § 2J1.2(b)(1)(B).  Contrary to Thompson's arguments, first, his theft and aiding and abetting of property destruction plainly qualifies his offenses of conviction as offenses "involv[ing] causing or threatening to cause . . . property damage[ ]in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B).  Second, the defendant's conduct obstructed the "administration of justice," *id.*, because the certification of the Electoral College vote falls within that phrase's scope, and Thompson stipulated that his conduct obstructed that certification. *See* Dkt. 62-4 at ¶ 48, Dkt. 73 at 1-2.

This Court should apply Section 2J1.2's three-level enhancement for "substantial interference with the administration of justice," for the same reasons.  U.S.S.G. § 2J1.2(b)(2). Thompson does not dispute that if the congressional certification qualifies as the "administration of justice," there was substantial interference with that certification on January 6, 2021.  Dkt. 145 at 9-10.  Thompson also stipulated that his conduct contributed to that.  Thompson's objection is thus limited to the same interpretive question he raises with respect to the eight-level enhancement: whether the certification of the Electoral College vote qualifies as the "administration of justice." Because it does, as every judge in this district who has considered the question, save one, has concluded, both the eight-level and three-level enhancements in Section 2J1.2 apply.

A.      **Thompson's property theft and aiding and abetting others' property destruction qualifies under Section 2J1.2's eight-level enhancement.**

Thompson first contends that he "did not cause or threaten to cause property damage in order to obstruct the administration of justice." Dkt. 145 at 3. As he notes, guidelines commentary states that the enhancement is "designed to address cases in which property damage is caused or threatened as a means of intimidation or retaliation." *Id.* (quoting U.S.S.G. § 2J1.2, app n.5). But Thompson's conduct falls squarely within what is covered by that application note.

For one thing, Thompson's theft of the coat rack, internal U.S. Sergeant at Arms pager, and bottle of bourbon—and his aiding and abetting those who were destroying property—were in service of "intimidation or retaliation." Thompson has offered no other plausible explanation for it. This was not a crime of poverty, driven by a need to sell stolen goods, or to trade them for drugs. Unlike the example Thompson cites from the guidelines commentary, Thompson did not steal these items, or aid and abet others in destroying them, because they were incriminating evidence of a different crime. U.S.S.G. § 2J1.2, app. n.5 (referring to "destroying a ledger containing an incriminating entry"). Thus, while destruction the purpose of which is to conceal or destroy evidence may not qualify, that does not describe Thompson's conduct. Thus, Thompson has not explained any objective or purpose he could have had in ransacking the Capitol other than attempting to intimidate Congress into changing its vote on the certification.

More importantly, Thompson has already stipulated (and personally agreed to) his purpose that day: to obstruct the certification of the vote. Dkt. 62-4 at ¶ 48. That purpose is also plain from his conduct and the context. Given that purpose, it follows that Thompson intended to affect, delay, or influence that certification *through intimidation*. No reasonable person could view theft of property, and participating in the looting of a staffer's office (which Thompson agreed he did

during cross-examination), as merely an attempt to gently persuade or reason with (rather than intimidate) Congress.  Thompson and other rioters like him stole staffers' items, put their feet up on U.S. Senators' desks, stole or destroyed symbolic items throughout the Capitol, and shuffled through official documents, scattering them on the floor.  Much like a school bully perusing through a victim's locker or lunchbox, the only plausible purpose of that kind of conduct is to send a message to the members of Congress and staff in the building: that the rioters, not the members of Congress or their staff, were in control.  That message of intimidation was sent to force Congress to delay the certification, to try to influence Congress to change its vote, or at a minimum to punish (i.e., retaliate against) Congress should it go through with the certification.  It is difficult to conceive of any other purpose beyond intimidation or retaliation that this riotous conduct could have served.

Thompson's contrary view would lead to absurd results.  An analogous case would be a defendant who showed up at a key government witness's house, on the morning of the witness's anticipated trial testimony, with a mob; waltzed in after the mob broke into the house, causing the witness to flee and lock themselves in a bedroom; stole the witness's furniture, rifled through his liquor cabinet, and told others to find purported evidence in the house; and left after having prevented the witness from leaving on time to testify.  Every court would conclude that that conduct was "caused or threatened as a means of intimidation or retaliation" under Section 2J1.2.  This case is no different, except that it was members of congress and their staff who were hiding in locked rooms and prevented from executing the "administration of justice."

Thompson next contends that "theft" is not included in the term "property damage."  But as the government has explained, definitions of "property damage" indicate that that term's ordinary meaning includes the loss or deprivation of use, as through theft. Dkt. 119 at 25.  The

government has also explained how Thompson both aided and abetted others' property destruction and joined in a common undertaking with those in the office who were engaging in property destruction that was foreseeable (indeed, seen) by Thompson and within the scope of their jointly undertaken rioting. *Id.* at 25-26 & n.8. Thompson testified at trial that he saw the crowd knocking over furniture and saw the broken windows in the Parliamentarian's office. He admitted that he nonetheless "participated in the riot going on inside the Senate Parliamentarian's office." Trial Tr. 530. He still then *returned* to the office, after leaving once, to steal more items from it—clearly indicating his joinder in the purpose of the ongoing riot's destruction of the Parliamentarian's office. And while he was there, he recorded himself shouting in celebration, picking up a staffer's cellphone, reviewing the beverages in the office, and instructing others to "Find [Anthony Weiner's] laptop!" Dkt. 119 at 25-26. All of that conduct, which is far more than mere presence alone, encouraged others in the office to engage in the destruction of property within the office— both through Thompson's express command or shouted encouragement, and through his example in showing others that he, too, was undeterred in rifling through the office's contents.

### B. The Electoral College vote involved the "administration of justice" under both Section 2J1.2(b)(1)(B) and 2J1.2(b)(2).

Thompson's second argument relies entirely on a recent order in which Judge McFadden concluded that the phrase "administration of justice" in Section 2J1.2 does not include Congress's certification of the 2020 Electoral College vote. Judge McFadden acknowledged that, even in his view, the interpretive question was close. Every other judge in this district to have considered the question disagrees with Judge McFadden's cramped interpretation of "administration of justice." And that interpretation is wrong, for the reasons given below. This Court should conclude that Congress's certification of the Electoral College vote involved the "administration of justice."

1.      **The Electoral College vote involved the administration of justice as defined broadly in the Guidelines.**

Section 2J1.2 applies to a variety of obstruction offenses, including all offenses under § 1512 and under 11 other statutes found in Chapter 73 of Title 18.  *See* U.S.S.G. § 2J1.2 cmt.; U.S.S.G. Appendix A.  As noted above, the eight-level increase under 2J1.2(b)(1)(B) applies if the offense involved property destruction or its threat "in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B).  A separate three-level increase applies "if the offense resulted in substantial interference with the administration of justice."  U.S.S.G. § 2J1.2(b)(2).

Section 2J1.2's text, purpose, and commentary all support the conclusion that conduct that obstructs Congress's certification of the electoral vote interferes with the "administration of justice" for purposes of the guideline.  Administration of justice, in its broadest sense, refers to the proper administration of law by all three branches of government.  Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice."   Black's Law Dictionary (11th ed. 2019); *see* Ballentine's Law Dictionary 696 (3d ed. 1969) (defining justice to include "exact conformity to some obligatory law").   When defining "contempt" to include "[c]onduct that defies the authority or dignity of a court *or legislature*," Black's Law Dictionary observes that "such conduct interferes with the administration of justice."  Black's Law Dictionary (11th ed. 2019) (emphasis added).  And courts have defined "administration of justice" to mean "the performance of acts or duties required by law," *Rosner v. United States*, 10 F.2d 675, 676 (2d Cir. 1926) (quotation omitted), or "the performance of acts required by law in the discharge of duties," *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977).

To be sure, the term "administration of justice" is most commonly used in a narrower sense to refer to "interference with the pendency of some sort of judicial proceedings." *In re Kendall*,

712 F.3d 814, 828 (3d Cir. 2013); *see In re McConnell*, 370 U.S. 230, 234, 236 (1962) (defining the term in the contempt context as relating to "the performance of judicial duty"); *United States v. Aguilar*, 515 U.S. 593 (1995) (stating that the "omnibus clause" of 18 U.S.C. § 1503, which criminalizes obstruction of the "due administration of justice," requires proof of "an intent to influence judicial or grand jury proceedings").  But there are compelling reasons for concluding that "administration of justice" bears its broader (albeit less common) meaning in U.S.S.G. § 2J1.2.

First, § 2J1.2's context and purpose support the broader reading of "administration of justice" in both (b)(2) and (b)(1)(B).  Section 2J1.2 applies to an array of obstruction statutes, including a number that do *not* involve the "administration of justice" in the narrow sense (i.e., relating to judicial or quasi-judicial proceedings).  *See* U.S.S.G. § 2J1.2 cmt. (listing covered statutes); U.S.S.G. Appendix A (statutory index).  Those offenses include concealing or destroying invoices or papers relating to imported merchandise, 18 U.S.C. §§ 551; obstructing an investigation under the Workforce Innovation and Opportunity Act, 18 U.S.C. § 665(c); obstruction of proceedings before departments, agencies, and committees, 18 U.S.C. § 1505; obstruction of enforcement of state gambling laws, 18 U.S.C. § 1511; obstruction of official proceedings, 18 U.S.C. 1512; obstruction of a federal audit, 18 U.S.C. § 1516; destruction of documents in agency investigations, 18 U.S.C. § 1519; and interfering with the administration of the Internal Revenue Code, 26 U.S.C. § 7212.  Yet under a narrow interpretation of the guideline, the enhancements under §§ 2J1.2(b)(1)(B) and (b)(2) would not apply to those statutes.  That is good reason to reject such a reading.  *Cf. United States v. Castleman*, 572 U.S. 572 U.S. 157, 167 (2014) (rejecting a reading of 18 U.S.C. § 922(g)(9) that "would have rendered [it] inoperative in many States at the time of its enactment").

Section 2J1.2's background indicates that the Sentencing Commission intended the enhancements to reach the type of violent and dangerous conduct at issue in this case. The background notes that § 2J1.2 broadly covers crimes "of varying seriousness," including offenses that involve intercepting grand jury deliberations, interfering with an illegal gambling investigation, or obstructing "a civil or administrative proceeding," and that the underlying conduct may "range from a mere threat to an act of extreme violence." U.S.S.G. § 2J1.2 cmt. Background. Within that range, the enhancements "reflect the more serious forms of obstruction." *Id.* The Commission thus crafted the enhancements in § 2J1.2 to cover the most egregious *conduct* in the full knowledge that obstruction-of-justice offenses are not limited solely to interference with judicial proceedings.

Relatedly, limiting subsection (b)(1)(B)'s and (b)(2)'s enhancements to obstruction of judicial proceedings would undermine the purpose of the Guidelines. "A principal purpose of the Sentencing Guidelines is to promote uniformity in sentencing imposed by different federal courts for similar criminal conduct." *Hughes v. United States*, 138 S. Ct. 1765, 1774 (2018). The Guidelines therefore seek to achieve "a strong connection between the sentence imposed and the offender's real conduct." *United States v. Booker*, 543 U.S. 220, 246 (2005). The Sentencing Commission quite reasonably determined, for example, that "causing or threatening physical injury to a person, or property damage, in order to obstruct the administration of justice" is more serious than obstruction not involving such injury or threats and should be punished more severely. U.S.S.G. § 2J1.2(b)(1)(B). And the seriousness of the threatening or injurious conduct does not depend on whether the obstructed proceeding is judicial, legislative, or executive. There is no sound basis for assigning a significantly higher offense level to someone who violently interferes with a court proceeding than someone who violently interferes with a congressional proceeding.

8

*See United States v. Rubenacker,* 21-cr-193 (BAH), Sentencing Hearing Tr. at 69 ("There is simply no indication in guideline Section 2J1.2 that the [specific offense characteristics] containing the phrase 'administration of justice' were meant to apply to only some of the statutes referenced to this guideline and not to apply to all of the cases involving obstruction of proceedings taking place outside of courts or grand juries; that simply doesn't make sense.")

This is especially true considering that subsections (b)(1)(B) and (b)(2) are not simply two factors among many but are the key sentencing factors in most obstruction cases. The three other enhancements in § 2J1.2 have limited application. Subsections (b)(1)(A) and (b)(1)(c) apply only to violations of § 1001 and § 1505 relating to sex or terrorism offenses. And subsection (b)(3), a comparatively minor two-level increase, applies only where a document was destroyed or altered or the offense was "extensive in scope, planning, or preparation." U.S.S.G. § 2J1.2(b)(3). Reading the enhancements in subsection (b)(1)(B) and (b)(2) as applying only to judicial or quasi-judicial proceedings would fail to distinguish between the seriousness of offenders' conduct in a wide variety of obstruction offenses covered by § 2J1.2. On the other hand, reading the term "administration of justice" more broadly eliminates this gap in the guideline.

Second, Section 2J1.2's commentary provides a broad definition of "administration of justice." It defines "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; or *the unnecessary expenditure of substantial governmental or court resources*." U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). This definition includes interference not only with "court" resources, but also with any "governmental" resources, a term that includes congressional resources. The Supreme Court has held that "commentary in the Guidelines Manual that interprets or explains a guideline is

9

authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). Because this commentary is consistent with the plain text of the Guideline, which uses the broad term "administration of justice," it is authoritative.

It is true that the commentary defines only the term "substantial interference with the administration of justice," which serves as the basis for the three-level enhancement in U.S.S.G. § 2J1.2(b)(2) and does not specifically define the term "in order to obstruct the administration of justice," which serves as the basis for the eight-level enhancement in U.S.S.G. § 2J1.2(b)(1)(B). But the relevant term "administration of justice" is identical and should be given the same interpretation in both enhancements. The operative verbs "interfere[]" and "obstruct" carry the same meaning in this context. And the adjective "substantial" in § 2J1.2(b) does not change the meaning of "administration of justice," especially since the commentary repeats the word, requiring "the unnecessary expenditure of *substantial* governmental . . . resources." U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). Thus, the term "in order to obstruct the administration of justice" in U.S.S.G. § 2J1.2(b)(1)(B) should be read to include obstructive conduct aimed at nonjudicial governmental activities. A different conclusion would lead to the incongruous result of giving two different meanings to the term "administration of justice" within the same guideline. *See Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.").

The Electoral College certification vote on January 6, 2021 falls comfortably within the meaning of "administration of justice" as used in § 2J1.2 because it involved Congress's performance of duties required by law. Specifically, Congress's certification of the Electoral

College vote was an official proceeding required by both the Constitution and federal statutes.[1]
*See* U.S. Const. art. II, § 1, cl. 3; 3 U.S.C. §§ 15-18.  Application of both subsections (b)(1)(B) and
(b)(2) is therefore appropriate here.

> **2.  Courts, including judges on this Court in January 6 cases, have correctly held
> that non-judicial proceedings can involve the administration of justice.**

Other courts have appropriately applied the "administration of justice" enhancements in
U.S.S.G. § 2J1.2(b)(2) to efforts to obstruct a wide range of proceedings that were not limited to
judicial or grand jury proceedings.  *See United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017)
(upholding the application of § 2J1.2(b)(2) after law enforcement officials expended substantial
resources to recover the defendant's children he kidnapped and transported internationally); *United
States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009) (applying
§ 2J1.2(b)(2) after a defendant interfered with OSHA investigations into a workplace accident);
*United States v. Weissman*, 22 F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998) (applying § 2J1.2(b)(2)
after a defendant withheld subpoenaed documents from a congressional subcommittee).

Several judges on this Court have applied § 2J1.2's "administration of justice"
enhancements in cases arising from the Capitol breach on January 6, both in cases where the parties
agreed to their application and where the application was contested.  *See, e.g.*, *United States v.*

---

[1] Chief Judge Howell has articulated a different basis on which to apply the enhancement to
obstruction of the Electoral College certification.  *United States v. Rubenacker*, 21-cr-193,
Sentencing Hearing Tr. at 69 (BAH).  She pointed out that Black's Law Dictionary defines
"administration of justice" to include the "maintenance of right within a political community by
means of the physical force of the state," Black's Law Dictionary (11th ed. 2019), and observed
that the joint session of Congress used "'the physical force of the state' in the form of law
enforcement officers located in and around the Capitol to secure the proceedings." *Rubenacker*,
Sentencing Tr. at 75.  This understanding of the guideline is arguably broader than the
interpretation advanced by the government because it could apply to any proceeding (or event) at
which there was a police presence, rather than being limited to proceeding involving the
administration of the law.

*Wilson*, No. 21-cr-345 (Lamberth, J.); *United States v. Hodgkins*, No. 21-cr-188 (Moss, J.); *United States v. Fairlamb*, No. 21-cr-120 (Lamberth, J.); *United States v. Chansley*, No. 21-cr-003, (Lamberth, J.); *United States v. Matthew Miller*, No. 21-cr-075 (Moss, J.) (uncontested, but independently addressed by the Court); *United States v. Rubenacker*, No. 21-cr-193 (contested); *United States v. Guy Reffitt*, No. 21-cr-032 (Friedrich, J.) (contested); *United States v. Pruitt,* No. 21-cr-23 (Kelly, J.); *United States v. Robertson,* 21-cr-34 (Robertson, J.) (contested).

**3.      Judge McFadden's contrary conclusion in *Seefried* and *Secor* is unpersuasive.**

One judge on this Court, Judge McFadden, has reached a contrary conclusion, concluding that "administration of justice" in § 2J1.2 is limited to "a judicial or related proceeding that determines rights or obligations." *United States v. Seefried*, No. 21-cr-287, Doc. 123, at 1 (D.D.C. Oct. 29, 2022) (TNM); *see United States v. Rodean*, No. 21-cr-57, Doc. 76 (D.D.C. Oct. 26, 2022) (restricted statement of reasons); *United States v. Secor,* No. 21-cr-157, Doc. 56 at 17-20 (Oct. 24, 2022) (TNM); *United States v. Hale-Cusanelli*, No. 21-cr-37, Doc. 120 at 50-55 (D.D.C. Sep. 27, 2022).  Judge McFadden's reasons for reaching that conclusion, however, are not persuasive.

Judge McFadden first discussed Black's Law Dictionary's definitions of "administration of justice" and "due administration of justice," which, he concluded, "suggest that the 'administration of justice' involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights."  *Seefried*, Doc. 123 at 4.  He also considered that dictionary's definition of "obstructing" and "interfering with" the administration of justice, a definition that he determined "further corroborates that the 'administration of justice' involves something like a legal proceeding, such as a trial or grand jury hearing."  *Id.* at 5.  But Judge McFadden did not consider the broader definitions of "justice" and "obstruction of justice" cited above, which relate to the orderly administration of the law more generally.  Indeed, Black's Law Dictionary recognizes that

"[c]onduct that defies the authority or dignity of a court *or legislature* . . . . interferes with the administration of justice."  Black's Law Dictionary (11th ed. 2019) (emphasis added).

Nor does Judge McFadden's corpus linguistics analysis support a different result. Surveying a representative sampling of 375 uses of the term "administration of justice" in legal usage between 1977 and 1987, Judge McFadden found that about 65% of the hits referred to "a judicial proceeding deciding legal rights," about 4% involved "law enforcement activities," and only three entries "referr[ed] to government function generally." *Seefried*, Doc. 123 at 11-13.  But the simple fact that the term *usually* bears judicial connotations does not mean that it *must*, particularly where, as here, the guideline's context, purpose, and commentary point in a different direction.  Like all words, legal terms often bear multiple meanings.  For example, the term "suppression of evidence" can refer either to a court's exclusion of evidence from trial or to the prosecution's withholding of favorable evidence from the defense.  Which meaning the term bears in a particular instance cannot be determined by the frequency of each meaning within the legal corpus.  And in this case, the frequent use of other meanings is no reason to reject a broader meaning of "administration of justice" that gives full effect to the guideline and corresponds with the commentary's definition.

Judge McFadden was also incorrect in his analysis of § 2J1.2's commentary.  *Seefried*, Doc. 123 at 14-17.  As an initial matter, he questioned whether the commentary was even "authoritative," pointing out that the D.C. Circuit "has suggested that courts should eschew deference to the Commission when the commentary expands the meaning of the text of the Guidelines themselves."  *Id.* at 14 (citing *United States v. Winstead*, 890 F.3d 1082, 1092 (D.C. Cir. 2018)).  But *Winstead* involved a very different situation, in which the guideline's text included a specific list of crimes defined as "controlled substance offenses" and the commentary

13

added an additional *attempt* crime that was "not included in the guideline." *Winstead*, 890 F.3d at

403.  The D.C. Circuit held that "[b]y purporting to add attempted offenses to the clear textual

definition," rather than "interpret[ing] or explain[ing] the ones already there," the commentary

conflicted with the guideline and was not authoritative under *Stinson*. *Id.* at 404.  Here, by contrast,

the commentary does not attempt to add to a finite list of offenses, but rather "explain[s]" that the

term "administration of justice" bears a broad meaning that includes non-judicial proceedings.

Nor was Judge McFadden correct that—even if it is binding—§ 2J1.2's commentary

supports only "a narrower interpretation of the 'administration of justice.'" *Seefried*, Doc. 123 at

15.  Although the other definitions in the commentary undoubtedly relate to "investigations,

verdicts, and judicial determinations," that fact does not support a definition that excludes

congressional proceedings.  The commentary's use of the word "includes" indicates that the

definition is not an exhaustive list.  *See* Antonin Scalia & Bryan A Garner, *Reading Law: The

Interpretation of Legal Texts* 132 (2012).  And the inclusion of the "premature or improper

termination of a felony investigation" indicates that the definition applies to executive-branch

investigations that are not yet before a grand jury or court.

Reading the commentary's use of the word "governmental . . . resources" to include

congressional resources would not, as Judge McFadden concluded, "render[ ] the phrase 'or court'

superfluous." *Seefried*, Doc. 123 at 17.  Although a "broad definition" of "governmental" could

"include court resources," *id.*, using both terms in an attempt to sweep in all three branches of

government is hardly an obvious superfluity.  The Sentencing Commission could have added the

word "court" to clarify that the term "governmental" did not exclude courts.  And the purported

superfluity could be avoided by reading "governmental . . . resources" to refer to the resources of

both the executive and legislative branches (as opposed to the judicial).  The superfluity canon

14

provides no basis to limit the term to "*prosecutorial* resources." *Id.* Moreover, Judge McFadden's interpretation of the commentary runs into its own superfluity problem. If, as he concluded, the term "administration of justice" in § 2J1.2 refers only to "a judicial or related proceeding," *id.* at 1, then the word "governmental" is itself superfluous. This reading should be rejected.

Judge McFadden's concern that a broader reading of "administration of justice" would allow the government to "trigger the enhancements at will" is also misplaced. *Seefried*, Doc. 123 at 16. The enhancements in § 2J1.2 do not apply whenever the offense "caused unnecessary expenditures of its resources" in some attenuated way, such as by causing the government to later bring a prosecution. *Id.* ("While the events of January 6 caused the Government to commit significant resources—evidenced in part by the number of cases charged in this district—this argument proves too much."). Instead, the enhancement is best read as applying where the obstructive conduct itself—not the later prosecution of that conduct—caused the unnecessary expenditure of substantial governmental or court resources. *See United States v. Harrington*, 82 F.3d 83, 87 n.2 (5th Cir. 1996) (observing that the case resulted in the expenditure of "substantial resources . . . over and above the routine costs of prosecuting the obstruction offense"). If the enhancement could truly be triggered simply by "charg[ing]" a case, *Seefried*, Doc. 123 at 16, then even under Judge McFadden's reading the enhancement would apply every time the government brought a felony prosecution, which results in the expenditure of substantial "court" and "prosecutorial" resources, *id.* at 16-17. Judge McFadden's conclusion that "governmental" should be read to exclude Congress simply does not follow from his concerns about excessive application of the enhancements.

Judge McFadden was also incorrect in perceiving a conflict between the government's interpretation of "administration of justice" in § 2J1.2 and the same term in 18 U.S.C. § 1503,

which contains a catchall provision prohibiting obstruction of "the due administration of justice." *See Seefried*, Doc. 123 at 5-6 (observing that the government had not charged any January 6 defendants under § 1503), 20-21 (saying it would be "incongruous" to conclude that "official proceeding" means something different in the Sentencing Guidelines than in the statutory context). The Supreme Court has made clear that a term can have a different meaning in the Sentencing Guidelines than it does in a statute. *DePierre v. United States*, 564 U.S. 70, 87 (2011). And there are at least three differences between § 1503 and § 2J1.2 that counsel in favor of reading them differently. First, unlike § 1503, § 2J1.2 includes its own definition of the "administration of justice," which covers the expenditure of "governmental *or* court" resources. Second, § 1503 appears in the context of a statute that applies to jurors, court officers, and judges, which may favor a narrower reading of the catchall provision for interference with the "due administration of justice." And, third, § 2J1.2's entire purpose is to distinguish between levels of culpability for those who violate a wide variety of obstruction statutes, many of which are not limited to judicial or quasi-judicial proceedings.

Judge McFadden's reading of § 2J1.2 also creates difficult line drawing problems. Under his reasoning, the enhancements in subsection (b)(1)(B) and (b)(2) apply only to offenses where the obstructed proceedings were "judicial" or "quasi-judicial" in nature. *Seefried*, Doc. 123 at 4. But those terms themselves raise difficult questions about how closely the obstructive conduct must "relate[]" to a judicial proceeding or what proceedings can be said to "determine[] rights or obligations." *Id.* at 1. For example, 18 U.S.C. § 1505 applies to obstruction of an investigation by the House Ethics Committee, which has the power to discipline current members of Congress. That inquiry would seem to be "quasi-judicial" and one that "determines rights or obligations," *id.* at 1, 4, yet it does not involve the "possibility of punishment by the state," *id.* at 4. The

government's broader reading of "administration of justice," by contrast, would apply to all the obstruction offenses covered by § 2J1.2. Under the government's reading, therefore, a sentencing court need not answer difficult questions about whether a proceeding is sufficiently "judicial" or "quasi-judicial" to trigger subsections (b)(1)(B) and (b)(2).

Moreover, even under a narrower reading of administration of justice, the certification fits within the definition because it has quasi-judicial features. The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.* Congress's certification of the Electoral College vote, moreover, must terminate with a decision: Congress may not recess until "the count of electoral votes" is "completed," and the "result declared." 3 U.S.C. § 16. Indeed, for these reasons, several judges on this Court have concluded that Congress's certification of the Electoral College is a "quasi-adjudicative or quasi-judicial" proceeding. *United States v. Nordean*, 579 F. Supp. 3d 28, 43 (D.D.C. 2021); *see United States v. Robertson*, 588 F. Supp. 3d 114, 121-22 (D.D.C. 2022) (holding that "the certification of the Electoral College vote is quasi-adjudicatory"); *United States v. Caldwell*, 581 F. Supp. 3d 1, 14-15 (D.D.C. 2021) (holding that the certification was "an 'adjudicatory' proceeding").

In sum, Congress's certification of the Electoral College vote constitutes the "administration of justice" for purposes of these two guidelines provisions.

## II. Thompson Is Not Entitled to a Two-Level Reduction for Acceptance of Responsibility.

Thompson next argues that he is entitled to Section 3E1.1's two-level reduction for acceptance of responsibility. Thompson is incorrect. By declining to take responsibility, disputing

17

material facts at trial, testifying in service of a factual defense the jury refuted, and perjuring himself in the process, Thompson forfeited any claim to acceptance credit.

Thompson first contends that his may be one of the "rare" situations in which a "defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct" even though he went to trial. Dkt. 145 at 10. That is not so. The types of defendants who might—in "rare" circumstances—receive acceptance credit after trial are those who go to trial not to dispute the facts of his guilt, but for some other reasons, such as preserving a constitutional or statutory argument after a stipulated facts trial. U.S.S.G. § 3E1.1 app. n.2. By contrast, the guidelines commentary is clear, the acceptance adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." *Id.* That describes Thompson to a tee. But Thompson did more than even the ordinary defendant who is precluded from obtaining acceptance credit. He took the stand in service of his factual *mens rea* defense, testified falsely, and denied that his conduct was criminal (because he believed he was merely acting on presidential orders). Undersigned counsel is unaware of a case in which a defendant received acceptance of responsibility credit after denying that his conduct was criminal during trial and lying on the stand about things material to his factual defense.[2]

Thompson appears to claim that he was misled into going to trial. But in his own letter to this Court, Thompson admits he went to trial because he was "scared to go to jail," Dkt. 145 at 11 (repeating that claim), and the government's plea offer would have required jail time. Thompson also claims his attorney "admitted that he was not aware that his defense strategy had already been

---

[2] The materiality of Thompson's false statements is reviewed briefly in Section III, *infra*.

tested at trial and failed." Dkt. 145 at 11. But that is not true; his defense strategy had not been "tested at trial," and had not by that point "failed" in front of any jury. Thompson's trial was the first, undersigned counsel believes, in which a January 6th rioter had asked the jury to acquit him on the ground that he believed his conduct that day was lawful and authorized. It was an untested defense that disputed a key factual question (Thompson's intent).

Finally, Thompson now claims that his attorney negotiated stipulations that "admitted the elements of all the charged and completely undermined his theory of defense." Dkt. 144-145. As an initial matter, Thompson personally signed those factual stipulations, admitting they were true. But in any event, the stipulations did *not* cover the one crucial remaining issue in the case. Thompson's defense at trial was that he thought his conduct was authorized or commanded by former President Trump and other officials on the morning of January 6, 2021. The government was therefore required to prove 1) that Thompson's intent was "corrupt" with respect to the 18 U.S.C. § 1512(c)(2) felony count—defined as "an understanding or awareness that what [the defendant] is doing is wrong or unlawful," Dkt. 83 at 27; 2) that he intended to take the coat rack "without right" under 18 U.S.C. § 641, *id.* at 29; 3) that he knew he was "without lawful authority" to enter or remain in restricted grounds under 18 U.S.C. § 1752(a)(1), *id.* at 30; 4) and that his conduct was "willful" (i.e., "he knew his conduct was unlawful and he intended to do something the law forbids") for both 40 U.S.C. § 5104(e)(2) offenses, *id.* at 36, 37, 39. By design, Thompson intentionally never stipulated that he understood his conduct was unlawful or wrong, leaving all five of those elements unproven. That is why, as this Court knows from having sat through it, there was a weeklong trial in which that factual issue of Thompson's *mens rea* was put to a jury and decided adversely to Thompson.

Thompson is therefore simply wrong to claim now that he "admitted that he intended to

obstruct the Certification through his disorderly and disruptive conduct which satisfies the element that he acted corruptly or understood that his actions were unlawful." Dkt. 145 at 13. Stipulating that his actions were unlawful did not prove that he *knew* his actions were unlawful, leaving open his defense that he did not. Thompson makes the same error with respect to Counts Three, Five, and Six. He stipulated that he entered a restricted area, did so without authorization, and engaged in disorderly conduct. Dkt. 145 at 14. But he never stipulated, and then disputed at trial, whether he *knew* he lacked lawful authority to enter the restricted area, or whether he *knew* his conduct was unlawful (i.e., whether he acted willfully for Counts Five and Six).

Thus, Thompson refused to stipulate to the key fact that Thompson disputed at trial. Moreover, the government gives Thompson only marginal credit for entering into any stipulations at all. Virtually all of the stipulations were to facts that were easily proven or that were actually caught on CCTV footage; his trial still required two days of witness testimony because of the issue he left for the jury to decide. And Thompson entered into those stipulations for an obvious strategic reason. In his opening statement, Thompson's trial counsel portrayed Thompson as not the government's adversary but its ally, stating that he had "work[ed] closely with government attorneys" to "synthesize these issues, to stipulate, to agree upon facts that are not in dispute." Trial Tr. 260. This was a strategic choice, given the overwhelming factual evidence of his conduct, to have the jury view him more favorably as someone who now agreed with the government but who was the victim of former President Trump's false claims.

Thompson's various complaints amount to little more than the accusations and regrets that many defendants express after losing on disputed factual issues at trial. As he notes, he could have pled guilty. He could have stipulated to all of the facts, including his intent, if he only wanted to preserve his legal argument that former President Trump was a necessary witness at trial. He

could have submitted a *pro se* letter to the Court prior to trial expressing acceptance of responsibility for his conduct.  Or he could have accepted responsibility when he got on the stand, rather than taking an oath and then testifying falsely.  Having taken the stand in service of his failed defense—a defense that rested on his testimony about what his own state of mind was—Thompson cannot now pretend that joint strategic choice, or his lies under oath, were his counsel's fault.

In any event, as noted above, the guidelines' clear commentary establish that Thompson is not entitled to acceptance credit.

## III.   The Court Should Apply the Two-Level Enhancement for Obstruction of Justice.

With respect to the Section 3C1.1's two-level enhancement for obstruction of justice, Thompson contends only that his testimony—while false—was not "material."  Dkt. 145 at 15.[3]

Thompson's argument rests on the same misunderstanding of the scope of his pretrial stipulations.  Thus, Thompson wrongly claims his testimony about witnessing Rudolph Giuliani's speech—which he now concedes was false, Dkt. 145 at 15—was immaterial because his stipulations "contradicted [his] defense and instead satisfied the elements of Count One" all by themselves.  Dkt. 145 at 16.  As explained above, that is not remotely true. Those stipulations left open the key issue at trial, which was whether Thompson knew his conduct was illegal or wrong.

---

[3] Thompson also contends vaguely that Section 3C1.1 does not apply when Section 2J1.2 does. Dkt. 145 at 15.  Not so.  Application note 7 of Section 3C1.1 states that its enhancement does not automatically apply when the underlying offense is obstruction of justice (that is, on top of the offense's base offense level).  But the note is clear that the enhancement *does* apply if there is a second act of obstruction that occurs "during the investigation, prosecution, or sentencing of the obstruction offense itself."  U.S.S.G. § 3C1.1 app n.7.  Here, Thompson's underlying offense was obstructing the congressional certification, while the two-level 3C1.1 enhancement is applied based on his separate act of perjury, which occurred "during the . . . prosecution" of his underlying obstruction offense.  *Id.*  Thus, the two-level enhancement applies.

Were Thompson correct, there would have been no trial at all.  Thompson is again simply engaging in revisionist history.  Aside from his incorrect claim that it was immaterial because he had stipulated to the elements of Count One, Thompson does not otherwise dispute that his false testimony about Giuliani was material to the question of his *mens rea*.  And it obviously was, for the reasons the government explained in its sentencing memorandum.  Dkt. 119 at 29-30.

Thompson's other statements were also material.  His testimony about the coat rack was that he stole it to protect officers—that is, that he did not think it was "wrong" or unlawful to do so.  Had the jury believed him, it might have concluded he did not have the requisite *mens rea* under Count One.  Therefore, it was material.  Contra Thompson's claim, the government did not assert his testimony about the coat rack was material "because the only unresolved issue in the case was whether it was unlawful to steal the coat rack."  Dkt. 145 at 16.  Thompson purports to quote the government's sentencing memorandum there, but it is a misquotation.  The government actually wrote the following, with italicized portions omitted from Thompson's quotation: that the "testimony was material because the only unresolved issue in the case was whether *Thompson knew that his conduct, including his theft of the coat rack, was unlawful or wrong*."  Dkt. 119 at 30.  Here, Thompson again conflates whether the theft was in fact unlawful (which was conceded), with the issue whether he *knew* the theft was unlawful or wrong at the time, which was the key issue at trial, and to which Thompson's testimony about the coat rack related directly.

Finally, as to the North Doors testimony, again Thompson argues only that he had already stipulated that he knowingly engaged in disorderly conduct and remaining on restricted grounds.  But Thompson had not stipulated that he knew his conduct was unlawful or wrong.  That he wanted to go back inside the building an hour after leaving it with the coat rack undercut any claim that he still, at that time, could somehow believe that what was going on was legal.  (Indeed, that

22

Thompson lied about it is itself some indication that he recognized it undercut his defense.) Because his intent to return inside the building was relevant to that key question, his false testimony in denying that intent was material.

*     *     *

The Court should apply the eight-level and three-level enhancements from Section 2J1.2 that were applied in the PSR.  It should also apply the two-level enhancement for obstruction of justice under Section 3C1.1.  And it should deny Thompson's request to apply the two-level adjustment for acceptance of responsibility under Section 3E1.1.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

*/s/ William Dreher*
WILLIAM DREHER
D.C. Bar No. 1033828
Assistant United States Attorney (Detailed)
700 Stewart Street, Suite 5220
Seattle, WA 98101
(206) 553-4579
william.dreher@usdoj.gov